# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

GEORGE SKATZES,

                                    :

          Petitioner,                              Case No. 3:09-cv-00289

                                    :

     -vs-                                          Magistrate Judge Michael R. Merz

WARDEN, Ross Correctional
   Institution,
                                    :

          Respondent.

---

# DECISION AND ORDER

---

This is a habeas corpus case under 28 U.S.C. § 2254 in which Petitioner George Skatzes pleads seventeen grounds for relief challenging his convictions for three counts of aggravated murder and two death sentences (Petition, ECF No. 25). Respondent has filed an Answer (ECF No. 31), Skatzes has filed his Traverse (Doc No. 42), and Respondent has filed a Sur-Reply (ECF No. 50). Also before the Court is Skatzes' Motion to Expand the Record (ECF No. 169), the Respondent's Opposition (ECF No. 170), and Skatzes' Reply (ECF No. 171).

The parties have unanimously consented to plenary Magistrate Judge jurisdiction under 28 U.S.C. § 636(c) and the case has been referred on that basis (ECF No. 165).

## I.    Litigation History

In the fall of 1995, Skatzes was tried and convicted of the aggravated murders of his fellow inmates, Earl Elder and David Sommers, and correctional officer Robert Vallandingham in the

Montgomery County Court of Common Pleas[1]. (ECF No. 66-2 at PageID 2880-2883). For the aggravated murder of Vallandingham, Skatzes was sentenced to life imprisonment, but for the aggravated murders of Sommers and Elder, Skatzes was sentenced to death. (*Id.*). According to the Ohio Supreme Court, the facts adduced during state court proceedings are as follows:

> {¶ 1} On the afternoon of April 11, 1993, inmates at the Southern Ohio Correctional Facility ("SOCF") at Lucasville rioted and took control of L Section, one of three main prison cell blocks. On or about April 12, inmates killed inmate Earl Elder. On April 15, inmates killed Robert Vallandingham, one of eight corrections officers taken hostage during the riot. On April 21, while inmates were surrendering and releasing the remaining hostages, inmates killed inmate David Sommers. Defendant-appellant, George Skatzes, was found guilty as one of the inmates responsible for the murders of Elder, Vallandingham, and Sommers and was sentenced to death.

> {¶ 2} Sometime before April 11, 1993, the Ohio Department of Health mandated that all prison inmates in Ohio's prison system be tested for tuberculosis. The test required an injection. The Muslim inmates at SOCF, led by Carlos "Hasan" Sanders, a leader of the Muslims at SOCF, objected to that form of testing on religious grounds. Word filtered down to the Muslims that a lockdown of SOCF was going to take place on Monday, the day after Easter Sunday, April 12, 1993, to facilitate the tuberculosis testing.

> {¶ 3} On the evening before the riot, April 10, high-ranking members of the Aryan Brotherhood, including Jason Robb, Dewey Bocook, and Freddie Snyder, and the Muslims, including Sanders and James Were, met in the L block gym. Upon seeing this gathering, inmate Robert Brookover knew "there was something going on." Robb told fellow Aryan Brotherhood member Roger Snodgrass, "[B]e on [your] toes tomorrow."

> {¶ 4} On the afternoon of April 11, inmates took control of the entire L section of the prison, including cell blocks 1 through 8. Prison authorities attempted to end the takeover by negotiating over the phone with representatives of the three dominant gangs. The gangs included the Muslims, led by Sanders, who controlled L6; the Aryans, led by Jason Robb and Skatzes, who controlled L2; and the Black Gangster Disciples, led by Anthony Lavelle, who controlled L1. Inmates controlled access to and from any area of L block.

> {¶ 5} Several corrections officers ("C.O.s"), including Robert Vallandingham, who was working in L1 that day, were taken hostage. As the riot unfolded in its early stages, Vallandingham had locked himself in the corrections officers' L1 restroom. Inmates were able to batter open the restroom door and take him

---

[1] Although the offenses were committed in Scioto County, Ohio, trial venue was transferred to Montgomery County.

hostage. Other inmates saw Sanders and Were escort Vallandingham to L6. Other guards taken hostage were eventually held in L6 as well, except for C.O.s Darrold Clark and Jeff Ratcliff, who were confined for most of the riot in L2.

{¶ 6} During the initial stages of the riot, inmates stormed to the back stairwell of L2 where C.O. Ratcliff and inmate Earl Elder had locked themselves. Using a weight bar, inmates punched holes in the wall next to the L2 stairwell door. Ratcliff came out of the stairwell and was beaten. Inmates then brought Elder out of the stairwell and began beating him with baseball bats and stabbing him with shanks. Robb was heard telling Elder, "You want to be police, we will show you what it is to be police." Elder was then locked in a cell in L6.

{¶ 7} Later that night, Lucky Roper, a Muslim inmate, met with Skatzes in the gym. Skatzes then went to Snodgrass and told him, "We got to go to L6." At L6, Skatzes told Snodgrass: "I want you to take this guy out." Then Skatzes, Roper, and Snodgrass went to the cell where Elder was being held, and Skatzes told Snodgrass, "Go ahead and take care of your business, son." Snodgrass went into the cell and stabbed Elder numerous times. When Snodgrass came out of the cell, Skatzes put his arm around him and said, "You did a good job, brother, I am proud of you." Elder's body was placed in the recreation yard at 10:15 the next morning. He died from multiple stab wounds in his chest and head, as well as skull fractures.

{¶ 8} On April 12, prison authorities turned off the electricity and water in L block. Skatzes shouted from a window with a bullhorn, demanding that the authorities turn the power back on. He also had C.O.-hostage Ratcliff identify himself using the bullhorn and demand that power be restored inside L block.

{¶ 9} Within two or three days of the takeover, FBI technicians had placed microphones in the tunnels underneath L block to record inmate conversations. By the end of the riot, 591 "tunnel tapes" had been recorded.

{¶ 10} The inmate leaders negotiated over the phone with prison authorities. Inmate David Sommers controlled the phones and tape-recorded the inmate leaders during their negotiations with prison authorities. During the first half of the riot, Skatzes was one of the lead inmate negotiators. He told the prison negotiators to stop tear-gassing K block, which they were doing to quell a disturbance, or they were "going to cost an officer's life." As he continued to argue with authorities over the phone, Skatzes declared, "[Y]ou just cost an officer's life." At that time, however, the inmates had not killed a guard.

{¶ 11} At another time during the siege, Skatzes and Robb ordered a crew of inmates to make a hole in a back wall of L7. They planned to kill a C.O. and dangle his body out of the back of L7, where it could be seen from the front of the SOCF by members of the media. In addition, Skatzes instructed inmates guarding the C.O. hostages to kill them if authorities came into L block.

{¶ 12} On April 14, the inmate leaders met in L2 to discuss a solution to the stalemate on their demands. In addition to the gang leaders, including Skatzes, other inmates within the three gangs also attended the meeting. According to Lavelle, a vote was taken to kill a guard if their demands were not met. "No one spoke against doing it, so it was agreed it would happen."

{¶ 13} Later that evening on April 14, inmate Miles Hogan overheard a conversation between Skatzes, Sanders, and inmate Stanley Cummings. They talked about the fact that someone who was supposed to kill a C.O. had backed out. Skatzes blurted out: "Fuck the CO, I will kill the CO or fuckin' COs."

{¶ 14} Another inmate-leader meeting took place on the morning of April 15. At that time, Skatzes got on the phone and demanded that prison authorities restore water and power within L block or "there would be a guaranteed murder." He added, "Do your thing. 10:30 or a dead man's out there." He said that if the water and power were not turned back on by 10:30, "the hardliners were going to step in and take over." At the inmate meeting of leaders, a vote was taken to kill a C.O., and a member from each inmate gang was chosen to participate in the killing. According to witnesses at the meeting, Skatzes agreed with the decision to kill a C.O.

{¶ 15} The deadline set by Skatzes passed without the water or power being restored. Officer Vallandingham was killed in L6 by Muslim inmates. Several masked inmates carried Vallandingham's body out of L6 and down the L corridor to the gym. Skatzes walked behind those who carried the body. At 11:10 a.m., Vallandingham's body was placed in the recreation yard. The coroner later concluded that Vallandingham had died by ligature strangulation.

{¶ 16} Negotiations resumed that afternoon, and the inmate leaders agreed to release a C.O. in exchange for allowing Skatzes to make a live radio broadcast to air the concerns and demands of the inmates. The broadcast took place that evening at 7:30 p.m. in the recreation yard. After the broadcast, C.O. Darrold Clark was released. Although he had a transcript, Skatzes's performance was described as "rambling." Many inmates were not pleased, and Sanders told Robb that he wanted him to make all future decisions on behalf of the Aryans. Skatzes's role as an inmate negotiator diminished thereafter.

{¶ 17} The following day, April 16, prison officials agreed to allow inmate Cummings to broadcast inmate grievances on television, in exchange for the release of another C.O. At 1:35 p.m., C.O. Tony Demons was released while Cummings delivered his live television address.

{¶ 18} The takeover continued because Sanders and Robb reportedly wanted to break the record for the longest prison takeover in the United States. Finally, on April 20 and 21, Sanders, Robb, and Lavelle met with attorney Niki Schwartz

to discuss ending the takeover. They reached an agreement, and the inmates began to surrender on April 21.

{¶ 19} Meanwhile, during a meeting in L2 between Robb, Lavelle, and Sanders, the gang leaders decided that inmate David Sommers, who controlled the phones and ran the inmates' tape player throughout the negotiations "had to die, he knew too much." Sommers had a reputation as a snitch before the riot. Robert Brookover also had a reputation as a snitch, but he was given a choice: kill someone or be killed. Brookover asked Skatzes if he was going to be killed. Skatzes replied, "[J]ust take care of business, be cool."

{¶ 20} The surrender was held up for a period of time because, as Skatzes, Robb, Sanders, and Cummings told Lavelle, they had "some things [they had] to take care of." An inmate called "Kinky" gave Brookover baker's clothes (kitchen whites, which Brookover put on), a shank, and an extension cord. Skatzes, Snodgrass, and Bocook also changed into different clothes. When Robb arrived, the group went to L7 across the corridor from L2. Bocook instructed Brookover to retrieve baseball bats out of a guitar case in the back of L7. When they arrived in L7, no one was there. Bocook screamed, "Where's that bitch Sommers at." Robb left to get Sommers from L2 and, moments later, Sommers was seen chasing Robb into L7. Brookover tackled Sommers and stabbed him. Skatzes ran up and kicked Sommers in the head. Brookover followed orders to choke Sommers with the extension cord, and then Skatzes struck Sommers in the head with a baseball bat at least three times. Brookover and the others beat and stabbed Sommers until he was dead. Then the killers cleaned themselves, burned their clothes, and surrendered to authorities.

{¶ 21} Prison authorities found Sommers's body in L7. The coroner attributed death to a massive blow to the head leading to skull fracture, laceration of the skull, and other severe brain injuries and bleeding.

{¶ 22} The Scioto County Grand Jury indicted Skatzes on six counts of aggravated murder, two counts each for the murders of Vallandingham, Elder, and Sommers. Each murder count carried four death specifications: murder in a detention facility [R.C. 2929.04(A)(4)], a prior aggravated murder conviction [R.C. 2929.04(A)(5)], murder as a course of conduct [R.C. 2929.04(A)(5)], and murder during a kidnapping [R.C. 2929.04(A)(7)]. Skatzes was also indicted on three counts of kidnapping [R.C. 2905.01].

{¶ 23} The trial court changed venue to Montgomery County, and the case was tried before a jury. After the state presented its case, the defense called five witnesses, including former hostage C.O. Ratcliff. Skatzes testified in his own behalf. The defense claimed that Skatzes had been a peacemaker during the prison takeover and had opposed killing a C.O. Skatzes denied involvement in the Elder and Sommers murders. The jury found Skatzes guilty on all counts and specifications. After a mitigation hearing, the jury recommended death for

the murders of Elder and Sommers and a life sentence for the murder of Vallandingham. The trial judge sentenced Skatzes accordingly.

*State v. Skatzes*, 104 Ohio St. 3d 195, 195–99 (2004).

Skatzes appealed his conviction and sentence to the Second District Court of Appeals. (Appellant's Merit Brief, ECF No. 67-2 at PageID 3970—ECF No. 67-3 at PageID 4216). On January 31, 2003, the Second District Court of Appeals affirmed Skatzes' convictions and sentences. (ECF No. 67-6 at PageID 5027-5163). Skatzes subsequently appealed to the Ohio Supreme Court, pleading sixty propositions of law. (Appellant's Merit Brief, ECF No. 67-7 at PageID 5307-5655). That court affirmed Skatzes' convictions and sentences. *Skatzes*, 104 Ohio St. 3d 195 (2004).

The Second District Court of Appeals denied Skatzes' motion to reopen his appeal on September 30, 2003**.** (Application for Reopening, ECF No. 54-7 at PageID 2662-2675, 2676; Second District Order, ECF No. 68-3, PageID 7399-7407). The Ohio Supreme Court *sua sponte* dismissed Skatzes' appeal of that order as untimely filed (ECF No. 68-5 at PageID 7645) and denied Skatzes' motion for reconsideration. (*Id.* at PageID 7680-7693, 7684).

At the same time his direct appeal proceedings were pending, Skatzes litigated his petition for postconviction relief in the Montgomery County Court of Common Pleas, where he pled twenty-nine claims for relief. (Postconviction Petition, ECF No. 68-7 at PageID 8029—ECF No. 68-8 at PageID 8110). On July 13, 2007, the Montgomery County Court of Common Pleas denied Skatzes' postconviction petition, finding some claims were barred by *res judicata* and the remainder lacked merit. (ECF No. 68-10 at PageID 8620-8669).

On January 18, 2007, Skatzes filed a motion for leave to file a motion for a new trial (Motion for Leave, ECF No. 70-8 at PageID 11023-11024; Memorandum in Support, *Id*. at PageID

11038-11059). The Montgomery County Court of Common Pleas granted leave, but ultimately denied the motion on the merits. (*Id*. at PageID 11025; ECF No. 78-9 at PageID 11271-11274).

Skatzes appealed the denial of his postconviction petition to the Second District Court of Appeals with twelve assignments of error. (Appellant's Merit Brief, ECF No. 70-1 at PageID 9938-9991). Skatzes also appealed the denial of his motion for a new trial to the Second District Court of Appeals. (Appellant's Merit Brief, ECF No. 70-10 at PageID 11367-11389). In a consolidated opinion, the Second District Court of Appeals affirmed (Court of Appeals' Opinion, ECF No. 70-7 at PageID 10909-10940), and the Ohio Supreme Court subsequently declined jurisdiction. (Supreme Court of Ohio Entry, ECF No. 70-11 at PageID 11740).

On April 5, 2010, Skatzes filed his petition for a writ of habeas corpus in this Court. (ECF No. 25). Skatzes pleads the following Grounds for Relief:

**First Ground for Relief**

Trial counsel rendered ineffective assistance in the culpability phase when they failed to investigate and present expert and lay witnesses that were material to George Skatzes's defense against the capital murder charges and specifications pertaining to corrections officer Robert Vallangdingham. U.S. Const. amend. 6, 14.

**Second Ground for Relief**

George Skatzes' conviction for the aggravated murder of Robert Vallandingham rests on insufficient evidence in violation of the due process clause of U.S. Const. amend. 14.

**Third Ground for Relief**

Trial counsel rendered ineffective assistance in the culpability phase when they failed to investigate and present exculpatory, impeaching, and rebuttal witnesses to defend against the capital murder charges and specifications pertaining to inmate David Sommers. U.S. Const. amend. 6, 14.

**Fourth Ground for Relief**

The state pursued materially inconsistent theories when it prosecuted George Skatzes for the aggravated murder of David Sommers. The state's inconsistent theories of prosecution violate Skatzes' right to due process and his right against cruel and unusual punishment. U.S. Const. amend. 8, 14.

**Fifth Ground for Relief**

The state's evidence is insufficient to prove that George Skatzes killed David Sommers with prior calculation and design. U.S. Const. amend. 14.

**Sixth Ground for Relief**

George Skatzes is actually innocent of the aggravated murder of David Sommers, in violation of the cruel and unusual punishment clause. His conviction for that capital crime is unreliable and inaccurate in violation of the due process clause. U.S. Const. amend. 8, 14.

**Seventh Ground for Relief**

Trial counsel rendered ineffective assistance in the culpability phase when they failed to investigate and present exculpatory, impeaching, and rebuttal witnesses to defend against the capital murder charges and specifications pertaining to inmate Earl Elder. U.S. Const. amend. 6, 14.

**Eighth Ground for Relief**

The state violated George Skatzes's right to due process when it suppressed evidence that was material to his defense to the aggravated murder charges and specifications for Earl Elder's death. U.S. Const. amend. XIV.

**Ninth Ground for Relief**

George Skatzes's conviction for the aggravated murder of Earl Elder rests on insufficient evidence in violation of the due process clause. U.S. Const. amend. 14.

**Tenth Ground for Relief**

George Skatzes is actually innocent of the aggravated murder of Earl Elder, in violation of the cruel and unusual punishment clause. His conviction for that capital crime is unreliable and inaccurate in violation of the due process clause. U.S. Const. amend. 8, 14.

**Eleventh Ground for Relief**

Trial counsel rendered ineffective assistance in the mitigation phase when they failed to prepare for mitigation, investigate for mitigation, and present background, character, traumatic brain injuries, and evidence that he operated under duress under the takeover of SOCF. U.S. Const. amend. 6, 14.

**Twelfth Ground for Relief**

The trial court violated George Skatzes's due process right to a fair trial when it improperly instructed the jury on crucial point of law for conspiracy and an element of capital specification. The instructional error on the capital specification also

infringed on Skatzes's right to a reliable capital sentencing hearing. U.S. Const. amend. 8, 14.

**Thirteenth Ground for Relief**

George Skatzes's due process right to a fair trial was violated by the admission of unreliable and prejudicial testimony from state's witness Roger Snodgrass. U.S. Const. amend. 14.

**Fourteenth Ground for Relief**

George Skatzes's constitutional right to a fair trial and capital sentencing hearing was infringed because the prosecutor offered, and the trial court admitted, prejudicial testimony about two uncharged murders and an irrelevant threat to commit murder. U.S. Const. amend. 8, 14.

**Fifteenth Ground for Relief**

Trial counsel rendered ineffective assistance in the culpability phase when they failed to object to improper jury instructions on crucial points of law and when counsel failed to object to the prosecutor's use of prejudicial "other acts" evidence. U.S. Const. amend. 6, 14.

**Sixteenth Ground for Relief**

Appellate counsel rendered ineffective assistance when counsel omitted meritorious issues from George Skatzes's first appeal as of right to the Ohio Court of Appeals. U.S. Const. amend. 14.

**Seventeenth Ground for Relief**

George Skatzes's death sentence violates the cruel and unusual punishment clause and due process clause because he suffers from serious mental illness. U.S. Const. amend. 8, 14.

## II.    LEGAL STANDARDS

### A.  Procedural Default

"Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or that failing to review the claim would result in a fundamental miscarriage of justice." *Williams v. Anderson*, 460 F.3d 789, 805–06 (6th Cir. 2006), (citing *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006)). "A claim may become procedurally defaulted in two ways." *Williams*, 460 F.3d at 806. "First, a

9

claim is procedurally defaulted where state-court remedies have been exhausted within the meaning of § 2254, but where the last reasoned state-court judgment declines to reach the merits because of a petitioner's failure to comply with a state procedural rule." *Id.* "Second, a claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule." *Id.*; *Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013).

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to first present those claims to the state courts for consideration. 28 U.S.C. § 2254(b), (c); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review. *Williams*, 460 F.3d at 806 (citing *Engle v. Isaac*, 456 U.S. 107, 125 n. 28 (1982)); *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991), *holding modified by Martinez v. Ryan*, 566 U.S. 1 (2012).

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court. To fairly present a claim to a state court a petitioner must assert both the legal and factual basis for his or her claim. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue—not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984). A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional

analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law." *Williams*, 460 F.3d at 806.

Under the independent and adequate state ground doctrine, a federal habeas claim is procedurally defaulted when: (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default. *Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (en banc) (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)). The second prong of this test requires that the state courts "actually enforce[ ]" the state procedural rule in denying relief. *Stone v. Moore*, 644 F.3d 342, 346 (6th Cir. 2011) (quoting *Maupin*, 785 F.2d at 138).

In other words, "it is not sufficient that the state court *could* have applied a procedural default under state law; it must actually have done so." *Skipper v. French*, 130 F.3d 603, 609 (4th Cir. 1997) (citing *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985)). To establish cause, a petitioner must show that "some objective factor external to the defense" impeded the petitioner's efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The petitioner bears the burden of showing cause and prejudice. *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001) (citing *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999)).

Procedural default may also be excused if a petitioner can show by clear and convincing evidence that he is "actually innocent," such that "a court cannot have confidence in the outcome of the trial[,]" *Lott v. Coyle*, 261 F.3d 594, 602 (6th Cir. 2001) (quoting *Schlup v. Delo*, 513 U.S. 298, 316 (1995)), *McQuiggin v. Perkins*, 569 U.S. 383 (2013), and thus, his conviction constituted a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 515.

Finally, as a procedural default is not an adjudication on the merits, if a petitioner can successfully set aside such a default, then this Court must review the claim de novo. *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

### B. Relief on Merits Under 28 U.S.C. § 2254

In analyzing Skatzes' petition for a writ of habeas corpus, the Court is bound by the standard of review established in the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA"). The Court may grant the writ on a claim adjudicated on the merits in a state court proceeding only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(1); 28 U.S.C. § 2254(d)(1)(2); *Harrington*, 562 U.S. at 100; *Bell v. Cone*, 535 U.S. 685, 693–94 (2002); *Williams (Terry) v. Taylor*, 529 U.S. 362, 379 (2000).

To determine whether the state courts decided an issue on the merits, the district court looks to the opinion of "the last state court to issue a reasoned opinion on the issue." *Hoffner v. Bradshaw*, 622 F.3d 487, 505 (6th Cir. 2010) (quoting *Payne v. Bell*, 418 F.3d 644, 660 (6th Cir. 2005)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 364–65. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the [petitioner's] case." *Id.* at 407.

12

In other words, to obtain relief on his petition, Skatzes must identify the "clearly established" legal principle on which he relies. To qualify as "clearly established," a principle must originate from an actual Supreme Court holding, not from dicta. *See White v. Woodall*, 572 U.S. 415, 419 (2014). Skatzes also must describe this holding with specificity. *Brown v. Davenport*, 596 U.S. 118, 136 (2022). He cannot recite a holding at a "high level of generality." *Lopez v. Smith*, 574 U.S. 1, 6–8 (2014) (per curiam) (citation omitted); *Metrish v. Lancaster*, 569 U.S. 351, 367–68 (2013). Circuit precedent cannot turn "a general principle of Supreme Court jurisprudence into a specific legal rule" that has not been stated by the Supreme Court. *Lopez*, 574 U.S. at 7 (quoting *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013)).

If relying on the "unreasonable application" clause, Skatzes next must show that the state court engaged in an "unreasonable application" of clearly established law. Under this test, a federal court's belief that a state court committed an error when applying a legal principle to the facts of a case does not suffice. Rather, the federal district court must be able to describe the state court's application as "objectively unreasonable[.]" *White*, 572 U.S. at 419, (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)). To warrant that description, a state court must have committed "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Skatzes faces an additional hurdle if he alleges a trial court error subject to harmless error review. Under these circumstances, a federal court cannot grant habeas relief without applying both the test outlined in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and the deferential review required by AEDPA. *Brown*, 596 U.S. 118. *Brecht* requires a state prisoner seeking to challenge his conviction in collateral federal proceedings to show that the error had a "substantial and injurious effect or influence" on the outcome of his trial. 507 U.S. at 637 (quoting *Kotteakos v.*

13

*United States*, 328 U.S. 750, 776 (1946)). A "substantial or injurious effect or influence" means "actual prejudice." *See id.* at 637–38. A "federal court must *deny* relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to *grant* relief, a court must find that the petition has cleared both tests." *Brown*, 596 U.S. at 134. To succeed on any of his trial error claims, Skatzes must convince this Court that there is grave doubt about his verdict *and* demonstrate that every fairminded jurist would agree that the error was prejudicial. *Id.* at 136.

As elaborated on below, these standards foreclose Skatzes' claims.

## III.    MOTION TO EXPAND THE RECORD (ECF No. 169)

In 2016, Skatzes filed a Motion to Expand the Record with a list of documents that were not part of the state court record. (ECF No. 146, PageID 24147). On June 1, 2017, the Court issued an Order granting in part and denying in part that motion. (ECF No. 152). Specifically, the Court concluded that it would be appropriate to consider the documents in connection with Skatzes' actual innocence gateway argument, but for no other purpose. (*Id.*). Skatzes filed a timely objection to ECF No. 152 (ECF No. 154), but no order was issued on his objection until August 9, 2024, when this matter was reassigned to a new District Judge.

The new District Judge overruled Skatzes' objection to ECF No. 152 "without prejudice to any argument therein which may be renewed in any further briefing of those Motions to be ordered by the Magistrate Judge and consideration of those Motions is recommitted to the Magistrate Judge." (ECF No. 159). Over concern for intervening case law, the Magistrate Judge subsequently withdrew ECF No. 152 and permitted Skatzes to "file a new motion or motions seeking parallel relief not later than September 30, 2024." (ECF No. 160).

Skatzes complied and re-filed a Motion to Expand the Record, (ECF No. 164), seeking consideration of documents that were not part of the state court record. (*Id.,* PageID 24404-

24405). The Court denied Skatzes' motion without prejudice and directed Skates to refile his motion with a more detailed explanation of which document pertained to which claim and more specific record citations. (ECF No. 168). Skatzes re-filed the motion, which is currently before the Court. (ECF No. 169). His motion complied with the Court's request with the inclusion of a detailed index. *See Id.* at PageID 24465. The index lists the documents with which Skatzes seeks to expand the record and whether Skatzes is seeking to use the document for a claim on the merits or the actual innocence gateway ("Proffered Documents").

Skatzes argues that he should be permitted to expand the record with the Proffered Documents notwithstanding the decision in *Cullen v. Pinholster*, 563 U.S. 170 (2011), *Shinn v. Ramirez*, 596 U.S. 366 (2022), and *Shoop v. Twyford*, 596 U.S. 811 (2022)*.* (ECF No. 169). Namely, Skatzes argues that *Pinholster* is inapplicable to claims that were not adjudicated by the state courts on the merits, to claims that were adjudicated unreasonably, or when the state courts misapplied a procedural rule. (*id.* at PageID 24480-24486). In opposition, Respondent argues that the record should not be expanded because *Pinholster*, *Shinn*, and *Shoop* definitively foreclose the Court's ability to consider anything outside the state court record. (ECF No. 170).

### *Cullen v. Pinholster*

The Supreme Court held in *Cullen v. Pinholster*, 563 U.S. 170 (2011), that habeas review by a federal court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id*. at 180. The limitations in *Pinholster* apply to expansion of the record as well as to evidentiary hearings. *Moore v. Mitchell*, 708 F.3d 760, 780–784 (6th Cir. 2013).

There are circumstances under which consideration of new evidence does not contravene *Pinholster*—such as if the Court determines from the existing record that the state court's decision was unreasonable under § 2254(d). *See Harris v. Haeberlin*, 752 F.3d 1054, 1058 (6th Cir. 2014).

Skatzes argues that this exception applies to the merits of his "*Strickland* claims." (ECF No. 169 at PageID 24485). As discussed in detail throughout this opinion, none of the state court adjudications of Skatzes' ineffective assistance of counsel claims were unreasonable and Skatzes cannot take advantage of this exception to *Pinholster*.

*Pinholster* is also inapplicable when a claim was procedurally barred in state court but is otherwise properly before the Court for federal habeas review. *See Davis v. Bobby*, 2017 WL 2544083, at *5 (S.D. Ohio June 13, 2017). Skatzes argues that this exception applies to part of Ground Seven. (ECF No. 169 at PageID 24484-24485). The exception does not apply to the relevant part of Ground Seven because, as discussed herein, the relevant part of Ground Seven is procedurally defaulted and not properly before the Court.

*Pinholster* does not prohibit expansion of the record when the state court did not adjudicate the claim on the merits. *Ballinger v. Prelesnik*, 709 F.3d 558, 562 (6th Cir. 2013). Skatzes invokes this exception for Ground Seven. (ECF No. 169 at PageID 24486). Skatzes asserts that the state courts failed to adjudicate portions of the claim pertaining to testimony by Marsh and Law *(Id.)*. Discussed below in connection with Ground Seven, the Court has concluded that Skatzes is not entitled to *de novo* review, and therefore this exception to *Pinholster* does not apply.

Lastly, Skatzes argues that the Court is permitted to consider the Proffered Documents for purposes of his gateway actual innocence argument. (ECF No. 169 at PageID 24479-24480). Respondent counters that this exception is no longer available in the wake of *Shinn v. Ramirez* and *Shoop v. Twyford.* (ECF No. 170 at PageID 24640-24641).

**Shinn v. Ramirez**

On May 23, 2022, the Supreme Court decided *Shinn v. Ramirez,* which answered the question of "whether the equitable rule announced in *Martinez* [v. *Ryan*, 566 U.S.1 (2012)] permits

16

a federal court to dispense with [28 U.S.C.] § 2254(e)(2)'s narrow limits [on evidentiary hearings] because a prisoner's state postconviction counsel negligently failed to develop the state-court record." The Supreme Court concluded that it does not. *Shinn*, 596 U.S. 366.

Citing *Coleman*, 501 U.S. 722, the Court acknowledged that the federal courts may hear a federal habeas petitioner's procedurally defaulted claim if he is able to show "cause and prejudice." Referring to *Martinez*, the Court also noted that "cause" can be established for an ineffective assistance of trial counsel claim if a habeas petitioner's postconviction counsel was ineffective, but only if the state requires the claim to be brought for the first time during postconviction proceedings. *Id.* at 380. The Supreme Court recognized that habeas petitioners asserting procedurally defaulted "*Martinez*" claims often seek to expand the state court record by introducing new evidence in federal court. *Id.* at 371.

The Supreme Court set forth the requirements that must be met for expansion of the state court record per 28 U.S.C. § 2254(e)(2):

> Section 2254(e)(2) provides that, if a prisoner "has failed to develop the factual basis of a claim in State court proceedings," a federal court may hold "an evidentiary hearing on the claim" in only two limited scenarios. Either the claim must rely on (1) a "new" and "previously unavailable" "rule of constitutional law" made retroactively applicable by this Court, or (2) "a factual predicate that could not have been previously discovered through the exercise of due diligence." §§ 2254(e)(2)(A)(i), (ii). If a prisoner can satisfy either of these exceptions, he also must show that further factfinding would demonstrate, "by clear and convincing evidence," that "no reasonable factfinder" would have convicted him of the crime charged. § 2254(e)(2)(B).

*Id.* at 381. The Court then explained that the opening clause of Section 2254(e)(2) is triggered by "fault" of the petitioner, which also includes any negligence or ineffective assistance by the petitioner's postconviction counsel. *Id.* "[U]nder AEDPA and our precedents, state postconviction counsel's ineffective assistance in developing the state-court record is attributed to the prisoner…a

prisoner ordinarily must 'bea[r] responsibility' for all attorney errors during those proceedings…" *Id.* at 382–383.

In reaching this conclusion, the Supreme Court relied upon its decision in *Coleman v. Thompson* which reasoned that "the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error." *Id.* at 380 (citing *Coleman*, 501 U.S. at 753). The Court summarized its holding: "under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel." *Id.* at 382.

### Shoop v. Twyford

*Shoop* involved a challenge to a district court order to transport a habeas petitioner to the hospital for neurological testing. *Shoop*, 596 U.S. at 814. The petitioner claimed his trial counsel was ineffective for failing to present evidence of a head injury he sustained as a teenager, and he hoped the neurological testing would develop evidence related to his claims for relief. *Id.* at 814-815. One challenge on appeal stemmed from the failure of the district court to address whether it would be able to consider the evidence that the petitioner hoped to develop. *Id.* at 816. Notably, the petitioner only "asserted in passing that the desired evidence could 'plausibly' bear on the question whether to excuse procedural default[,]" but "did not identify the particular defaulted claims he hope[d] to resurrect, nor did he explain how the testing would matter to his ability to do so." *Id.* at 823. The Supreme Court held that the district court erred in granting petitioner's motion to transport without first considering whether the newly developed evidence "would aid its adjudication of his habeas petition." *Id.* at 822.

Neither *Shinn* nor *Shoop* addressed the specific question posed by Skatzes' Motion to Expand the Record: Can the Court consider documents outside the state court record when a

18

habeas petitioner asserts the actual innocence gateway? Respondent argues that the holdings in *Shinn* and *Shoop* extend to gateway actual innocence, but this Court and others have concluded that they do not.

After the Supreme Court decisions in *Shinn* and *Shoop*, the respondent in *Barbour v. Hamm* asked the Middle District of Alabama to reconsider a discovery order. *Barbour v. Hamm*, No. 2:01-CV-612-ECM, 2022 WL 3570327, at *1 (M.D. Ala. Aug. 18, 2022). The court determined neither *Shinn* nor *Shoop* called for rescission of the discovery order because those cases did not address actual innocence. *Id.* at 2–3. The court determined that 28 U.S.C. § 2254(e)(2) also did not prohibit the discovery order:

> [T]he Court is not limited to the state court record in determining whether Barbour has demonstrated actual innocence under *Schlup*, and § 2254(e)(2) imposes no bar to discovery on the *Schlup* question. *Schlup* makes clear that a successful actual innocence claim requires new reliable evidence *that was not presented at trial.* 513 U.S. at 324. *House* reiterated that "the habeas court must consider 'all the evidence,' old and new." 547 U.S. at 537 (citation omitted). Section 2254(e)(2) does impose certain conditions on the federal habeas court's ability to hold an evidentiary hearing on a "claim" if the petitioner "has failed to develop the factual basis of [the] claim in State court proceedings." 28 U.S.C. § 2254(e)(2). But Barbour's assertion of actual innocence under *Schlup* and its progeny is not a "claim" for purposes of § 2254; rather, it is "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera*, 506 U.S. at 404; *see also Schlup*, 513 U.S. at 314–16. It therefore falls outside of § 2254(e)(2)'s ambit. *See House*, 547 U.S. at 539 (explaining that § 2254(e)(2) does not address "the type of petition at issue here—a first federal habeas petition seeking consideration of defaulted claims based on a showing of actual innocence" and so its "standard of review ... is inapplicable"); *see also Sibley v. Culliver*, 377 F.3d 1196, 1207 n.9 (11th Cir. 2004) (explaining that an actual innocence allegation is not a "claim" as referred to in § 2254(e)(2) and thus the provision does not "govern[] the availability of evidentiary hearings when petitioners seek to introduce evidence concerning actual innocence"); *Fontenot v. Crow*, 4 F.4th 982, 1029–30 (10th Cir. 2021).

19

*Id.* at 3.

The Southern District of Mississippi employed a similar rationale in the capital habeas case, *Underwood v. Cain*, No. 3:06-CV-273-DPJ, 2024 WL 4311505 (S.D. Miss. Sept. 26, 2024). Relying on the Fifth Circuit opinion in *Mullis v. Lumpkin*, 70 F.4th 906, 910 (5th Cir. 2023), the court allowed the petitioner to conduct discovery to establish the actual innocence gateway:

> By its text, § 2254(e)(2) precludes new evidence "on the claim" … But "[h]istorically, [the Fifth Circuit] has construed 'claim' in the narrower sense ... declin[ing] to apply AEDPA's evidentiary bar to showings that a procedural default is excused." *Mullis*, 70 F.4th at 910… "*Shinn* did not reach—and indeed expressly reserved— resolution of" whether a petitioner could use "evidence outside the state record in the *Martinez* context to establish cause and prejudice." *Mullis*, 70 F.4th at 910… *Shinn* and *Shoop* were tied to the specific facts presented and it was clear that the evidentiary development was nothing more than a "Hail Mary pass" to get new evidence admitted on the merits claim. *Id.* at 911.

*Underwood,* at *4-5.

Other courts considering expansion of the record for procedural rather than substantive claims have reached the same conclusion. *See Garcia Del Castillo v. Shinn*, No. CV211394PHXSPLJFM, 2022 WL 4073014, at *5 (D. Ariz. June 15, 2022), *report and recommendation adopted*, No. CV 21-01394-PHX-SPL, 2022 WL 4017404 (D. Ariz. Sept. 2, 2022), *report and recommendation adopted,* No. CV 21-01394-PHX-SPL, *Garcia Del Castillo v. Shinn*, No. CV 21-01394-PHX-SPL, 2022 WL 4017404 (D. Ariz. Sept. 2, 2022) ("this Court is not precluded by § 2254(e)(2) from considering newly presented evidence in support of a claim of *procedural* actual innocence"); *Nicholls v. Long*, No. 20-1159, 2022 WL 211617, at *5 (10th Cir. Jan. 25, 2022) ("Because, in substance, a *Schlup* claim is not a habeas claim that seeks merits relief ... the hurdles and restrictions imposed by 28 U.S.C. § 2254(e)(2) are not applicable to a petitioner's request for an evidentiary hearing regarding a *Schlup* claim"); *Sapp v. Jenkins*, No.

2:17-CV-1069, 2023 WL 1793533, at *4–*5 (S.D. Ohio Feb. 7, 2023), *appeal denied*, No. 2:17-CV-1069, 2023 WL 3475412 (S.D. Ohio May 16, 2023) (finding plain language of § 2254(e)(2) shows it restricts only factual development of substantive claims for habeas relief).

Accordingly, the Court **GRANTS** in part and **DENIES** in part Skatzes' Motion to Expand the Record (ECF No. 169). The Court has considered the Proffered Documents identified in the index at ECF No. 169 at PageID 24465-24475 when evaluating Skatzes' actual innocence gateway argument and for no other purpose. Because the Court finds that no other exception to the statutory and jurisprudential restrictions on the Court's authority to consider documents outside the state court record applies, Skatzes' motion is denied in all other respects.

## IV.  GATEWAY ACTUAL INNOCENCE ARGUMENT

Skatzes asks the Court to excuse his procedural default of all or part of Grounds One. Eleven, Twelve, Thirteen, Fourteen, and Sixteen (Traverse, ECF No. 42 at PageID 665, 783, 834, 854-855, 880-881). These claims pertain to ineffective assistance of trial counsel for failure to call certain inmate witnesses and a prison culture expert; error in the jury instructions; the admission of Roger Snodgrass' testimony, and the admission of uncharged murders; and ineffective assistance of appellate counsel. (*Id.*). Skatzes asserts the actual innocence gateway in his Traverse (ECF No. 42), Memorandum on Gateway Innocence Argument (ECF No. 96), and Motion to Expand the Record (ECF No. 164). Respondent disputes Skatzes' entitlement to the actual innocence gateway in the Sur-Reply to Petitioner's Traverse (ECF No. 50 at PageID 983-994), Response to Petitioner's Memorandum on Gateway Innocence Argument (ECF No. 104), and Opposition to Motion to Expand the Record (ECF No. 166).

A habeas petitioner can overcome a procedural default by showing either "cause for the default and actual prejudice as a result of the alleged violation of federal law, or ... that failure to

consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750;

*McQuiggin v. Perkins*, 569 U.S. 383, 393, 397 (2013) (noting the "miscarriage of justice"

exception survived the passage of the AEDPA "intact and unrestricted" when raised in the context

of "a first petition for federal habeas relief"). The Sixth Circuit has described the actual innocence

"gateway" through procedural default as follows:

> [I]f a habeas petitioner "presents evidence of innocence so strong
> that a court cannot have confidence in the outcome of the trial unless
> the court is also satisfied that the trial was free of nonharmless
> constitutional error, the petitioner should be allowed to pass through
> the gateway and argue the merits of his underlying claims." *Schlup
> v. Delo*, 513 U.S. 298, 316 (1995). "Thus, the threshold inquiry is
> whether "new facts raise[ ] sufficient doubt about [the petitioner's]
> guilt to undermine confidence in the result of the trial." *Id.* at 317.
> To establish actual innocence, "a petitioner must show that it is more
> likely than not that no reasonable juror would have found petitioner
> guilty beyond a reasonable doubt." *Id.* at 327. The Court has noted
> that "actual innocence means factual innocence, not mere
> legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623, 140
> L.Ed. 2d 828, 118 S. Ct. 1604 (1998). "To be credible, such a claim
> requires petitioner to support his allegations of constitutional error
> with new reliable evidence—whether it be exculpatory scientific
> evidence, trustworthy eyewitness accounts, or critical physical
> evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324.
> The Court counseled however, that the actual innocence exception
> should "remain rare" and "only be applied in the 'extraordinary
> case.'" *Id.* at 321.

*Souter v. Jones*, 395 F.3d 577, 590 (6th Cir. 2005).

The Court has reviewed Skatzes' actual innocence evidence with the following standard in

mind: we must consider "all the evidence, old and new, incriminating and exculpatory," without

regard to whether it would necessarily be admitted under rules of evidence. *House*, 547 U.S. at

538 (quoting *Schlup*, 513 U.S. at 331–32) (internal quotation marks omitted). Based on this total

record, the court must make "a probabilistic determination about what reasonable, properly

instructed jurors would do." *Id.* (quoting *Schlup*, 513 U.S. at 329). "The court's function is not to

make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.* This standard is demanding and permits review only in the "extraordinary case." *Id.* (quoting *Schlup*, 513 U.S. at 327). The petitioner's burden at the gateway stage is to demonstrate that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *Id.*

The Supreme Court held in *Sawyer v. Whitley*, 505 U.S. 333 (1992), that habeas courts may reach the merits of defaulted, successive, or abusive habeas claims when a capital petitioner is "innocent of death." *Id.* at 335–336, 341. To show actual innocence, a petitioner must prove "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Id.* at 336. [T]o the extent a capital petitioner claims he did not kill the victim, the *Schlup* "more likely than not" standard applies. "To the extent a capital petitioner contests the special circumstances rendering him eligible for the death penalty, the *Sawyer* 'clear and convincing' standard applies, irrespective of whether the special circumstances are elements of the offense of capital murder or mere sentencing enhancers." *Calderon v. Thompson*, 523 U.S. 538, 560 (1998).

This exacting standard sets an extremely high hurdle for Skatzes.

The Ohio Supreme Court found that the following trial evidence was sufficient to sustain Skatzes' conviction for the aggravated murder of Robert Vallandingham:

> ¶ 140} With regard to the kidnapping and aggravated murder of Vallandingham, the state's evidence showed that on April 14, inmate gang leaders, including Skatzes, voted to kill a guard. That evening, Skatzes complained to Muslim gang leaders that whoever was supposed to kill a guard had backed out of it. Then Skatzes blurted out, "Fuck the CO, I will kill the CO."
>
> {¶ 141} On the morning of April 15 at another inmate-leader meeting, Skatzes got on the phone with prison negotiators and demanded that water and power be restored within L block or "there would be a guaranteed murder. Do your thing. 10:30 or a dead man's out there." The leadership voted to kill a guard, and a member

23

of each inmate gang was chosen to participate in the killing. Skatzes agreed with the decision to kill a C.O. hostage.

{¶ 142} After Vallandingham was killed, Skatzes and other Aryans followed behind when the body was being carried out by masked inmates. Viewing this evidence in a light most favorable to the state, sufficient evidence supported Skatzes's conviction for the murder of Vallandingham.

*Skatzes*, 104 Ohio St. 3d at 223. Skatzes' argues that each of these findings is refuted by newly discovered evidence, attached to his Motion to Expand the Record (Proffered Documents).

Skatzes makes his case for actual innocence based largely on witness statements to the Ohio State Highway Patrol (OSHP) and testimony from the trials of Carlos Sanders[2] and Jason Robb. Skatzes argues that this "new evidence" establishes: (1) no vote to kill a guard occurred at the April 14, 1993 or April 15, 1993 meetings, (2) he did not make the statement "Fuck the CO, I will kill the CO" and, in fact, opposed killing a guard, (3) his statement to negotiators about a "guaranteed murder" was not a threat but an attempt to prevent the killing, and (4) the "hardliners" engaged in rogue action without his knowledge when they killed Robert Vallandingham.

**(1) April 14th and April 15th Meetings**

Skatzes argues that Anthony Lavelle testified at Skatzes' trial that the April 14th meeting culminated only in a decision to communicate an ultimatum to the state, but Lavelle's testimony at Carlos Sanders' trial was more explicit when he said no one was killed as a result of the meeting. (Traverse, ECF No. 42 at PageID 642).

Anthony Lavelle testified at Skatzes' trial that the three gangs—the Muslims, Black Gangster Disciples, and Aryan Brotherhood, controlled the riot. (ECF No. 74-1 at PageID 17827-17828). According to Lavelle, each gang had representation, and they voted by "majority rules." (*Id.*). George Skatzes was one of the members of the Aryan Brotherhood who had "say-so." (*Id.* at

---

[2] Now known as Siddique Abdullah Hasan.

pid 17828). Lavelle testified that Skatzes was present for the April 14th meeting, where the riot leaders discussed how they were "being stonewalled by…the state negotiator." (*Id.* at pid 17841). Lavelle testified, "[e]ventually, the discussion ended up getting around the killing of a guard, that we would kill a hostage if our demands wasn't met, and we took a vote. No one spoke against doing it, so it was agreed that it would happen." (*Id.* at pid 17842). Skatzes argues that Lavelle's testimony at Jason Robb's trial demonstrates Skatzes' actual innocence:

> Q. No one was killed as a result of the meeting on the 14th?
> A. That's correct.

 (ECF No. 145-3 at PageID 23496-97).

Skatzes argues that the Court should disregard the other inculpatory trial evidence about the April 14th meeting, David Lomache's testimony. (Traverse, ECF No. 42 at PageID 643; Memorandum on Gateway Actual Innocence Argument, ECF No. 96 at PageID 20510-20511). Skatzes contends that the new evidence shows Lomache should not be believed because he gave inconsistent details about the date and time of the meeting across his various accounts, he failed to acknowledge an affiliation with the Aryan Brotherhood, and his testimony was not corroborated by other inmates. (Traverse, ECF No. 42 at 642-644; Memorandum on Gateway Actual Innocence Argument, ECF No. 96 at PageID 20508-20511).

David Lomache testified at Skatzes' trial that he was at a meeting where he heard conversations among the riot leaders, including Skatzes, about the killing of a guard. (ECF No. 73-18 at PageID 16471-16472). According to Lomache, the participants of the meeting agreed that a hostage would be selected by lottery and the Black Gangster Disciples would carry out the murder. (*Id.* at PageID 16473). Lomache provides a timeframe of the meeting as after the Tess Unwin statement to the media. (*Id.* at PageID 16475). On cross-examination, Lomache repeated that the meeting occurred after the Unwin statement (ECF No. 73-20 at PageID 16803). Lomache

was confronted with his previous testimony that the meeting happened on April 15, 1993, but denied it. (*Id.*).

Skatzes provides Lomache's statement to OSHP, testimony in the Jason Robb trial, and testimony at the Carlos Sanders trial as evidence that he gave inconsistent accounts about when the meeting occurred. In his statement to the OSHP, Lomache said that the meeting occurred on the same day that Vallandingham was killed. (ECF No. 96-16 at PageID 21096). Lomache testified in the Robb trial that his "chronology of that is a little off" and he believed that the meeting occurred after the Tess Unwin statement. (ECF No. 145-3 at PageID 23471). On cross-examination, Lomache was confronted with his different statements about when the meeting occurred and repeated his testimony that the meeting occurred after the Tess Unwin statement. (*Id.* at PageID 23474-23475, 23477). At the Carlos Sanders trial, Lomache testified that the meeting occurred after the Unwin statement, but before the Vallandingham murder. (*Id.* at PageID 23488-23489).

Next, Skatzes argues that his new evidence proves that no vote or decision to kill a guard occurred at the April 15, 1993, meeting. (Traverse, ECF No. 42 at PageID 645-646). Skatzes contends that Lavelle offered clearer testimony at the Jason Robb and Carlos Sanders' trials that after the ultimatum was delivered to the negotiators, another meeting was supposed to be held to make a final decision on killing a guard. (Traverse, ECF No. 42 at PageID 646). Affidavits from two other inmates repeat this point. (*Id.*).

At trial, Skatzes did not dispute his presence at the April 15, 1993, meeting. (ECF No. 74-10 at PageID 19406). He did dispute that he agreed to kill a guard. (*Id.* at PageID 19410-19411). Anthony Lavelle gave a different account. He testified that the meeting on the 15th picked up where they left off on the 14th. (ECF No. 74-1 at PageID 17847). They decided to "demand if the lights

and water aren't turned on in a certain time period, an officer would be killed. Everyone agreed to it." (*Id.* at PageID 17848). Lavelle testified that a plan was made where a man from each group would commit the murder and Skatzes would deliver the ultimatum over the phone. (*Id.* at PageID 17848-17849). Skatzes claims that Lavelle's testimony in Were's first trial and Carlos Sanders' trial helps make his case for actual innocence. Skatzes only provided one page of the transcript, so it is unclear whether Lavelle is referring to the April 14th or 15th meeting during Sanders' trial. Lavelle testified in Sanders' trial:

> I had told them, you know, that we should decide on what we're going to do but we need to come back after the deadline and make sure that this is what we want to do. So, I said, you know, after we give them a deadline, if they don't meet it we should come back together and decide, you know, whether we want to do this or not.

(ECF No. 145-3 at PageID 23495). At Were's first trial, Lavelle testified:

> When I left the meeting, the understanding was we was going to meet up later on that afternoon and give them our final ultimatum. I had told them, you know, just pick a time later on this afternoon, we can all come back and take the final vote. If they don't meet the demands by that time frame that we give them, then we will kill a guard.

(*Id.* at PageID 23502). But this testimony is not materially different from the testimony Lavelle gave at Skatzes' trial:

> Q. As you left that meeting that morning, what was your understanding of what was going to happen?
>
> A. It was that I told them, Let's pick a time we can meet and finalize, make sure this was what we want to do. Everybody said okay, we will meet up later on that afternoon to finalize it, so I went back to the cell block, L-l.

(ECF No. 74-1 at PageID 17850).

### (2) Hogan's Testimony that Skates said, "Fuck the CO, I will kill the CO" and Opposition to Killing a Guard

Skatzes also argues his new evidence refutes Miles Hogan's testimony that Skatzes said, "Fuck the CO, I will kill the CO" and it is not to be believed. (Traverse, ECF No. 42 at PageID 647). Skatzes points out that at the time Hogan claims he overheard this comment, Skatzes was on

27

a recorded telephone call with the state's negotiator. (*Id.*).  Skatzes also argues that during Hogan's interview with the OSHP, he attributed the statement, "Fuck the CO, I will kill the CO," to a Muslim inmate. (Memorandum on Gateway Actual Innocence Argument, ECF No. 96 at PageID 20512). Skatzes also offers new evidence in the form of statements from several inmates and two corrections' officers to support his position that he did not want to kill a guard. (Traverse, ECF No. 42 at PageID 650-651; ECF No. 96 at PageID 20491-20498).

Skatzes offers Miles Hogan's January 28, 1994, statement to the OSHP as new evidence of his actual innocence. (ECF No. 96-19 at PageID 21166). Hogan recounts overhearing a conversation between Lavelle, Sanders, and Skatzes, where Sanders said he would make sure someone killed a guard. (*Id.*). Hogan did not tell the OSHP that Skatzes said, "Fuck the CO, I will kill the CO." (*Id.*). But this evidence is not new because Hogan was cross-examined on his January 28, 1994, statement at trial. Hogan told the jury on direct examination that he overheard Skatzes make the comment. (ECF No. 73-20 at PageID 16893). Hogan said there was no doubt in his mind that Skatzes said it. (*Id.* at PageID 16893-16894). When Hogan was cross-examined on his January 1994 statement to OHSP, he said that he "may not have" told them that George Skatzes made the comment, but he remembers him saying it. (ECF No. 73-21 at PageID 16973-16975).

Skatzes provides the statements of James Mays, Joseph Hutchison, Eddie Harris, James Truxel, Dennis Sipos, Jeffrey Ratcliff, and Darrold Clark as new evidence that Skatzes opposed the killing of a guard.  Mays told the OSHP several times that Skatzes did not want to kill an officer and contradicted Jason Robb when he suggested cutting off one of their heads. (ECF No. 96-1 at PageID  20523, 20524, 20537, 20548; ECF No. 96-2 at PageID 20562, 20564). Hutchison said that Skatzes did not believe in killing a guard. (ECF No. 96-3 at PageID 20598). Harris said that he got the impression that Skatzes would rather not have to kill anyone at all. (ECF No. 96-4 at

PageID 20630). Truxel said that Skatzes told him that the Aryan Brotherhood did not want any officers to die, it was a "stupid" thing to do, and Skatzes thought it should not have been done. (ECF No. 96-5 at pid 20694). Sipos said that Skatzes told everyone to "treat [the guards] like you want to be treated." (ECF No. 96-6 at PageID 20717). Officer Ratcliff told the OSHP that after Vallandingham's murder Skatzes expressed, "this is crazy," "I can't control these people," and a fear that the others would kill him because he was helping the guards. (ECF NO. 96-7 at PageID 20734-20736). Officer Clark likewise told the OSHP, said that Skatzes told him that he did not want an officer killed and "almost had tears in his eyes." (ECF No. 96-8 at PageID 20752).

Skatzes elicited some evidence at his trial that he did not want an officer to be killed. Skatzes testified that he was "absolutely not" in favor of the death of an officer. (ECF No. 74-10 at PageID 19411). Officer Ratcliff testified on behalf of the defense and described Skatzes' reaction to finding out Vallandingham had been killed:

> He said: Man, I can't believe it. He just—I can't act the way he was acting down when it happened. He come in. He had his head down, he was rubbing his head. He said: I can't believe this, I can't believe it happened. I said: What? He says: I think they really did a guard. I says: Which one? He says: I don't know.

(ECF No. 74-9 at PageID 19183). Officer Ratcliff also testified that he and Skatzes got down on their knees and prayed after they found out about Vallandingham's death. (*Id.* at PageID 19184).

Roger Snodgrass testified on direct examination for the State about the April 15, 1993, meeting where killing a guard was discussed. (ECF No. 74-5 at PageID 18440-18444). Snodgrass testified that Skatzes spoke up and said:

> [L]ook brothers I'm with you; don't get me wrong now, I'm with you, but, you know, before we do this, we had better give this a lot of thought because once you kill a correctional officer, it is going to change the whole ball game. In other words, he was trying to, I think he was trying to dissuade them or make them think of an alternative or what, you know.

(*Id.* at PageID 18443).

**(3) Skates' Statement About "Guaranteed Murder"**

To dispute the Ohio Supreme Court's finding about his statement to state negotiators, "there would be a guaranteed murder. Do your thing. 10:30 or a dead man's out there," Skatzes offers an alternative interpretation of the evidence offered at trial. (Traverse, ECF No. 42 at PageID 651-652). Skatzes argues that the transcripts from the negotiation tapes show that his statements were not a threat, but an attempt to save the guard's life: "Skatzes spoke of a 'guaranteed murder' not out of any support for the hardliners threat to kill a guard; rather, he sought to emphasize to the authorities the seriousness of the hardliners' threat and plead with the authorities to take steps to avoid it." (Traverse, ECF No. 42 at PageID 652).

Skatzes was recorded communicating the co-conspirators' ultimatum to the state's negotiator: "there would be a guaranteed murder. Do your thing. 10:30 or a dead man's out there." (Negotiation Tape #6, ECF No. 71-9 at PageID 13102). Skatzes testified on cross-examination about his state of mind when he made that statement:

> Q:   Were you involved in threatening to kill guards?
>
> A:   I would have to say to a certain degree, yes, sir.
>
> Q:   When you guaranteed a murder were you lying to the state?
>
> A:   I knew that that was going to happen that morning.

(ECF No. 74-11 at PageID 19536).

**(4) Vallandingham's Death was Rogue Action Committed without Skatzes Knowledge**

Skatzes next argues that he is actually innocent because "[Robert] Vallandingham's murder was a rogue action orchestrated and supervised by [Anthony Lavelle]," (Traverse, ECF No. 42 at PageID 655), and "the hardliners took over and acted without Skatzes." (Memorandum on Gateway Actual Innocence Argument, ECF No. 96 at PageID 20504). Skatzes offers statements

30

and testimony from inmates, providing details of the hands-on murder of Vallandingham and accounts suggesting Lavelle was involved. (*Id.* at PageID 20502-20504).

Eric Girdy told the OSHP that he saw James Were instruct Sherman Sims and Darnell Alexander to kill Vallandingham. (ECF No. 96-11 at PageID 20966-20974). Sherman Sims told the OSHP that he saw Alvin Jones and Kenneth Law kill Vallandingham. (ECF No. 96-13 at PageID 21062-21066). Wayne Flannigan said he believed that he saw Lavelle instruct Aaron Jefferson to kill Vallandingham. (ECF No. 145-3 at PageID 23661-23663). According to Roy Donald, Lavelle had Officer Horsely kill Vallandingham. (*Id.* at PageID 23664-23667). Tony Taylor told the OSHP that he witnessed Were say, "get me a guard" and Anthony Lavelle escorted Vallandingham from his cell. (ECF No. 96-10 at PageID 20804-20806). According to Leroy Elmore, Lavelle confessed to him that he had a guard killed. (ECF No. 145-3 at PageID 23673-23676).

Willie Johnson testified at James Were's first trial that after Vallandingham's murder he saw Were slap Lavelle, heard Were tell Lavelle he would be held responsible for the decision he made, and heard Lavelle say, "the bitch didn't think we were serious." (ECF No. 145-3 at PageID 23504-05). Johnson testified at Jason Robb's trial that he heard Lavelle talking about the ultimatum and said, "the Muslims they playing peacekeepers and they think we ain't serious." (ECF No. 145-3 at PageID 23483). Later, Johnson saw Lavelle return to the cell block with a pipe in his hand "ranting and raving…now they see that we're serious." (*Id.* at PageID 23485). An unidentifiable witness[3] testified at James Were's second trial that Lavelle beat him for refusing to participate in the murder (i*d.* at PageID 23506-12) and another unidentifiable witness testified at the same trial that he witnessed Lavelle beating Brian Eskridge (*id.* at PageID 23514-16).

---

[3]        The portion of the transcripts provided by Skatzes do not identify the witness.

Further to the same, Skatzes argues that the inmate accounts of Anthony Lavelle, Roger Snodgrass, and Stacy Gordon's personal involvement in Vallandingham's murder undermine the reliability of their trial testimony. (Memorandum on Gateway Actual Innocence Argument, ECF No. 96 at PageID 20505-08, 20511-12). He offers Eddie Harris' statement to OSHP, claiming that Snodgrass was on the Vallandingham "execution squad" (ECF No. 96-4 at PageID 20635), Tony Taylor's statement to the OSHP that Gordon accompanied Lavelle when escorting Vallandingham from his cell (ECF No. 96-10 at PageID 20806-07), and a letter from Clarence Bogan to the Parole Board, which claims that Gordon admitted to killing Vallandingham. (ECF No. 96-18).

The new evidence offered by Skatzes fails to meet the standard to pass through the actual innocence gateway in that he cannot show "that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. Reasonable and properly instructed jurors would not have been swayed based on the new evidence offered by Skatzes to find him not guilty. Skatzes' jury was instructed:

> It is the prosecution's theory of this case that this defendant purposefully committed these offenses in conjunction with others. This is referred to as complicity.
>
> ***
>
> Before you can find the defendant guilty, you must find beyond a reasonable doubt…the defendant acting with the required culpable mental state for the particular offense, number one solicited or procured another to commit the offenses; number two, aided or abetted another in the committing of the offenses; and/or three conspired with another to commit the offense.
>
> ***
>
> In order to find that the defendant conspired, you must find beyond a reasonable doubt that on or about the dates charged, the defendant with purpose to commit aggravated murder or kidnapping, either, one, planned with another person or persons that one or more of them would engage in conduct which facilitated the commission of the offense, or two agreed with another person or persons that one or more of them would engage in conduct which facilitated the commission of such an offense.[4]

---

[2]    Skatzes challenges the conspiracy instruction in Ground Twelve, *infra*.

(ECF No. 74-13 at PageID 19852-19853).

Skatzes disputes the State's evidence about what occurred at the April 14th and April 15th meetings or the fact that he said, "Fuck the CO, I will kill the CO". But this does not change the fact that Skatzes delivered the message to the state negotiator:

> I stress to you, I…if I turn this on, you think you might electrocute somebody. Fuck that. If you don't turn it on, it's a guaranteed murder. Now I'm sorry. That's the way it is and, that's it…. Do your thing. 10:30 or a dead man's out there. (Skatzes hangs up).

(Negotiation Tape #6, ECF No. 71-9 at PageID 13102).

From Skatzes' words, the jury could conclude that Skatzes agreed with the other inmates to do just as he said.[5] And although Skatzes disputes that he agreed to kill a guard, the jury heard Tunnel Tape #61, a partial recording of the April 15th meeting where Skatzes was present. In that recording riot leaders discussed a lack of progress with the negotiations and killing a guard if their demands were not met.[6] (Tunnel Tape #61, ECF No. 72-1 at PageID 13582-13599)

In arguing for his actual innocence, Skatzes offers no "new evidence" that refutes the fact that he delivered the ultimatum to the negotiator. Indeed, Skatzes testified that his intent in delivering the "guaranteed murder" line to the negotiator was to express the seriousness of the situation:

Q:     What were you trying to do in that conversation?

---

[5]     In Ohio, for a person who is complicit in the commission of an offense to be prosecuted and punished as if he were a principal offender, the State must show the complicit defendant shared the criminal intent of the principal, and this intent may be inferred from the circumstances surrounding the crime and from the defendant's conduct before, during, and after the offense. *State v. Carter*, 2017-Ohio-7501, ¶ 98 (citing *State v. Johnson*, 93 Ohio St. 3d 240, 245 (2001)).

[6]     Cummings: Okay, we can but we can sit down and come back in, and we put the non-negotiable things up then we came back with the time element that we give them to do it. Hey Jason, ahh Hasan, why don't we put the non-negotiable things up, George go back in. Talking about the hardlines came up with non-negotiable things. Then we going to set down and go over the time element, if they don't do these things…if you don't give us these things, the non-negotiable things we going with the time element, then we going to kill them one. Then we open up negotiations again. I mean, is everyone in agreement on that? (Tunnel Tape #61, ECF No. 72-1 at PageID 13597).

A:    I was trying to get that man to understand that this is for real, no matter how they have to get water in there, whatever, like let's work on somethin'. They could have done something, you know, bring a water hose in there, anything. I tried to explain to this guy this shit is real…

Q:    …You said words about a guaranteed murder, correct?

A:    That's a fact. I sure said it.

Q:    At this point in time, George, had you voted for the death of a corrections officer?

A:    Absolutely not, absolutely no way.

Q:    Had you agreed with anyone that a corrections officer should die?

A:    No, sir.

(ECF No. 74-10 at PageID 19409-19410). Skatzes' spin of the same evidence the jury heard at his trial is insufficient to pass through the actual innocence gateway. *See Claritt v. Kemp*, 336 F. App'x 869, 871 (11th Cir. 2009) (noting Claritt's new interpretation of existing evidence was insufficient to show actual innocence to overcome a procedural default).

Skatzes' argument that he should pass through the actual innocence gateway because Vallandingham's murder was committed through the "rogue action" of Anthony Lavelle and others also fails. In Ohio, one conspirator is criminally liable for the acts of co-conspirators done in furtherance of the conspiracy and reasonably foreseeable as a necessary or natural consequence of the conspiracy. *State v. Brownlee*, 2018-Ohio-739, ¶12. Even if there was some misunderstanding about whether there was to be another meeting before the murder, it was reasonably foreseeable that one of the co-conspirators would have followed through with the ultimatum to kill a guard when the state failed to meet the deadline.

In sum, nothing Skatzes has offered undermines confidence in the verdict such that no reasonable juror would have found him guilty. Skatzes has failed to meet the strict standard to pass

34

through the actual innocence gateway and may not rely on actual innocence to excuse any procedurally defaulted claims.

## V.     ANALYSIS

### *Ground One*

In Ground One, Skatzes contends that his trial counsel were ineffective for failing to investigate and present expert and lay witnesses that were material to defend against the charges for the capital murder of Robert Vallandingham. (Petition, ECF No. 25 at PageID 256-263). Particularly, Skatzes argues that he was prejudiced because his counsel failed to call lay witnesses: Kenneth Law, Eddie Moss, and Aaron Jefferson (*id.* at PageID 260-262) and failed to call an expert on prison culture. (*Id.* at PageID 262-263).

Respondent argues that the part of Ground One concerning failure to call lay witnesses is procedurally defaulted because Skatzes failed to appeal the denial of his postconviction claim. (Return of Writ, ECF 31 at PageID 427-428). Skatzes concedes the procedural default (ECF No. 42 at PageID 665).[7] The Court turns first to the non-defaulted part of Ground One concerning the failure to retain a prison culture expert.

The Second District Court of Appeals dismissed Skatzes' appeal of his postconviction claim, which Skatzes asserted as Assignment of Error No. 8:

{¶ 72} Skatzes' eighth assignment of error states:

{¶ 73} "THE TRIAL COURT ERRED IN DENYING PETITIONER'S TWELFTH GROUND FOR RELIEF, THAT HE WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE TRIAL COUNSEL FAILED TO CALL A PRISON CULTURE EXPERT TO EXPLAIN HIS STATEMENT RELEVANT TO THE VALLANDINGHAM MURDER."

---

[7]     Skatzes asserts his actual innocence as an excuse (Traverse, ECF No. 42 at PageID 665), the merits of which are addressed and denied in connection with his procedural and substantive claims.

35

{¶ 74} Skatzes asserts that, had his attorney called a prison culture expert to testify at trial, he would have been acquitted of Vallandingham's murder. He claims that such an expert would have explained that the hesitation Skatzes allegedly expressed during the discussions of whether to kill a guard "were as far as an inmate could go in expressing dissent without fear of personal bodily injury or possibly even death." The state claims that this claim is barred by res judicata because it could have been raised on direct appeal, that the evidence would have been cumulative of other evidence that Skatzes was hesitant to kill the guard, and that such evidence would not have been admissible because an expert was not needed to interpret Skatzes' comments.

{¶ 75} The trial court concluded that Skatzes' claim was barred by res judicata because the record establishes that counsel's failure to call a prison culture expert could have been raised on direct appeal. Further, the court concluded that Skatzes had not shown that the failure to call a prison culture expert fell below an objectively reasonable level of representation.

{¶ 76} Because Skatzes' argument about the need for a prison culture expert relies, at least in part, on evidence outside the record, it may not have been properly raised on direct appeal, as the trial court suggested. However, we agree with the trial court's conclusion that Skatzes failed to show that it was objectively unreasonable not to call such an expert. We question whether the peer pressure that existed in the midst of the riot was really an issue about which expert testimony was needed or appropriate. Extensive evidence was presented to the jury about the dynamics within and among the various prison gangs during the riot, the amount of violence used to control and punish inmate behavior, and the stress of the negotiations with authorities. In our view, the jurors were capable of interpreting Skatzes' behavior under these circumstances without the benefit of expert testimony. Thus, trial counsel could have reasonably concluded that such an expert was unnecessary.

*State v. Skatzes*, 2008-Ohio-5387, ¶¶ 73-77.

Skatzes argues in his habeas petition that the Second District Court of Appeals' decision was unreasonable because it found that the jurors could have interpreted Skatzes' behavior without expert testimony, but the Ohio Supreme Court made a contrary statement when it permitted the admission of "other acts" testimony, "Given the prison-inmate culture and the gang loyalty demonstrated by gang members, much of this testimony would not be within the knowledge or experience of the average juror." (Traverse, ECF No. 42 at PageID 670-671).

36

Respondent argues that the Second District Court of Appeals' opinion was not unreasonable because the jury heard testimony from the "best possible source—the inmates involved," about the dynamics at SOCF. (Return of Writ, ECF No. 31 at PageID 435).

"In all criminal prosecutions," the Sixth Amendment affords "the accused...the right...to Assistance of Counsel for his defence [sic]." U.S. Const. amend. VI. "Only a right to 'effective assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011) (citation omitted). The Supreme Court set forth the legal principles governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective assistance, a defendant must show both deficient performance and prejudice. *Berghuis v. Thompkins*, 560 U.S. 370, 389 (2010). As to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland*, 466 U.S. at 689.

As to the second prong, the Supreme Court held: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to overcome confidence in the outcome." *Id.* at 694.

Where an exhausted claim of ineffective assistance of trial counsel is raised in a federal habeas petition, review under AEDPA is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S.

111, 123 (2009). That is, "*Strickland* requires deference to counsel and AEDPA requires deference to the state court." *Moody v. Parris*, No. 20-5299, 2022 WL 3788503, at *4 (6th Cir. Aug. 30, 2022). The question then is not whether trial counsel was ineffective, but "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101. The Supreme Court clarified the double deference that is due:

> This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* (internal citation omitted). A petitioner must show the state court's decision is so obviously wrong that its error lies "beyond any possibility for fairminded disagreement." *Id.* at 103. Congress "meant" this standard to be "difficult to meet." *Id.* at 102.

The Supreme Court recently reiterated how this standard is to be applied to counsel's decision on whether to retain an expert:

> As to counsel, we have often explained that strategic decisions— including whether to hire an expert—are entitled to a "strong presumption" of reasonableness. Defense lawyers have "limited" time and resources, and so must choose from among "'countless'" strategic options…[E]ven if there is reason to think that counsel's conduct "was far from exemplary," a court still may not grant relief if "[t]he record does not reveal" that counsel took an approach that no competent lawyer would have chosen.

*Dunn v. Reeves*, 594 U.S. 731, 739–40 (2021) (internal citations omitted). Skatzes' claim does not meet this standard.

Skatzes attached an affidavit to his postconviction petition from Clemens Bartollas, Ph.D., who identifies himself as an expert in correctional institutions and prison culture. (ECF No. 69-1 at PageID 8920-8928). Dr. Bartollas' affidavit discusses the reason for and scope of Skatzes' involvement in the Aryan Brotherhood, and opines the following about Skatzes' participation in the April 15, 1993, meeting:

> 32. As Skatzes sat there listening to the debate about killing an officer, it is reasonable to assume that he was affected by a couple of factors: George had read the book, The Hate Factory, an anonymous book written by an inmate at Santa Fe during their 1980 riot, and in this book the author aptly documents how risky it is for inmates to fail to participate or cooperate with other inmates during a riot.
>
> 33. Skatzes knew that he was in a vulnerable position during this "silent vote." He was aware that it would not take much for the other inmates to turn on him if he dissented too strongly. The fact is that this nearly happened following Skatzes' radio address that dissatisfied many inmates.
>
> 34. The "silent vote," as this meeting among inmates is sometimes called, was one in which George Skatzes did all he felt he could do to persuade the voting inmates not to kill the officer. It is difficult to make out the voices in this Tunnel Tape, but George clearly warns the inmates of the dire consequences to them if the officer should be killed. Roger Snodgrass, a witness for the state during the trial, said that he said something like, "look brothers, I'm with you; don't get me wrong now; I'm with you, but you know, before we do this, we had better give this a lot of thought because once you kill a correctional officer, it is going to change the whole ball game. In other words, he was trying to, I think he was trying to dissuade them or make them think the alternative." During our interview, Skatzes says that he also distinctly remember[s] telling inmates: "if you kill him, there will be war in here."
>
> 35. In other words, Skatzes disassociated to the maximum degree or point that he felt was possible. He felt, not an unreasonable feeling given other prison riots, that to do more would result in his being killed by the rioting inmates.

(*Id.* at PageID 8926-8927).

Skatzes cannot overcome the strong presumption that his counsel's decision not to hire a prison culture expert was reasonable. Dr. Bartollas' affidavit makes the point that the unique pressures of the prison environment informed Skatzes' decisions and actions with respect to the April 15, 1993, meeting where the killing of a guard was discussed. But this point was made at

39

trial through the lay testimony of Anthony Lavelle, Roger Snodgrass, and Skatzes himself. On cross-examination by Skatzes' counsel, Anthony Lavelle testified:

> Q:   So, if an inmate dissents, another inmate might think it looks like you are helping the administration, looks like you are working for the staff; that's a serious accusation?
>
> A.   Very serious.
>
> Q.   It can also have risk of other consequences that other inmates would take it out on you physically, correct?
>
> A.   Yes.
>
> Q.   To be accused or labeled as someone helping the administration can be a life-threatening position, would you agree?
>
> A.   It is a life-threatening position.

(ECF No. 74-3 at PageID 18078). Also, on cross-examination by Skatzes' counsel, Roger Snodgrass testified about the general feeling of fear among the inmates, "I don't believe there was anyone in that riot for that entire eleven days that did not fear for their life, white, black, or otherwise. Sometimes tensions got higher than others, but everyone in there feared for their life. If they didn't, they was a fool." (ECF No. 74-5 at PageID 18569).

During his direct exam, Skatzes explained how he felt threatened for trying to negotiate with the state:

> Dirk Prise offered me a live radio broadcast for one hostage. I called them fellars back down there and I put that forth to them…and Lucky Roper called me the police in there. He said: why you workin' so hard for them? He called me the police. I thought my ass was out there then, but it didn't matter. I'm trying to do something.

(ECF No. 74-10 at PageID 19413).

Skatzes' trial was a complex one that lasted more than two months and during which more than twenty witnesses testified. The Court cannot say that his counsel's performance was deficient

40

for forgoing an expert who could discuss unique prison environmental pressures when similar testimony could be elicited on direct or cross-examination from other witnesses, including Skatzes.

The Court does not find that the Second District Court of Appeals' dismissal of this claim was unreasonable. Skatzes argues that the language used by the Second District in this claim and the Ohio Supreme Court in a different claim is irreconcilable. But it is the standard for habeas relief on an ineffective assistance of counsel claims that controls here. And Skatzes cannot establish that there was anything said by Dr. Bartollas in his affidavit that was not said or could have been said by a lay witness at his trial. Thus, Skatzes has not established that Dr. Bartollas' testimony would have had any impact on the outcome of his trial.

The Second District's decision dismissing Skatzes' claim that his counsel was ineffective for failing to retain a prison culture expect was neither contrary to nor an unreasonable application of *Strickland*.

While procedurally defaulted, Skatzes' claim about his counsels' failure to call certain witnesses to challenge his culpability for Vallandingham's murder is also without merit. Skatzes defaulted this part of Ground One because, while he raised it in his postconviction petition, he failed to include it in his appeal to the Second District. When the Montgomery County Court of Common Pleas dismissed the claim, it concluded that there was no ineffective assistance of counsel because the proffered testimony was cumulative, contradictory, and immaterial. (ECF No. 68-10 at PageID 8641-8644).

In his habeas petition, Skatzes proffers the following evidence from Anthony Lavelle, Eddie Moss, and Aaron Jefferson:

Anthony Lavelle
"On the morning of April 15, 1993, ... [Law] heard ...Lavelle, Aaron Jefferson, and Tim Williams talking about killing a guard. Lavelle left L-1, along with two others whom [Law] recognized to be Gangster Disciples, despite their masks." Later, Law

41

saw the two masked men exit L-6 and Law then entered L-6. Lavelle was inside L-6 and Law saw Vallandingham's dead body in a shower cell. Law thought it was clear that "Lavelle and his associates had killed the guard." (Petition, ECF No. 25 at PageID 260-261).

Eddie Moss
He saw Lavelle "and two masked inmates come out of Block L-6 shortly after 10 a.m. on ... April 15, 1993." A couple hours later, Lavelle tried to recruit Moss to join the Gangster Disciples. As an enticement to that offer, Lavelle told Moss that his group "had taken care of business," despite the reluctance of the Aryans and Muslims. Lavelle told Moss that he would know about the business that Lavelle took care of because it would be on the radio. After news of Vallandingham's death was broadcast on the radio, Moss saw Muslim James Were confront Lavelle and knock him to the floor. Were scolded Lavelle, saying "[Lavelle] didn't have the power to make that call and do what he had done. [Moss] understood this to mean that Were was upset with Lavelle for having killed Officer Vallandingham." Moss also said that he was transferred to the prison in Mansfield after the riot, and on the bus trip there, he heard Lavelle confess to and brag about Vallandingham's murder. (Petition, ECF No. 25 at PageID 261).

Aaron Jefferson
Jefferson attested that Skatzes opposed killing a guard. He also said that Lavelle announced there would be another meeting if the inmates' "10:30 a.m. deadline passed without any response by the state." At the post-ten-thirty meeting, the groups would "decide whether or not to follow through on [their] threat to kill a corrections officer. Lavelle would also decide which officer would be killed, who would do the killing, and how it would be done." Jefferson also said that Lavelle "solicited [him] to kill Officer Vallandingham ..." before the morning meeting. However, Jefferson "ignored him." And Jefferson said that Lavelle "talked [to him] about killing the officer" after the ten-thirty meeting. (Petition, ECF No. 25 at PageID 262).

Like his claim invoking the actual innocence gateway, Skatzes argues in support of habeas relief in Ground One that the testimony of these witnesses would have established that he opposed killing a guard and Anthony Lavelle alone accomplished Vallandingham's murder. (Traverse, ECF No. 42 at PageID 666-669). Although the standard is different, the result is the same. Skatzes was not prejudiced because his counsel failed to call these witnesses. The witnesses would have only reiterated Skatzes' point that he opposed the murder. As noted above, the jury heard through other testimony that he voiced some dissent and lamented Vallandingham's death after it occurred. Also

noted above, evidence of Anthony Lavelle's independent actions associated with Vallandingham's death do not absolve Skatzes because he was a co-conspirator. Anthony Lavelle's actions do not change the uncontroverted facts that Skatzes attended the meeting on April 15, 1993, and voluntarily delivered the conspirator's ultimatum to the state's negotiator.

For these reasons, the part of Ground One properly before the Court regarding Skatzes' counsel's failure to call a prison culture expert is dismissed for lack of merit. The defaulted part of Ground One concerning Skatzes' counsels' failure to call certain lay witnesses would be dismissed even if it were properly before the Court because it also lacks merit.

### Ground Two

In Ground Two, Skatzes contends that the evidence was insufficient to sustain his conviction for the aggravated murder of Robert Vallandingham. (Petition, ECF No. 25 at PageID 264-267). Skatzes raised Ground Two in his direct appeal as Proposition of Law No. 39 (Appellant's Brief, ECF No. 67-7 at PageID 5323, 5516), which was ultimately decided and dismissed by the Ohio Supreme Court:

> {¶ 140} With regard to the kidnapping and aggravated murder of Vallandingham, the state's evidence showed that on April 14, inmate gang leaders, including Skatzes, voted to kill a guard. That evening, Skatzes complained to Muslim gang leaders that whoever was supposed to kill a guard had backed out of it. Then Skatzes blurted out, "Fuck the CO, I will kill the CO."

> {¶ 141} On the morning of April 15 at another inmate-leader meeting, Skatzes got on the phone with prison negotiators and demanded that water and power be restored within L block or "there would be a guaranteed murder. Do your thing. 10:30 or a dead man's out there." The leadership voted to kill a guard, and a member of each inmate gang was chosen to participate in the killing. Skatzes agreed with the decision to kill a C.O. hostage.

> {¶ 142} After Vallandingham was killed, Skatzes and other Aryans followed behind when the body was being carried out by masked inmates. Viewing this evidence in a light most favorable to the state, sufficient evidence supported Skatzes's conviction for the murder of Vallandingham.

*Skatzes*, 104 Ohio St. 3d at 223–52.

"[A federal habeas court] may not characterize state-court factual determinations as unreasonable merely because [it] would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (internal citations omitted). "Instead, § 2254(d)(2) requires that [a federal habeas court] accord the state [] court substantial deference. If [r]easonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the [state] court's ... determination." *Id.* (internal citations omitted).

The standard of review for evaluating sufficiency of the evidence claims was established by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979). The Court held in *Jackson* that, because the Due Process Clause requires the state to prove beyond a reasonable doubt every fact necessary to constitute the charged offense, "the relevant question" in assessing the sufficiency of the evidence "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original).

Under the *Jackson* standard, the state need not rule out every hypothesis except that of guilt beyond a reasonable doubt. *Id.* at 326. Rather, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution." *Id.*; *Walker v. Engle*, 703 F.2d 959, 969–70 (6th Cir. 1983). It is the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence and to draw reasonable inferences from the evidence. *Jackson*, 443 U.S. at 319. Consequently, the reviewing court is not permitted to reweigh the evidence, reevaluate the credibility of witnesses, make its own subjective determination of guilt or innocence, or otherwise

44

substitute its opinion for that of the jury. *See id.* at 318–19 & n.13; *see also United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (citing *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009)).

Federal habeas review of a claim challenging the sufficiency of the evidence is even further limited. As the Sixth Circuit explained in *Brown*, the federal habeas court is "bound by two layers of deference to groups who might view facts differently than [the habeas court] would." 567 F.3d at 205. The federal habeas court must defer not only to the trier of fact's findings as required by *Jackson*, but under 28 U.S.C. § 2254(d), must also "defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Id.* (emphasis in original); *see also Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011). The Sixth Circuit went on to emphasize in *Brown*:

> [W]e cannot rely simply upon our own personal conceptions of what evidentiary showings would be sufficient to convince us of the petitioner's guilt. We cannot even inquire whether *any* rational trier of fact would conclude that petitioner...is guilty of the offenses for which he was charged. Instead, we must determine whether the Ohio Court of Appeals itself was unreasonable in *its* conclusion that a rational trier of fact could find [the petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial.

567 F.3d at 205 (emphasis in original).

Skatzes argues in Ground Two that the Ohio Supreme Court made an unreasonable determination of the facts when it concluded that he agreed with the decision to kill a guard. (Traverse, ECF No. 42 at PageID 674-677). Skatzes points to trial evidence that he argues establishes that there was no final decision made to kill a guard at the April 15, 1993, meeting. He also argues that his failure to object at the meeting was insufficient under Ohio law to establish his culpability because it requires "express concurrence." Skatzes also disputes the credibility of Hogan's testimony that he said "Fuck the CO" because there was other trial evidence that he was on the phone with the state negotiator at the time. (*Id.*). Respondent, on the other hand, argues that the record is "replete" with evidence of express concurrence. (Return of Writ, ECF No. 31 at

PageID 483-84). In addition to the evidence mentioned by the Ohio Supreme Court, Respondent points out that Skatzes testified on cross-examination that he knew an officer would be killed when he relayed the inmates' ultimatum to the state's negotiator. (*Id.* at PageID 483).

The record does in fact include evidence that Skatzes expressly concurred in the plan to kill a guard. The Ohio Supreme Court laid the evidence out in its opinion. Skatzes delivered the inmates' ultimatum to the state. (Negotiation Tape #6, ECF No. 71-9 at PageID 13102). He urges the Court to adopt a more favorable interpretation of his words. But the plain meaning of Skatzes' words to the state negotiator as well as Skatzes' trial testimony reasonably support an inference that he adopted the conspirators' plan. In any event, the *Jackson* standard does not permit the Court to substitute an alternative view of the evidence.

Besides the recorded conversation with the state, the jury heard testimony from David Lomache that everyone at the meeting he witnessed, including Skatzes, seemed to agree to the plan to kill the guard (ECF No. 73-18 at PageID 16473-16474) and testimony from Anthony Lavelle that Skatzes voted to kill a guard (ECF No. 74-1 at PageID 17904-17905).

The Court is bound to defer to the reasonable conclusions by both the jury and the Ohio Supreme Court that the evidence was sufficient to sustain a conviction for the aggravated murder of Robert Vallandingham. The Ohio Supreme Court's dismissal of Ground Two was neither contrary to nor an unreasonable application of *Jackson*. Ground Two is dismissed as meritless.

### *Ground Three*

In Ground Three, Skatzes contends that his trial counsel were ineffective for failing to investigate and present witnesses that were material to the defense against the charges for the capital murder of David Sommers. (Petition, ECF No. 25 at pid 267-72). Skatzes raised Ground Three in his postconviction petition (Postconviction Petition, ECF No. 68-7 at PageID 8036-8038).

46

Unsuccessful, Skatzes appealed to the Second District Court of Appeals as Assignment of Error

No. 6, which was also denied:

> {¶ 58} Skatzes' sixth assignment of error states:
>
> {¶ 59} "THE TRIAL COURT ERRED IN REJECTING PETITIONER'S FIRST GROUND FOR RELIEF, THAT PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE OF TRIAL COUNSEL'S FAILURE TO CALL EXCULPATORY WITNESSES REGARDING THE SOMMERS MURDER."
>
> {¶ 60} Skatzes presented affidavits from inmates Aaron Jefferson, Jesse Bocook, and Wayne Flannigan, each of whom claimed that Skatzes had not been involved in Sommers' murder, and from his trial attorneys, who claimed that they had not had a strategic reason for failing to call these inmate witnesses. Skatzes claims that these affidavits demonstrate the ineffective assistance of trial counsel in failing to call the inmates to testify on his behalf. The trial court disagreed.
>
> {¶ 61} As the trial court noted, testimony at Skatzes' trial revealed that Jefferson had been present at Sommers' murder and might have been able to provide exculpatory evidence. Thus, the failure to call Jefferson could have been raised on direct appeal and is barred by res judicata.
>
> {¶ 62} Neither Jefferson, Bocook, nor Flannigan indicated in his affidavit that Skatzes' trial counsel or other agents of the state knew of the information contained therein before trial, and the attorneys do not claim that they knew this information before trial. If counsel had no reason to know of or suspect these claims, the affidavits fail to establish the constitutional violation of ineffective assistance of counsel.
>
> {¶ 63} Furthermore, the credibility of the inmates' affidavits is questionable. The trial court observed that the affidavits "raise several red flags." For example, the affidavits of Jefferson and Bocook are inconsistent as to who was involved in killing Sommers, and the inmates' stories have changed over time.
>
> {¶ 64} The trial court properly concluded that Skatzes' evidence on this issue did not establish that he had been denied the effective assistance of counsel.
>
> {¶ 65} The sixth assignment of error is overruled.

*State v. Skatzes*, 2008-Ohio-5387, ¶¶ 59-65.

Respondent argues that the Court cannot consider the part of Ground Three concerning

Aaron Jefferson's affidavit because the Second District Court of Appeals dismissed it as res

judicata, and it is consequently procedurally defaulted. (Return of Writ, ECF No. 31 at PageID 438). In response, Skatzes argues that the procedural bar was improperly imposed because his claim relies on evidence outside the trial record. (Traverse, ECF No. 42 at PageID  680-82).

In Ohio, res judicata bars consideration of constitutional claims in postconviction proceedings brought under Ohio Rev. Code Ann. § 2953.21 when those claims have already been or could have been fully litigated either before judgment or on direct appeal from that judgment. *State v. Perry*, 10 Ohio St. 2d 175 (1967). It is also settled that *res judicata* applies when a defendant who is represented by new counsel on direct appeal fails to raise the issue of ineffective assistance of trial counsel, and the issue could fairly have been determined without resort to evidence outside the record. *Monzo v. Edwards*, 281 F.3d 568, 576–77 (6th Cir. 2002) (citing *State v. Cole*, 2 Ohio St. 3d 112 (1982)).

The Montgomery County Court of Common Pleas found that part of Ground Three concerning Aaron Jefferson should have been raised on direct appeal because Robert Brookover testified at Skatzes' trial that Aaron Jefferson was present at the murder of David Sommers. (ECF No. 68-10 at PageID 8632). The Second District Court of Appeals affirmed on grounds of *res judicata*. (ECF No. 70-7 at PageID 10925). But neither state court identified the trial record testimony that established the elements for a claim of ineffective assistance of counsel.

Robert Brookover testified at Skatzes' trial to the events surrounding the murder of David Sommers, including his own involvement. (ECF No. 73-24 at PageID 17472-17486). Brookover testified that Aaron Jefferson was present and implicated Jefferson in the murder along with Skatzes. (*Id.).* Brookover gave no indication that Jefferson would have provided beneficial testimony if defense counsel had called him as a witness. That information came from evidence *de hors* the record in the form of Aaron Jefferson's affidavit where he attests that "George

[Skatzes] did not kill or participate in the killing or order the murder of David Sommers." (ECF No. 69 at PageID 8749). "[P]otential evidence from witnesses who never appeared at trial, as well as testimony of trial counsel respecting trial tactics, is by definition *de hors* the record." *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001).

Aaron Jefferson's affidavit represents a classic example of evidence *de hors* the record. Skatzes therefore did not violate Ohio's doctrine of *res judicata* by not asserting his ineffective assistance of counsel claim on direct appeal. Accordingly, the first *Maupin* factor is not satisfied, and Skatzes did not procedurally default this part of Ground Three.[8]

Skatzes argues that the part of Ground Three concerning David Marsh's affidavit was overlooked by the state courts, which means that AEDPA deference does not apply. (Traverse, ECF No. 42 at PageID 693). The Court disagrees. When "a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted." *Johnson v. Williams*, 568 U.S. 289, 301 (2013). The presumption can be rebutted "[w]hen the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court." *Id.* at 303. In such a situation, "§ 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge." *Id.*; *see also Nian v. Warden, N. Cent. Corr. Inst.*, 994 F.3d 746, 755 (6th Cir. 2021); *Wofford v. Woods*, 969 F.3d 685, 697 (6th Cir. 2020). Here, Skatzes has not rebutted the presumption. The Second District addressed the affidavits submitted by Skatzes as a group and it is likely, as discussed below, the court elected to

---

[8] The Court notes that in the Sur-Reply, the Respondent "makes no comment" in opposition to Skatzes' argument that *res judicata* was improperly imposed. (Sur-Reply, ECF No. 50 at PageID 995). Consistent with the argument made by Respondent in the Sur-Reply, the Court has deferred to the Second District Court of Appeals' alternative merits analysis. *See Brooks*, 513 F.3d at 624–25.

omit a specific discussion of Marsh's affidavit because it lacked any noteworthy exculpatory information.

Turning to the merits of Ground Three, the Court finds that the Second District's dismissal of this claim was neither contrary to nor an unreasonable application of *Strickland*. That court concluded that Skatzes failed to establish that his trial counsel was deficient because there was no proof that they were aware of the information in the witnesses' affidavits before trial. (ECF No. 70-10 at PageID 11467). The court also questioned the credibility of the affidavits, noting "red flags" identified by the Common Pleas Court (*Id.*). The trial court expressed concern that the trial counsel affidavits involved a lack of recollection and were inconsistent with the record, and the inmate affidavits were too similar to one another and had portions crossed out. (ECF No. 68-10 at PageID 8633).

Indeed, the only two affidavits that would have had any potential effect on the outcome of the trial lack credibility. Aaron Jefferson's affidavit states that he would have testified that Skatzes was not involved in Sommers' murder. (ECF No. 69 at PageID 8748). But Jefferson's affidavit as well as the status of his own conviction for the David Sommers' murder at the time of Skatzes' trial calls his veracity into question.

Jefferson's affidavit attests that he was convicted of the aggravated murder of David Sommers in April 1995. (ECF No. 69 at PageID 8749). The transcripts in the record confirm that Jefferson's pretrial hearings were held in the early part of 1996. (ECF No. 69 at PageID 8842-47). This inaccuracy and the fact that Jefferson crossed out the original typed content that he "pled guilty" raise questions about the reliability of its content and about Jefferson's involvement in the preparation. (ECF No. 69 at PageID 8749).

In any event, Jefferson was convicted for the aggravated murder of Sommers and Skatzes has asked the Court to take judicial notice of the direct appeal of his conviction. (Traverse, ECF No. 42 at PageID 683). The Court takes judicial notice that at the time of Skatzes' trial, Jefferson was under indictment for David Sommers' murder. *State v. Jefferson*, No. 15828, 1997 WL 111757, at *1 (Ohio Ct. App. Mar. 14, 1997) (noting Jefferson was indicted for Sommers' murder on August 26, 1994). Skatzes argues that Jefferson's direct appeal proceedings provide proof that his counsel should have known that Jefferson confessed his involvement in the Sommers murder to the OSHP. (Traverse, ECF No. 42 at PageID 683-684).

Even though Jefferson's 2003 affidavit says he would have testified at Skatzes' trial, the Court finds it highly unlikely that, while he was facing charges for aggravated murder, he would have waived his privilege against self-incrimination or that he would have even provided testimony consistent with the affidavit. This is especially true since, at his own trial, Jefferson disavowed his confession to the OSHP and denied that he was present when Sommers was killed. The Second District Court described Jefferson's testimony:

> Jefferson denied any involvement in the attacks on Sommers and Newell. Jefferson explained his statement to Trooper Fleming by saying that he had been trying to "dirty the waters of the investigation" and that he had thought he was "in difficulty" when he made the statement, although he had not been indicted for any crimes at that time and had not been interviewed by riot investigators in over a year. When challenged about how he knew the details of Sommers' murder if he had not been present, Jefferson stated that he had talked with some people and had used his imagination to come up with a story. Jefferson denied that he would have stayed behind with the Aryan Brothers after the rest of the BGDs had surrendered because to do so would have been "suicide." Jefferson also denied that the BGDs had agreed to any of the killings which occurred on the last day of the riot. On cross-examination, Jefferson admitted that he would be willing to lie for his friends and for himself in certain situations.

*State v. Jefferson*, 1997 WL 111757, at *2 (Ohio Ct. App. Mar. 14, 1997).

The Court also finds it hard to believe that Jefferson would have exposed himself to potential questioning about Robert Vallandingham's murder by testifying at Skatzes' trial. When Jefferson made his statement to the OSHP, he "alluded to his involvement in the murder of Officer Robert Vallandingham but would not discuss any specifics of that murder without his attorney present." *State v. Jefferson*, 1997 WL 111757, at *1 (Ohio Ct. App. Mar. 14, 1997). Jefferson's affidavit demonstrates that he had continued concern in 2003 about his exposure for Vallandingham's murder, because as noted by the Court of Common Pleas, Jefferson crossed out all parts of the affidavit that associated him with the conspiracy. (ECF No. 69 at PageID 8747-8748). Jefferson altered the affidavit to place all blame on Anthony Lavelle, who testified at Skatzes' trial that Jefferson was present at the April 15, 1993, meeting. (*Id.*; ECF No. 74-1 at PageID 17847-17848).

Jesse, a/k/a "Dewey" Bocook's affidavit is similarly suspect. He crossed out all paragraphs concerning the April 15, 1993, meeting and the subsequent murder of Robert Vallandingham. (ECF No. 69 at PageID 8765-8766). The original content of these paragraphs, as well as Anthony Lavelle's trial testimony, placed Bocook at the April 15 meeting. (*Id.*; ECF No. 74-1 at PageID 17848). The Court also finds Bocook's statement that he would have testified for the defense at Skatzes' trial to lack credibility because it appears that he harbored concern about his criminal exposure for the murder of Robert Vallandingham when he signed the affidavit. The deletions also call into question the level of Bocook's involvement in creation of the affidavit and the extent to which he truly adopted the statements therein.

The other two inmate affidavits include content that would have had no impact on the outcome of Skatzes' trial. Marsh only offers a potential reason for Sommers's murder based on

hearsay. (ECF No. 69 at PageID 8791-92). Flannigan offers a vague statement that he did not see Skatzes in the area where the murder was committed. (ECF No. 69 at PageID 8769-71).

Skatzes' trial counsel, Robert Dixon, filed affidavits contending that they could either not recall or had no strategic reason for failing to call witnesses Jefferson, Bocook, Marsh, or Flannigan. (ECF No. 69 at PageID 8753, 8761). The absence of trial counsels' recall in these affidavits is fatal to Skatzes' ineffective assistance of counsel claim because he cannot prove that his counsel knew or should have known that these witnesses would have provided favorable testimony.[9] *See White v. Plappert*, 131 F.4th 465, 478 (6th Cir. 2025) (citation modified) ("It's not enough for [a habeas petitioner] to convince us that his counsel 'took an approach that no competent lawyer would have chosen' [he] must also prove that '*every* fairminded jurist would agree that every reasonable lawyer would have made a different decision.'").

For these reasons, the Second District's dismissal of Ground Three was neither contrary to nor an unreasonable application of *Strickland* and is therefore entitled to deference.

### Ground Four

In Ground Four, Skatzes contends that the state pursued materially inconsistent theories in the prosecution against him and Aaron Jefferson for the same murder of David Sommers. He alleges this strategy violated his due process rights and rights against cruel and unusual punishment. (Petition, ECF No. 25 at PageID 272-275). Skatzes raised Ground Four

---

[9] The Court notes that trial counsels' affidavits are nearly identical and are carefully worded. With respect to Bocook, the affidavits state that he was interviewed, but counsel "cannot recall having a strategic reason for not calling [him]" as a witness. (ECF No. 69 at PageID 8753, 8761). The affidavits do not state that Bocook's interview yielded favorable testimony or that he was willing to testify at trial.

With respect to Jefferson and Moss, the affidavits state that there was no strategic reason for failing to interview them or call them as witnesses at trial. (*Id.*). The affidavits do not provide any insight into how trial counsel should have known that Jefferson or Moss had favorable testimony they were willing to offer at trial. To be sure, the way the affidavits are worded, the statements therein would not technically be false if either of these witnesses refused to be interviewed by Skatzes' counsel or refused to testify at trial.

in his postconviction petition. (Postconviction Opposition to Motion to Dismiss, ECF No. 68-8 at

PageID 8231-8234). Unsuccessful, Skatzes appealed Ground Four to the Second District as

Assignment of Error No. 5. The Second District concluded:

> {¶ 53} Skatzes contends that his due process rights were violated because the state charged and convicted two inmates—Skatzes and Aaron Jefferson—with the murder of David Sommers, when the evidence suggested only one fatal blow. He argues that these "inherently factually contradictory theories" violated his due process rights and the prosecutors' duty to seek justice impartially. He relies on *Smith v. Groose* (C.A.8, 2000), 205 F.3d 1045 and *Bradshaw v. Stumpf* (2005), 545 U.S. 175, 187–188, 125 S.Ct. 2398, 162 L.Ed.2d 143.

> {¶ 54} *Stumpf* involved a guilty plea and did not reach the question of whether the prosecutor's use of contradictory evidence at two different trials would have violated the defendant's due process rights. The Supreme Court concluded that Stumpf "never provided an explanation of how the prosecution's post-plea use of inconsistent arguments could have affected the knowing, voluntary, and intelligent nature of his plea" and concluded that the prosecutor's actions did not require voiding Stumpf's plea. *Stumpf*, 545 U.S. at 187. Thus, the reasoning in *Stumpf* is inapplicable to Skatzes' case.

> {¶ 55} In *Groose*, the Eighth Circuit Court of Appeals found reversible error when, in separate trials, two defendants were separately convicted of the same murders through the prosecution's use of "diametrically opposed" statements by its key witness. The court held that the state was forbidden from using irreconcilable theories to secure convictions against two separate defendants in prosecutions for the same offenses arising out of the same event. *Groose*, 205 F.3d at 1049.

> {¶ 56} Here, the state's theories in obtaining murder convictions against Skatzes and Jefferson were not irreconcilable. The evidence established that a group of men savagely choked, stabbed, and beat Sommers about his head and torso. Although the coroner referred to the wound both as a fatal "blow" and fatal "injury," there was no question that multiple inmates inflicted head injuries. The state's theory was that both Skatzes and Jefferson were complicit in the crime; there was no way to prove who had inflicted the fatal head injury. These theories are not "diametrically opposed." We also note that, pursuant to R.C. 2923.03(F), "[a] charge of complicity may be stated in terms of this section, or in terms of the principal offense." A defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is stated in terms of the principal offense and does not mention complicity. *State v. Herring*, 94 Ohio St.3d 246, 251, 2002–Ohio–796, 762 N.E.2d 940. See, also, *State v. Walton*, Cuyahoga App. No. 88358, 2007–Ohio–5070, ¶ 20. The state's theory of the case did not produce inconsistent verdicts because it always acknowledged that there were multiple perpetrators. Skatzes' due process rights were not violated by this approach.

*State v. Skatzes*, 2008-Ohio-5387, ¶¶ 50-57.

Respondent argues that Skatzes' Eighth Amendment claim is procedurally defaulted because Skatzes failed to raise it with the Ohio state courts. (Return of Writ, ECF No. 31 at PageID 524). The Court agrees. The record reflects that Skatzes mentioned the Eighth Amendment in the headings of his brief to the Second District (Appellant's Brief, ECF No. 70-1 at PageID 9969) and the Ohio Supreme Court (Appellant's Brief, ECF No. 70-11 at PageID 11595). But this is insufficient to preserve an Eighth Amendment claim for review. *See Blackmon v. Booker*, 394 F.3d 399, 400–401 (6th Cir. 2004). Skatzes did, however, fairly present his Fourteenth Amendment due process claim to the state courts.

That said, the Court finds that Skatzes' due process claim lacks merit. Skatzes argues that during his trial the state advanced a theory that he was the "principal offender" in David Sommers' murder. (Petition, ECF No. 25 at PageID 273-74). Skatzes argues that the state offered testimony from Roger Snodgrass and Robert Brookover that he hit Sommers on the head with a baseball bat (*id.* at pid 273) and testimony from the medical examiner, Dr. Buerger, that Sommers died from a "single massive blow" to the right temple area of his skull (*id.* at PageID 273). Skatzes argues that in Aaron Jefferson's trial, the state took the position that Jefferson, not Skatzes, inflicted the single death blow. (*Id.* at PageID 273-74). Skatzes contends that his constitutional rights were violated because the state advanced materially inconsistent theories at the two trials. (Traverse, ECF No. 42 at PageID 698-709).

In opposition, Respondent argues that the Supreme Court has never declared that a due process violation occurs when the state pursues different theories for the prosecution of two suspects in the same crime. (Return of Writ, ECF No. 31 at PageID 524-27). Respondent further argues that the Second District's dismissal of Ground Four was not objectively unreasonable

because the prosecution argued in both trials that David Sommers was beaten by several inmates. (*Id*. at PageID 527-531).

In Count Five of the Indictment, Skatzes was charged with the aggravated murder of David Sommers "purposely, and with prior calculation and design." In Count Six, he was charged with the aggravated murder of David Sommers "while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit the offense of Kidnapping." (ECF No. 65 at PageID 1723-1725). Both counts carried death penalty specifications. (*Id*.).

At Skatzes' trial the prosecution elicited testimony from Roger Snodgrass regarding the events surrounding David Sommers' murder. (ECF No. 74-5 at PageID 18484-18495). Snodgrass identified himself, Skatzes, Jefferson, Brookover, and Bocook as participants in the murder. Snodgrass testified that he saw Skatzes hit Sommers with a bat three times in the upper head area, he saw Bocook "beat [Sommers'] brains in" with a bat and saw Jefferson stab Sommers. (*Id*. at PageID 18492-93). Snodgrass testified that he saw Jefferson with a bat as they left the area where the murder occurred. (*Id*.).

Robert Brookover also testified at Skatzes' trial regarding the events surrounding David Sommers' murder. (ECF No. 73-24 at PageID 17468-87). Brookover testified that five inmates inflicted blows on Sommers, including himself, Bocook, Snodgrass, Skatzes, and Jefferson. (*Id.* at PageID 17485-86). Brookover testified that he saw Aaron Jefferson hit Sommers with a baseball bat. (*Id.* at PageID 17484).

The medical examiner, Dr. Buerger, testified that the right side of Sommers' skull in the parietal, temple region was shattered from a single injury from a blunt instrument. (ECF No. 73-23 at PageID 17263). Dr. Buerger described the injuries to Sommers' skull and commented, "all of this was the result of a single massive blow." (*Id.* at PageID 17264). Dr. Buerger testified that

Sommers' cause of death was a "massive blow to the head leading to skull fracture…." (*Id.* at PageID 17266).

During closing argument in Skatzes' trial, the state argued—"[n]ext homicide David Sommers. Aggravated murder, again two theories, kidnapping and the prior calculation and design." (ECF No. 74-12 at PageID 19719). The state argued that riot leadership planned to kill David Sommers because he was a snitch that knew too much, and a group of killers subsequently lured him to his death during the final hours of the riot. (*Id.* at PageID 19719-25). The state argued that several men participated in the murder, including Skatzes who "got his hands dirty." (*Id.* at PageID 19722). The prosecutor did not explicitly dispute Dr. Buerger's testimony, but he did argue that different people inflicted blows on Sommers, including Jefferson (*id*. at PageID 19723), and both Skatzes and Bocook hit him in the head with a baseball bat (*id.* at PageID 19721).

In addition to receiving instructions on the elements of aggravated murder, with respect to David Sommers' murder, the jury was instructed:

> Before you can find the defendant guilty of Specification Number 3, you must find that the State has proved beyond a reasonable doubt that the defendant purposely caused the death of David Sommers while committing, or attempting to commit, or fleeing immediately after the committing or attempting to commit kidnapping, and either the offense or the offender was a principal offender in the commission of the aggravated murder or, if not a principal offender, committed the aggravated murder with prior calculation and design.

A principal offender is one who has hands-on involvement in the homicide. (ECF No. 74-13 at PageID 19875). The first paragraph tracks the language of Ohio Rev. Code Ann. § 2929.04(7).

The jury found Skatzes guilty of the aggravated murder of David Sommers. (ECF No. 66-1 at PageID 2695; 2707). According to the verdict form, the jury concluded that Skatzes was a principal offender in Sommer's murder. (ECF No. 66-1 at PageID 2698; 2706). On direct appeal,

the Supreme Court of Ohio found that the trial court erred because its instruction on "principal offender" was not specific enough, but the error was harmless because "the evidence at trial showed that Skatzes was an actual killer of Sommers." *Skatzes*, 104 Ohio St. 3d at 209–10.

In his postconviction petition, Skatzes relied on *Bradshaw v. Stumpf*, 545 U.S. 175 (2005), as authority for his position that his due process rights were violated. (Postconviction Opposition to State's Motion to Dismiss, ECF No. 68-8 at PageID 8231-34). Stumpf pled guilty to aggravated murder in Ohio. *Bradshaw*, 545 U.S. at 179. During his sentencing hearing before a three-judge panel, the state argued that Stumpf pulled the trigger and killed the victim, but even if he did not pull the trigger, Stumpf deserved the death penalty because he was an accomplice to the murder. *Id.* at 180. After Stumpf's guilty plea, his co-defendant, Clyde Wesley was extradited to Ohio and tried by jury for the same murder. *Id.* at 180. At Wesley's trial, a previously unavailable witness came forward and testified that Wesley pulled the trigger, and the prosecutor argued that Wesley deserved the death penalty because he was the principal offender. *Id.* The Supreme Court declined to void Stumpf's guilty plea, finding that "the precise identity of the triggerman was immaterial to Stumpf's conviction for aggravated murder." *Id.* at 187. However, the Supreme Court then found that "the prosecutor's use of allegedly inconsistent theories may have a more direct effect on Stumpf's sentence..." and remanded the case to the Sixth Circuit to "consider, in the first instance, the question of how [the witness's] testimony and the prosecutors conduct in the Stumpf and Wesley cases relate to Stumpf's death sentence in particular." *Id.* at 187–88.

On remand, the Sixth Circuit found no due process violation, distinguishing the circumstances where a prosecutor's behavior has been found improper:

> Nothing misleading or deceitful happened here. The prosecution did not present a different and incomplete set of facts in support of different theories of culpability for the same crime... It did not offer different (and contradictory) testimony from the same witness in

> Wesley's trial, without acknowledging the contradiction… And it
> did not omit evidence of Wesley's or Stumpf's guilt or innocence
> from its presentation.

*Stumpf v. Robinson*, 722 F.3d 739, 749 (6th Cir. 2013) (internal citations and quotations omitted).

The Sixth Circuit then found that if a due process violation could be recognized, it would be subject to harmless error analysis. *Id.* at 752. The Sixth Circuit concluded that any error was harmless because the record contained ample evidence that Stumpf, not Wesley, pulled the trigger. *Id.*

Respondent first argues that Skatzes is not entitled to relief on Ground Four because there is no clearly established due process right under the circumstances. (Return of Writ, ECF No. 31 at PageID 525-27). The Supreme Court's treatment of the issue in *Bradshaw*, 545 U.S. 175, and the Sixth Circuit's subsequent treatment of the open question on remand, *Stumpf*, 722 F.3d 739, at least suggests that under the appropriate circumstances, the Supreme Court would recognize a due process violation. But the Court does not need to reach the issue because the Second District Court was not unreasonable for concluding the prosecution theories in the Skatzes and Jefferson trials were not inconsistent because "it always acknowledged that there were multiple perpetrators." *State v. Skatzes*, 2008-Ohio-5387, ¶ 56. The prosecution put on evidence at Skatzes' trial that multiple inmates planned Sommers' murder, participated in beating Sommers, hit Sommers on the head with a bat, and that his cause of death was a single blow to the head. The prosecution argued to the jury in closing that Skatzes should be found guilty of the aggravated murder of David Sommers because it was committed during a kidnapping, the decision to kill him had been made with prior calculation and design, and Skatzes "got his hands dirty." (ECF No. 74-12 at PageID 19719-25). The jury found Skatzes guilty and selected "principal offender" on the verdict form.

The state did not seek the death penalty in Aaron Jefferson's trial. His jury received instructions, *inter alia*, on the elements of "aggravated murder" and "complicity." *State v.*

*Jefferson*, 1997 WL 111757, at *7 (Ohio Ct. App. Mar. 14, 1997). The prosecutor in Jefferson's

trial argued to the jury:

> …Everybody said, everybody who was there, all the testimony, that this man was
> beaten many, many times. It was not just one single bat or blow to the head. There
> were multiple ones this is a conclusion that is inescapable once you've examined
> these photos this man was a victim of a massive beating, multiple wounds to the
> head. But you know, I didn't say I don't believe Dr. Buerger, he couldn't [sic] be
> mistaken on that factor. It doesn't make any difference.
>
> Why doesn't it make a difference? Two reasons. First one, what did this man say
> and reiterate time and again even when Trooper Fleming was trying to get him---
> no, no, no, no that's not true, no sir, not true, couldn't do that, couldn't be that way.
> I know that first lick I hit on him did damage. It leaked. I saw the brains leak. I got
> the blood all over me.
>
> If there was only one blow to the head of David Sommers the strongest evidence
> you have is the individual---I won't call him human—this is the individual that
> administered the blow. Out of his own mouth. If there was only one blow, he's the
> one that gave it…
>
> Ah, we don't know who did it…Still, when then we get back to what the Court is
> going to tell you about complicity, aiding and abetting. It is not necessary that he
> be the one that actually administered the fatal blow.

(ECF No. 69 at PageID 8846-8847).[10]

   According to the prosecutor's argument, Dr. Buerger's testimony remained consistent

between the two trials. The difference between the Skatzes and Jefferson trials is that in the

Jefferson trial, the prosecutor explicitly mentioned that evidence supported a contrary conclusion

that there were multiple blows to the head and also argued that resolution of that fact was

unnecessary because the defendant was guilty either way under the theory of complicity.

---

[10]     Per *Pinholster,* 563 U.S. 170 (2011), the Court has not considered references in Skatzes' Traverse to
transcript pages from Jefferson's trial that are not included in the state court record. (Traverse, ECF No. 42 at PageID
706-09). Because the exhausted claim relates to the Aaron Jefferson trial, the Court has also not considered any
arguments about how the evidence at Skatzes' trial is inconsistent with the evidence offered at Carlos Sanders' trial.
(Traverse, ECF No. 42 at PageID  705-06).

The state made it known at both trials that multiple inmates participated in the Sommers' murder, including Aaron Jefferson. Skatzes focuses his argument on the fact that Dr. Buerger testified that Sommers died from a single blow to the head, contending that it could not have been delivered by both him and Jefferson. (Traverse, ECF No. 42 at PageID 705). Trial testimony other than Dr. Buerger's supported a reasonable inference that Sommers in fact suffered multiple blows to the head, with Snodgrass testifying that he witnessed both Skatzes and Brookover strike Sommers in the head (ECF No 74-5 at PageID 18492-93), and Brookover testifying that five inmates inflicted blows. (ECF No. 73-24 at PageID 17485-86).

The Ohio Supreme Court rejected Skatzes' argument on direct appeal in Proposition of Law No. 13 that "principal offender" was synonymous with "sole offender": "We have stated that 'principal offender' means the 'actual' killer and not the 'sole' offender. As there can be more than one actual killer, there can be more than one principal offender." *Skatzes*, 104 Ohio St. 3d at 210. *See also Joseph v. Coyle*, 469 F.3d 441, 455 (6th Cir. 2006) (acknowledging that under O.R.C. 2929.04(A)(7) "there may be multiple principal offenders corresponding to multiple fatal blows.").

The state presented evidence at both trials that Sommers received multiple blows from several inmates, including Skatzes and Jefferson, and the coroner believed that Sommers died from a single blow to the head. Like the Sixth Circuit concluded in *Stumpf*, 722 F.3d at 749, there was nothing deceitful about the state's conduct in the two trials, Skatzes has no basis for a due process claim. Skatzes' argument ignores the fact that the jury was free to reject Dr. Buerger's testimony, in whole or in part. A reasonable inference could be made from the evidence presented that Skatzes was an actual killer of David Sommers.

Even if the prosecutor's behavior could be considered a due process violation, the error was harmless. *Stumpf*, 722 F.3d at 752. If the prosecutor had acknowledged at Skatzes' trial that

Dr. Buerger's testimony about the single fatal blow may be wrong, according to the Ohio Supreme Court, the evidence still established that Skatzes was a "principal offender."

Ground Four is without merit and must be dismissed.

### *Ground Five*

In Ground Five Skatzes contends that the state's evidence is insufficient to prove that he killed David Sommers with prior calculation and design. (Petition, ECF No. 25 at PageID 275-277). Skatzes raised Ground Five in his direct appeal as Proposition of Law No. 40 (Appellant's Brief, ECF No. 67-7 at PageID 5323, 5514-15), which was ultimately denied by the Supreme Court of Ohio:

> {¶ 144} With respect to the murder of Sommers, several inmates testified that Sommers controlled the phones in L2 during negotiations and had made some bombs during the riot. Although Sommers stayed in the Aryan-controlled L2 during the riot, he was not a member of the Aryan Brotherhood. Moreover, Sommers had a reputation as a "snitch," an inmate who cooperated with prison authorities against other inmates.

> {¶ 145} As the surrender was taking place at the end of the riot, Skatzes, Robb, Sanders, and Cummings told Lavelle that they had "some things [they had] to take care of." Skatzes, Snodgrass, and Bocook dressed in other clothes in L2, and when Robb showed up, they went to L7, across the hall from L2. Inmate Brookover also had a reputation as a snitch and was led to believe that he had a choice: kill someone or be killed. When Brookover asked Skatzes if he was going to be killed, Skatzes replied, "Just take care of business, be cool." Brookover was with the group that went into L7.

> {¶ 146} When the group entered L7, no one else was there. Bocook yelled out, "Where's that bitch Sommers at." Robb lured Sommers into L7, and the group proceeded to beat him. Skatzes ran up, kicked Sommers in the head, and hit him in the head with a baseball bat—three times, according to Snodgrass. Brookover testified that Skatzes hit Sommers in the head as "[h]ard as you could hit." Other inmates also beat and stabbed Sommers. The killers, including Skatzes, then cleaned themselves and burned their clothes. The coroner testified that Sommers's skull had been "shattered" and that he died from a massive blow to the head. Based on the foregoing, a jury could have reasonably concluded that Skatzes murdered Sommers. The fact that others also stabbed and beat Sommers does not absolve Skatzes from culpability in his murder. See *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 69. We reject proposition of law XL.

*Skatzes*, 104 Ohio St. 3d at 223–24.

Skatzes argues in his habeas petition that the Supreme Court of Ohio was unreasonable, and he is entitled to relief on Ground Five because "there was no evidence Skatzes had any designs on killing Sommers" and "the Ohio Supreme Court erroneously and unreasonably inferred that Skatzes had 'prior calculation and design' specific to killing Sommers." (Traverse, ECF No. 42 at PageID 713, 714). In the Return of Writ, the Respondent counters that Sommers' murder was not a "spur of the moment" decision, and that satisfies "prior calculation and design" under Ohio law. (Return of Writ, ECF No. 31 at PageID 710-18).

Skatzes made the same argument to the Supreme Court of Ohio that he now makes in his habeas petition—that the facts support "spur of the moment contemplation" and not "prior calculation and design." (Appellant's Brief, ECF No. 67-7 at PageID 5514). The Supreme Court implicitly rejected this argument when it upheld the jury's finding of "prior calculation and design," and the testimony adduced at trial supports that conclusion.

Roger Snodgrass testified that during their last meeting before the surrender, he, Skatzes, Bocook, Tramp Johnson, and Robb discussed killing inmates Newell, Israel, and Creager. (ECF No. 74-5 at PageID 18480-81). But, when he, Skatzes, Bocook, Brookover, and Aaron Johnson, went to L-7 to accomplish the job, Robb left to get the inmates and returned without them. (*Id.* at PageID 18488-89). This prompted Bocook to say, "where's that bitch Sommers at?" *Id.* Snodgrass testified that he stood around for a while and then saw Skatzes hitting Sommers with a baseball bat. (*Id.* at PageID 18489-90). Snodgrass testified that he did not know how Sommers got to L-7. (*Id.*).

Brookover's account largely mirrors Snodgrass's (ECF No. 73-24 at PageID 17471-80). Brookover added, however, that after Bocook said, "go get that bitch Sommers," Robb left to get him from L-2. (*Id.* at PageID 17479). Bocook testified that he was not sure how long, "minutes

63

later" Robb and Sommers returned (*Id.* at PageID 17480), and they proceeded to attack and kill Sommers (*id.* at PageID 17480-86).

As discussed in Ground Two, the well-settled standard of review for evaluating the merits of constitutional claims challenging the sufficiency of the evidence was established by the Supreme Court in *Jackson*. The federal habeas court is "bound by two layers of deference to groups who might view facts differently than [the habeas court] would." *Brown*, 567 F.3d at 205. The habeas court must defer not only to the trier of fact's findings as required by *Jackson*, but under 28 U.S.C. § 2254(d), must also "defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Id.*

The trial evidence established that the group of inmates, including Skatzes, did not originally plan to kill Sommers, but that does not absolve him from "prior calculation and design." The jury could make a reasonable inference from the evidence presented that the passage of time from the decision to kill Sommers until the time Sommers arrived at L-7 was enough to satisfy "prior calculation and design." Considering the deference owed to the jury's finding of prior calculation and design and the Ohio Supreme Court's conclusion that evidence was sufficient to sustain that verdict, the Court cannot say that the dismissal of the claim made in Ground Five was an unreasonable application of *Jackson*. As pleaded here, it must be dismissed.

### Ground Seven

In Ground Seven, Skatzes contends that his counsel was ineffective for failing to investigate and call the following witnesses to defend against the Earl Elder aggravated murder charge: Michael Trocadoro, Anthony Taylor, Eric Girdy, and Kenneth Law. (Petition, ECF No. 25 at PageID 280-86). Skatzes raised Ground Seven in his postconviction petition as his fourth and sixth grounds for relief (Postconviction Petition, ECF No. 68-7 at PageID 8043-45, 8048-49). On

appeal to the Second District Court of Appeals, Skatzes asserted Ground Seven as Assignment of Error No. 2. (Appellant's Brief, ECF No. 70-1 at PageID 9939, 9957-9963). The Second District Court of Appeals affirmed the dismissal of the claim:

{¶ 14} Skatzes' second assignment of error states:

{¶ 15} "THE TRIAL COURT ERRED IN REJECTING PETITIONER'S FOURTH AND SIXTH GROUNDS FOR RELIEF, THAT COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EVIDENCE THAT INMATE ERIC GIRDY MURDERED EARL ELDER AND FOR FAILING TO INVESTIGATE AND CALL INMATES MICHAEL TROCODARO AND THOMAS ANTHONY TAYLOR AS EXCULPATORY WITNESSES."

{¶ 16} Skatzes claims that he was denied the effective assistance of counsel because his attorneys did not investigate and present evidence that another inmate, Eric Girdy, had murdered Earl Elder or had witnessed Elder's murder and did not call inmates Michael Trocodaro and Thomas Anthony Taylor as exculpatory witnesses.

{¶ 17} As the state points out, Skatzes did not argue in his petition that his attorneys should have called Girdy *as a witness* to Elder's murder. He argued only that counsel did not adequately pursue and present evidence that Girdy had actually committed the murder. Because it was not raised in the trial court, Skatzes has waived the former argument.

{¶ 18} The state presented evidence at trial that Elder had been attacked three times in the early hours of the riot: once in the stairwell to which he fled with one of the guards as the riot began and twice hours later in cell L–6–60. In all, Elder received 163 stab wounds, as well as many other injuries, in these attacks, and numerous inmates were involved. Skatzes was implicated in the second attack, and Girdy seems to have been implicated in the third attack. Many of Elder's stab wounds were superficial, but several caused injuries that could have been fatal. During Elder's autopsy, glass was found in one of his more serious wounds.

{¶ 19} In support of his argument that counsel was ineffective in failing to discover and present evidence that Girdy had killed Elder, Skatzes relied on evidence that included an affidavit from attorney Alice Lynd, who assisted counsel in representing Skatzes in the postconviction proceedings; the coroner's autopsy of Earl Elder; and affidavits from defense counsel, attached to which was a copy of Girdy's indictment for the aggravated murder of Earl Elder.

{¶ 20} According to Lynd, Girdy admitted to her that he had killed Elder by stabbing him with a piece of glass. Skatzes claims that this exculpatory evidence, coupled with the autopsy report indicating that glass was found in one of Elder's

more serious wounds would have changed the outcome of his trial. He also claims that Girdy's subsequent indictment for Elder's murder proves that he was prejudiced by counsel's failure to investigate Girdy.

{¶ 21} The trial court concluded that the evidence presented regarding Girdy did not support postconviction relief based on the ineffective assistance of counsel. We agree. As the trial court noted, there is nothing in the record to suggest that trial counsel should have known about Girdy's purported involvement at the time of Skatzes' trial. Lynd's interview with Girdy occurred much later, and Skatzes' petition did not point to any reason why counsel should have suspected that an interview with Girdy would be helpful to their case. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and counsel's actions were not objectively unreasonable if there was no basis to suspect Girdy's alleged involvement.

{¶ 22} Skatzes also asserts that the state's subsequent indictment of Girdy in 2005 for Elder's murder supports his theory that his attorneys were ineffective and contradicts the state's theory in his own case. The trial court properly concluded, however, that Girdy's subsequent indictment did not show that Skatzes had been wrongly convicted or that he had been denied the effective assistance of counsel. The fact that Girdy may have been involved in these attacks, even if he inflicted a potentially fatal blow, does not preclude the conclusion that Skatzes was also culpable for Elder's murder.

{¶ 23} Moreover, the trial court noted that Lynd's and Girdy's affidavits were inconsistent. In Girdy's affidavit, he stated that, after some other attacks on Elder, inmates Tim Williams, Doc Ellis, and two other men punched Elder and stabbed him with a piece of glass, after which he "became quiet." In other words, Girdy implied that Williams, Ellis, and two other men inflicted the fatal blows. Lynd claims that, in her interview with Girdy, he admitted that he was one of the "other men." These inconsistencies call Girdy's credibility into question and cast doubt on whether Girdy would have been a helpful witness at trial.

{¶ 24} Skatzes also contends that the trial court erred in failing to hold a hearing on his claims that his counsel was ineffective in failing to call inmates Michael Trocodaro and Thomas Anthony Taylor to testify on his behalf. Skatzes claims that both men were in a position to witness the events in cell L–6–60, where Elder was killed on the first night of the riot.

{¶ 25} Trocodaro stated by affidavit that Skatzes did not enter Elder's cell on L-block. He claimed that only Roger Snodgrass had been involved in the first attack in the cell and that inmate Lucky Roper and a few other inmates inflicted the final blows in a later attack. Trocodaro claimed that Skatzes was protecting inmates in L-block, including Elder, rather than harming anyone. These claims contradicted the statements Trocodaro made to Highway Patrol officers shortly after the riot, in which he provided a version of events consistent with the state's evidence at trial.

Specifically, in May 1993, Trocodaro had reported seeing Skatzes escorting Snodgrass to Elder's cell and holding the door while Snodgrass stabbed Elder. Skatzes' trial attorney stated by affidavit that he had spoken with Trocodaro before trial, but Trocodaro not did provide information that called into doubt Skatzes' involvement in Elder's murder.

{¶ 26} Based on Skatzes' evidence with respect to Trocodaro, the trial court properly concluded that ineffective assistance of counsel had not been demonstrated. Because there is no evidence that Trocodaro told a version of events exonerating Skatzes prior to Skatzes' trial, trial counsel's conduct did not fall below an objective standard of reasonableness in failing to call Trocodaro as a witness or to further investigate him. Moreover, considering the starkly inconsistent stories told by Trocodaro in May 1993 and in his affidavit, there is no reasonable probability that Trocodaro's testimony would have been deemed so reliable as to have affected the outcome of the trial.

{¶ 27} Similarly, Taylor's affidavit asserts that Skatzes did not enter Elder's cell the day Elder was killed. However, like Trocodaro, Taylor gave statements in the months after the riot that were consistent with the state's evidence at trial that Skatzes and Snodgrass had attacked Elder in cell L–6–60. Because Taylor had made statements prior to trial that incriminated Skatzes, trial counsel's conduct did not fall below an objective standard of reasonableness in failing to further investigate Taylor as a potentially helpful witness.

{¶ 28} Finally, we address Skatzes' assertion that the trial court was bound to presume that Girdy's, Trocodaro's, and Taylor's affidavits were truthful under the authority of *Calhoun*, 86 Ohio St.3d at 284, 714 N.E.2d 905. Skatzes implies that the court was unduly skeptical of these affidavits in reviewing his petition for postconviction relief. "However, not all affidavits accompanying a postconviction relief petition demonstrate entitlement to an evidentiary hearing, even assuming the truthfulness of their contents. Thus, where a petitioner relies upon affidavit testimony as the basis of entitlement to postconviction relief, and the information in the affidavit, even if true, does not rise to the level of demonstrating a constitutional violation, then the actual truth or falsity of the affidavit is inconsequential." (Citations omitted.) *Id.* The trial court was confronted with this exact situation. Even if the substance of the affidavits was true, the affidavits did not establish that trial counsel committed errors that affected the outcome of the trial or that counsel's representation fell below an objective standard of reasonableness. Accordingly, Skatzes was not entitled to postconviction relief on these bases.

{¶ 29} The second assignment of error is overruled.

*State v. Skatzes*, 2008-Ohio-5387, ¶¶ 14-29.

67

Respondent argues that the parts of Ground Seven pertaining to Anthony Taylor and Eric Girdy are procedurally defaulted. (Return of Writ, ECF No. 31 at PageID 444-45). Respondent argues that the part of Ground Seven concerning counsels' failure to call Anthony Taylor as a witness is procedurally defaulted because Common Pleas Court found that it was barred by *res judicata.* However, "[t]o determine whether a state procedural rule was applied to bar a habeas claim, [a federal habeas court] look[s] to the last reasoned state court-decision disposing of the claim." *Henderson v. Palmer*, 730 F.3d 554, 560 (6th Cir. 2013) (internal citations omitted). The last reasoned decision here, that of the Second District, made no mention of *res judicata* in connection with Anthony Taylor and reviewed this part of Ground Seven on the merits.

On the other hand, the Second District Court of Appeals did find that the part of Ground Seven concerning trial counsels' failure to call Eric Girdy as a witness was waived because it was not presented to the Court of Common Pleas. (ECF No. 70-7 at PageID 10914). The Second District Court found that Skatzes only presented a claim to the lower court that his counsel failed to present evidence that Eric Girdy murdered Earl Elder (*Id.*). Because the Second District enforced a state procedural rule with which Skatzes failed to comply, this part of Ground Seven is procedurally defaulted. *See Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994) ("Waiver is an adequate and independent state ground to bar *habeas* review.").

Skatzes makes an argument that the part of Ground Seven concerning Kenneth Law should be reviewed *de novo* because the state courts overlooked it. (Traverse, ECF No. 42 at PageID 748). The Court disagrees. The state courts did not overlook an argument concerning Law; Skatzes never presented it. No argument that his counsel failed to investigate Law or call him as a witness appears in Skatzes' postconviction petition or his brief to the Second District. (Postconviction Petition, ECF No. 68-7 at PageID 8043-45, 8048-49; Appellant's Brief, ECF No. 70-1 at PageID 9957-

9963). In fact, Skatzes has procedurally defaulted this part of Ground Seven. *See Sowell v. Bradshaw*, 372 F.3d 821, 830 (6th Cir. 2004) (holding it is not inappropriate for the district court to raise procedural default *sua sponte*); *see also Lorraine v. Coyle*, 291 F.3d 416 (6th Cir.), *opinion corrected on denial of reh'g*, 307 F.3d 459 (6th Cir. 2002) (§ 2254 capital case); *White v. Mitchell*, 431 F.3d 517, 514 (6th Cir. 2005) (capital case). "Fair presentation requires that the state courts be given the opportunity to see both the factual and legal basis for each claim." *Hooks v. Sheets*, 603 F.3d 316, 320 (6th Cir. 2010). Skatzes did not provide the state courts with the legal and factual basis of his claim pertaining to counsels' failure to call Kenneth Law as a witness, and thus it is procedurally defaulted.[11] In any event, as discussed below the Court finds that all of Ground Seven lacks merit.

Skatzes alleges in his petition that his trial counsel were ineffective for failing to present evidence that Eric Girdy killed Earl Elder and in failing to call Girdy as a witness at trial. (Petition, ECF No. 25 at PageID 283-85). Skatzes argues that his trial counsel were on notice that Girdy could have had exculpatory information and it was objectively unreasonable for them to fail to investigate him or call him as a witness. (Traverse, ECF No. 42 at PageID 746).

The record reflects that Eric Girdy gave an interview to OSHP on August 25, 1993. (ECF No. 68-8 at PageID 8194). During the interview, Girdy admitted to murdering inmates Farrell and Svette, but took no responsibility for the death of Earl Elder. (*Id.*). Girdy told the OSHP that Roper and Bocook killed Elder. (*Id.*).

Skatzes attached an affidavit to his postconviction petition from one of his attorneys, Alice Lynd. (ECF No. 69 at PageID 8855-8859). Lynd interviewed Eric Girdy at Ohio State Penitentiary

---

[11] Although no argument was made in Skatzes' postconviction petition concerning his counsels' failure to call Kenneth Law as a witness, Law's affidavit was presented to the postconviction court. For this reason, the Court is not prohibited by *Pinholster* from considering it in a merits review.

on August 9, 2000, with the intent of obtaining favorable information for Skaztes' postconviction proceedings. (*Id.*). According to Lynd's affidavit, during the interview, Girdy said that "Skaztes did not have anything to do with killing Elder." (*Id.*). Lynd asserted that Girdy told her that Elder was killed by Doc Ellis, Tim Williams, and "another guy," using a piece of glass from the officers' bathroom. (*Id.*). Girdy admitted to Lynd that he was the "other guy." (*Id.*). Lynd's affidavit is dated August 16, 2000. (*Id.* at PageID 8859).

A little more than three years later, on September 21, 2003, Eric Girdy executed an affidavit that was also attached to Skatzes' postconviction petition. (ECF No. 69-1 at PageID 8907-10). Girdy claimed that he witnessed the death of Earl Elder on April 12, 1993, and Skatzes was not involved. (*Id.*). According to Girdy's affidavit, he was standing at "front of the block" when he saw Williams, Ellis, and "two other men" stab Elder with a piece of broken glass. (*Id.*). Girdy's affidavit does not admit to his participation in the murder.

Girdy was indicted in Scioto County on October 11, 2005, for the aggravated murder of Elder. (ECF No. 68-9 at PageID 8400-01). On June 6, 2006, he plead guilty to the reduced charge of murder and received a sentence of fifteen years to life. (ECF No. 68-10 at PageID 8586-8589).

In opposition to Skatzes' postconviction petition, Respondent presented evidence that Anthony Taylor gave interviews to the OSHP on July 20, 1993, and on March 14, 1994. (ECF No. 68-9 at PageID 8383-84). Taylor told the OSHP, "Carlos Sanders told guys to finish off Elder in L-6-60" and then he saw George Skatzes and Roger Snodgrass go in the cell and come back out. (*Id.* at PageID 8384). In an affidavit dated September 27, 2003, and attached to Skatzes' postconviction petition, (ECF No. 69 at PageID 8851-52), Taylor asserted that Skatzes was not in L-6 "at all." (*Id.*) He attested that he saw Roger Snodgrass and one or two other people, not including Skatzes, enter Elder's cell and attack him, but Elder was alive after they left. (*Id.*).

According to Taylor's affidavit, thirty minutes later he saw seven or eight people, not including Skatzes, drag Elder from his cell. (*Id*.).

Respondent presented evidence to the postconviction court that Michael Trocadoro gave a statement to the OSHP on May 3, 1993. (ECF No. 68-9 at PageID 8383). Trocadoro said:

> I seen inmate Skatzes come in and open up the door to L-6-60. I saw Snodgrass—he went in and told Earl Elder you got 5 minutes to live, make peace with God. I hear him hit him four or five times with a knife or something. …Skatzes had a long steel rod. He opened up the door for Snodgrass to go in.

(*Id.*) Trocadoro gave another interview on July 13, 1993, where he gave a substantially similar account. (*Id.*).

Skatzes attached two affidavits from Trocadoro to his postconviction petition—one dated March 18, 1999 (ECF No. 69-1 at PageID 8911-13) and one dated September 4, 2003. (ECF No. 69 at PageID 8848-50). In his 1999 affidavit, Trocadoro claimed that around 10:00 p.m. on the first night of the riot, he saw Roger Snodgrass go into L-6-60, tell Elder, "you got 5 minutes to make your peace with God," and then Trocadoro heard blows. (ECF No. 69-1 at PageID 8912). Trocadoro swore in the 1999 affidavit that a couple of hours later, a group of black prisoners, including Lucky Roper and Tim Williams came out of L-6-60 with Elder's dead body on a blanket. (*Id.*).

In Trocadoro's 2003 affidavit he swore again that he witnessed the murder of Earl Elder. (ECF No. 69 at PageID 8848-50). Trocadoro's 2003 affidavit asserted that he saw Snodgrass, alone, enter Elder's cell, tell him to "make your peace with God," and stab him. (*Id.* at PageID 8849). Trocadoro swears that Snodgrass left Elder alive until Lucky Roper and three other guys, none of whom were Skatzes, followed Loper's instructions to "put Elder out of his misery." (*Id*.).

71

Kenneth Law's affidavit is dated September 19, 2003. (ECF No. 69-1 at PageID 8967-70). He asserted that he saw Roger Snodgrass, Lucky Roper, Tim Williams, and Sterling Barnes kill Earl Elder. (*Id.* at PageID 8968). Law asserted that the OSHP interview summary stating he said that Skatzes was involved in Elder's murder is "utterly false." (*Id.*).

Skatzes' trial counsel, Jeffrey Kelleher, and Robert Dixon, also filed affidavits with Skatzes' postconviction petition. (ECF No. 69 at PageID 8750-64). Kelleher asserted that he interviewed Trocadoro, but did not call him as a witness at trial. (*Id.* at PageID 8753). Kelleher further asserted that he did not interview Girdy. (*Id.*). Kelleher's affidavit does not mention Taylor or Law in connection with the Earl Elder murder. Dixon's affidavit mirrors Kelleher's. (*Id.* at PageID 8760).

The Second District's dismissal of the ineffective assistance of trial counsel claims in Ground Seven is not an unreasonable application of *Strickland*. The Sixth Circuit has explained:

> [H]indsight bias is the very thing that *Strickland*'s deferential standard counsels against: in assessing attorney performance after the fact, we must make "every effort ... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenge[d] conduct, and to evaluate the conduct *from counsel's perspective at the time*." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (emphasis added). And given *Strickland*'s objective standard of reasonableness, the subjective, post-hoc views of trial counsel are simply not relevant considerations.

*Hale v. Cool*, 122 F.4th 637, 649 (6th Cir. 2024).

The record contains no indication that Skatzes' counsel knew *before trial* that Eric Girdy was involved in Elder's murder or would have provided favorable testimony as a witness. In fact, the record reveals the opposite. Girdy withheld information about his involvement in the murder at least until he privately confessed to Skatzes' attorney in August 2000, and officially withheld

his involvement until he pled guilty in 2006. Girdy did not even acknowledge his involvement in the Elder murder when he executed his affidavit for Skatzes' postconviction petition in 2003.

This raises the next issue with Girdy's potential testimony. He told three different stories about what occurred—one to OSHP, one to Alice Lynd, and one in his 2003 affidavit. The different stories to Alice Lynd and in his 2003 affidavit were *simultaneously s*ubmitted by Skatzes to the postconviction court. As noted by the Second District Court of Appeals, Girdy's multiple stories and vulnerability to impeachment "cast[] doubt" on his viability as a favorable witness at trial.

The record also reflects that Taylor, Trocadoro, and Law gave statements to the OSHP that implicated Skatzes, which they recanted in their postconviction affidavits. There is no proof in the record that Skatzes' counsel had information that any of these three witnesses *before trial* had favorable information to offer. And, like Girdy, all three of these witnesses would have been vulnerable to impeachment on cross-examination because their original statements to the OSHP were consistent with the state's theory about how the Elder murder occurred.

Moreover, all the witnesses offered by Skatzes in Ground Seven present different stories about how Elder was murdered and those stories have evolved over time. Calling these witnesses would have left Skatzes' counsel without the ability to present a believable and cohesive theory to the jury on how Elder's murder occurred. It also would have likely damaged Skatzes' credibility because Skatzes testified to yet another, divergent story about Elder's death during the defense's case in chief.[12] Even if counsel had known the witnesses were willing to change their OSHP statements, it would not have been ineffective to strategically forgo calling them at trial.

---

[12]     Skatzes testified that when he first saw Elder he was in the L-6 shower and "near dead," but still breathing. Skatzes testified that he went to the gym and got Charles Parker and Roger Snodgrass so they could move Elder to the yard. When they returned to L-6, Elder was in cell L-6-60 and was dead. (ECF No. 74-10 at PageID 19381-19387).

Considering this record, the Court cannot say that the Second District Court of Appeals was unreasonable in concluding Skatzes failed to prove his counsel were deficient or that he was prejudiced because they failed to call any of the proffered witnesses at trial. Skatzes failed to prove that his counsel had favorable evidence before trial that these witnesses could have credibly offered to change the outcome. Ground Seven is without merit and is dismissed.

### *Ground Eight*

In Ground Eight, Skatzes contends that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose to the defense favorable statements from Michael Trocadoro, Jack Spurlock, and Tim Williams. (Petition, ECF No. 25 at PageID 286-88). Skatzes raised Ground Eight in his postconviction petition as grounds for relief eight, nine and ten. (Postconviction Petition, ECF No. 68-7 at PageID 8052-57). When Skatzes appealed the denial of his Postconviction Petition, he appealed grounds nine and ten, only, as Assignment of Error No. 3. (Appellant's Brief, ECF No. 70-1 at PageID 9963-9965). The Second District Court of Appeals affirmed the denial, concluding:

{¶ 31} "THE TRIAL COURT ERRED IN REJECTING PETITIONER'S NINTH AND TENTH GROUNDS FOR RELIEF THAT THE STATE WITHHELD FROM TRIAL COUNSEL IMPEACHING AND EXCULPATORY EVIDENCE REGARDING ELDER'S MURDER."

{¶ 32} Under the ninth ground for relief in Skatzes' petition, he asserted that the state had withheld evidence—namely, statements made by inmate Tim Williams— which would have exonerated him or allowed him to impeach Williams at trial. Under Skatzes' tenth proffered ground for relief, he claimed that the state failed to provide exculpatory evidence from inmate Jack Spurlock's statements to the highway patrol. Skatzes relies on *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, which requires the state to disclose exculpatory evidence to the defense.

{¶ 33} When he was first interviewed by the highway patrol after the riot, Williams denied having seen anything related to the murder of Earl Elder. Later, he made a statement incriminating Skatzes and another inmate, Jason Robb. Skatzes claims

74

that his conviction should be vacated because he did not receive a copy of the statement Williams initially made to the highway patrol.

{¶ 34} Skatzes' attorneys had been provided with the transcript of Jason Robb's trial, and they relied on it in preparing for Skatzes' trial. It was clear from Williams' testimony in both cases that he had given conflicting accounts to the highway patrol—first denying any knowledge of Elder's murder in L–6–60 and later implicating Skatzes in the killing. Because it is clear that Skatzes' attorneys were aware of the conflicting statements when they questioned Williams at trial, the trial court properly concluded that a claim based on *Brady* was barred by res judicata; such a claim could have been raised on direct appeal. The court also correctly concluded that there could have been no prejudice under these circumstances. Thus, Skatzes' argument is without merit.

{¶ 35} With respect to Spurlock, the summaries of highway patrol interviews provided to the defense before trial indicated that Spurlock had implicated Williams in Elder's murder. Counsel for postconviction relief contends that he did not receive copies of the full statements from previous counsel. Skatzes contends that this would have been "powerful impeachment and exculpatory evidence."

{¶ 36} Based on the cross-examination at trial, the trial court concluded that trial counsel were, in fact, familiar with the content of Spurlock's statement to the highway patrol. Thus, the trial court concluded that the state had complied with *Brady* and had provided Skatzes' trial counsel with the statement, even if his subsequent attorneys did not receive it. The affidavits from trial counsel do not indicate that they did not receive Spurlock's statements. Because trial counsel was familiar with the exculpatory evidence, Skatzes has not demonstrated a *Brady* violation, and the court properly concluded that Skatzes' objection to the evidentiary issue was barred.

{¶ 37} The third assignment of error is overruled.

*State v. Skatzes*, 2008-Ohio-5387, ¶¶ 31-37.

Respondent argues that Ground Eight is procedurally defaulted in its entirety. (Return of Writ, ECF No. 31 at PageID 531-33). Respondent argues that Skatzes failed to appeal his postconviction claim concerning Michael Trocadoro's statement to the Second District Court of Appeals, and the remaining two statements from Spurlock and Williams were dismissed by the Second District Court of Appeals as barred by *res judicata*. (*Id.*).

The Court agrees that the part of Ground Eight concerning Trocadoro's statement is procedurally defaulted. The record reflects that Skatzes raised this claim in his postconviction petition as ground eight (Postconviction Petition, ECF No. 68-7 at PageID 8052-53), but he failed to appeal the denial of the claim to the Second District Court of Appeals or the Ohio Supreme Court. *See Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001) (finding that, in circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim). In any event, as discussed below, this part of Ground Eight would be dismissed for lack of merit even if it was not procedurally defaulted.

The Court disagrees, however, that the remainder of Ground Eight is barred by *res judicata*. The record reflects that Skatzes' *Brady* claim could not have been adjudicated on direct appeal without evidence *de hors* the record. The cross-examination by Skaztes' trial counsel of Tim Williams never directly references the prior witness statements.[13] (*See* ECF No. 73-22 at PageID 17205-08, 17178, 17195-96). Indeed, the Second District Court relied on evidence *outside the record* provided by the parties to the postconviction court when it determined that the evidence had not been suppressed, including the transcript of the Jason Robb trial, summaries of the OSHP interviews, and affidavits from trial counsel. Because the merits of Skatzes' *Brady* claim could not

---

[13] Skatzes' trial counsel asked Tim Williams to identify photos of Tony Taylor, Billy Browner, and Jack Spurlock and asked if these witnesses were present when Elder was killed. (ECF No. 73-22 at PageID 17203-06). The state objected to the line of questioning and the defense responded that their good-faith basis for the questioning was "interviews with these inmate witnesses." (*Id.* at PageID 17206-08). The trial court sustained the objection. This passage from the trial transcript does not reference whether counsel was in possession of Spurlock's May 5, 1993, or July 28, 1993, interview. Nor does the content of the cross-examination of Williams unequivocally suggest that counsel was in possession of these two interviews. The transcript of the cross-examination of Williams also includes no references to his May 26, 1996, interview. While counsel was questioning Williams about his September 22, 1993, interview with OSHP, Williams spontaneously admitted to counsel that he told OSHP "the first time" that he "didn't see, hear, or know anything, period." (*Id.* at PageID 17195-96).

be reached solely on the trial record, the first part of the *Maupin* test is not satisfied and this part of Ground Eight is not procedurally defaulted. *Maupin*, 785 F.2d at 138.[14]

A *Brady* claim arises when (1) there is evidence favorable to the accused, "either because it is exculpatory or because it is impeaching"; (2) that evidence was "suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). The *Brady* obligation applies even to "evidence known only to police investigators" and thus imposes on prosecutors "a duty to learn of any favorable evidence known to the others acting on the government's behalf ... including the police." *Id.* at 280–81, (internal quotation marks omitted). *Brady* thus applies to relevant evidence in the hands of the police, whether the prosecutors knew about it or not, whether they suppressed it intentionally or not, *id.*, and whether the accused asked for it or not, *id.* at 280; *accord United States v. Agurs*, 427 U.S. 97, 107 (1976), *holding modified by United States v. Bagley*, 473 U.S. 667 (1985).

The prejudice analysis under *Brady* evaluates the materiality of the evidence. "Evidence is material under *Brady* if a reasonable probability exists that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Jells v. Mitchell*, 538 F.3d 478, 501 (6th Cir. 2008), *writ denied*, 2011 WL 1257306 (N.D. Ohio Mar. 31, 2011). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419 (1995).

On habeas review, Skatzes' claim must be examined through "the dual lens of AEDPA and *Brady*. The two standards work 'in tandem.'" *Chinn v. Warden, Chillicothe Corr. Inst.*, 24 F.4th 1096, 1103 (6th Cir. 2022) (citing *Harrington*, 562 U.S. at 105).

---

[14] Because the Second District alternatively reviewed the merits of Ground Eight, AEDPA deference applies. *See Brooks*, 513 F.3d at 624–25 (6th Cir. 2008).

[The habeas court does not] ask whether the new evidence creates "a reasonable probability of a different result." Instead, [the habeas court asks] whether any fairminded judge could agree with the state court's *Brady* assessment….so long as the state courts reach a *decision* that reasonably applies Supreme Court precedent—however deficient some of the court's reasoning might be—[the habeas court] must deny the writ.

*Id.* (internal citations omitted). Skatzes' *Brady* claim fails because he cannot meet this standard.

In his postconviction petition, Skatzes relied on Michael Trocadoro's affidavit as proof that he provided favorable information to the OSHP that was suppressed by the prosecution. (Postconviction Petition, ECF No. 68-7 at PageID 8052-8053). Trocadoro's averred:

The highway patrol interviewed me several times after the surrender. I also took a polygraph. I said Snodgrass killed Elder. The man who administered the polygraph told me I was a liar. He said Lucky Roper killed Elder. I said he was wrong. Then Officer Phillip Long apologized for the polygraph administrator and said Skatzes killed Elder. I said he was wrong.

(ECF No. 69-1 at PageID 8913). Respondent attached an affidavit to its opposition to Skatzes' Postconviction Petition from Howard Hudson. (ECF No. 68-8 at PageID 8192-98). Hudson's affidavit contained a summary of the tape-recorded statements Trocadoro gave to the OSHP:

6. Inmate Michael Trocadoro was interviewed on May 3, 1993, in interview number 33. In this interview he said "I seen Skatzes come in and open the door to L-6-60. I saw Snodgrass—he went in and told Earl Elder you got 5 minutes to live, make peace with God. I hear him hit him four or five times with a knife or something." At page 6 of this same interview he said, "Skatzes had a long steel rod. He opened the door and let Snodgrass go in."

7. Inmate Michael Trocadoro was re-interviewed on July 13, 1993, in interview number 866. At page 15 of side B of the interview tape, Trocadoro stated, I talked to George (Skatzes) off and on all day. Around 9 to 10 at night George came down with a long key. And then Snodgrass slides into L-6-60. He tells Elder you have 5 minutes to make your peace with God. At page 16 he states, "George is holding the door, he pulled it real wide and Snodgrass goes under George's arm…I see Snodgrass making stabbing motions. Thirty seconds later George closes the door and they walk off.

(*Id.* at PageID 8193).

Even if Skatzes had not procedurally defaulted the part of Ground Eight concerning Trocadoro's statement, it would be dismissed for lack of merit. The Trocadoro statements that Skatzes contends were suppressed were not favorable because they were not exculpatory. Trocadoro's May 3, 1993, and July 13, 1993, statements were consistent with Roger Snodgrass' and Tim Williams' testimony about how Elder's murder occurred. The statements do not exonerate Skatzes and corroborate the prosecution witnesses' testimony that Skatzes escorted Snodgrass to Elder's cell for the purpose of murdering Elder.

The record reflects that the remainder of Ground Eight lacks merit because the Second District Court of Appeals was not unreasonable for concluding that the Spurlock and Williams' statements were not suppressed.

Tim Williams was interviewed by the OSHP on May 26, 1993. (ECF No. 68-8 at PageID 8195). In the interview, he said, "he did not see any assaults…[he] saw assault victims but no suspects." (*Id.*). During Skatzes' trial, his counsel acknowledged during a pretrial hearing that they had received a copy of the trial transcript from Jason Robb's trial. (ECF No. 73-3 at PageID 13941-44). Skatzes attached relevant portions of the Robb transcript including the testimony of Tim Williams to his postconviction petition:

> Q:    On May 26th, Sir, isn't it true that you told Ohio State Highway Patrol that you did not see any assaults but was recruited to go out into the yard and get food, you saw assault victims, but no suspects. You saw victims, but no suspects. Isn't it true you told them that on May 26th of 1993?
>
> Williams:    It was asked of me, and I was recruited to do anything. That was the only thing I was recruited to do is get some food.
>
> Q:    Okay. You admit that you told them that you were recruited to get food?
>
> Williams:    Yes, I did.

> Q:        But you also denied to them seeing any assaults. You saw
>           assault victims, you said, but you did not see any suspects
>           correct?
>
> Williams:    That's correct.

(ECF No. 69 at PageID 8795-99).

Skatzes' trial counsel had knowledge of the contents of Williams' May 26, 1993, statement before his trial. Counsel had Williams' sworn testimony that he had originally denied to the OSHP that he saw any assaults and could have used this testimony to impeach Williams at his trial, but did not need to, because Williams spontaneously admitted during his cross-examination that he told OSHP "the first time" that he "didn't see, hear, or know anything, period." (ECF No. 73-22 at PageID 17195-96).

The Second District's conclusion that the prosecution did not suppress the Williams' statement was not unreasonable. A prosecutor violates his constitutional duty of disclosure only if "his omission is of sufficient significance to result in the denial of defendant's right to a fair trial," *United States v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990) (quoting *Agurs*, 427 U.S. at 108), and where the defendant was aware of the essential facts that would allow him to take advantage of the exculpatory evidence, the government's failure to disclose it did not violate *Brady. Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998). If the person on trial knows or should have known the crucial information, there is really nothing for the government to disclose *Clark v. Abdallah*, 131 F.4th 432, 455 (6th Cir. 2025)(internal citations omitted). Here, Skatzes' trial counsel had the essential facts of Williams' May 26, 1993, statement from Williams' testimony in the Robb trial, which could have been used to impeach Williams at Skatzes' trial. But, as noted above, impeachment was unnecessary because Williams admitted during his testimony that he told the OSHP "the first time" that he saw nothing.

80

The record reflects that Skatzes' trial counsel also had the essential facts of Jack Spurlock's statements before trial. According to Howard Hudson's affidavit:

> 14. Inmate Jack Spurlock was initially interviewed on May 5, 1993, in interview number 644. In this interview he said he was not a snitch and would not talk to investigators even if they furnished an attorney. He was later re-interviewed in interview number 896 on July 28, 1993. In this interview, he said that inmate Michael Ellis entered L-6-60 and attacked inmate Elder. He also said Inmate Timothy Williams entered L-6-60 on two occasions and attacked Elder. On August 3, 1993, Spurlock was given a polygraph, assigned interview number 922, and determined to be lying about inmates Ellis and Williams participating in the murder of Earl Elder. On October 27, 1993, in interview number 1170, the information provided by inmate Spurlock was deemed false through the use of polygraph and subsequent interview.

(ECF No. 68-8 at PageID 8195). Skatzes' postconviction petition alleged that his trial counsel were provided with a summary of inmate interviews before trial. (Postconviction Petition, ECF No. 68-8 at PageID 8138-40). Skatzes attached the summary (in pertinent part):

| Victim's Name | Information Regarding Incident | Suspect's Name | Interview No. |
|---|---|---|---|
| Earl Elder | Inmate Jack Spurlock said that inmate Timothy Williams entered L-6-60 and attacked Earl Elder on two occasions | Timothy Williams | 896 |
| Earl Elder | Inmate Jack Spurlock on a second interview confirmed that inmate Timothy Williams killed Earl Elder. | Timothy Williams | 897 |
| Earl Elder | Witness information was deemed false through the use of polygraph and subsequent interview | Timothy Williams | 1170 |

(ECF No. 69-1 at PageID 8915, 8717).

Skatzes argued in his postconviction petition that a *Brady* violation occurred because he received the summaries in lieu of the interviews themselves. (Postconviction Petition, ECF No. 68-8 at PageID 8138-40). However, Skatzes' trial counsel knew before trial that Jack Spurlock

had accused Timothy Williams of killing Earl Elder during two interviews with OSHP. *Coe*, 161 F.3d at 344. Skatzes has not demonstrated that he was prejudiced by not receiving the actual statements.

Skatzes has failed to demonstrate that the prosecution suppressed the Williams or Spurlock statements. The record reflects that his counsel, in fact, had knowledge of the essential facts needed to take advantage of any favorable information from these statements. Notably, the affidavits from Skatzes' trial counsel make no allegation that the Williams or Spurlock statements were suppressed. (ECF No. 69 at PageID 8750-8764).

Skatzes has also not demonstrated that he was prejudiced. As discussed above, Williams admitted during his trial testimony that he originally gave an inconsistent statement to the OSHP, obviating the need for impeachment. Spurlock implicated Williams in the Elder murder, but Skatzes offers no proof that Spurlock would have been willing to repeat the accusation under oath at his trial or that his counsel would have called him as a witness. The fact that Spurlock failed the OSHP polygraph suggests that Spurlock could have been a very risky witness for the defense. The unknown potential for impeachment or rebuttal evidence may have seriously damaged the credibility of Skatzes' defense.

Skatzes has failed to establish the elements of a successful *Brady* claim. Ground Eight is without merit and is dismissed.

### *Ground Nine*

In Ground Nine Skatzes contends that the evidence was insufficient to sustain his conviction for the aggravated murder of Earl Elder. (Petition, ECF No. 25 at PageID 288-90). Skatzes raised Ground Nine on direct appeal as Proposition of Law No. 38. (Appellant Brief, ECF No. 67-7 at PageID 5510-5511). The Supreme Court of Ohio issued the last reasoned decision:

{¶ 136} With regard to the murder and kidnapping of Earl Elder, the state's evidence showed that during the initial stages of the takeover, C.O. Jeffrey Ratcliff and inmate Elder fled to the locked rear stairwell in L2. Inmates retrieved Ratcliff and Elder from the stairwell and then beat them. Elder was thereafter locked in a cell in L6.

{¶ 137} Inmate Snodgrass testified that on the first night of the takeover, after a meeting with Muslim inmate Lucky Roper, Skatzes told Snodgrass, "We got to go to L6." At L6, Skatzes told Snodgrass, "I want you to take this guy out," which Snodgrass understood to mean that he was to kill someone. When Skatzes, Snodgrass and Roper arrived at Elder's cell, Skatzes told Snodgrass, "Go ahead and take care of business, son." After Snodgrass stabbed Elder a number of times, he left the cell. Skatzes put his arm around Snodgrass and told him, "You did a good job, brother, I am proud of you."

{¶ 138} Snodgrass explained that he acted on Skatzes's orders because he believed that he would have been killed if he disobeyed an order from the Aryan Brotherhood. Aryan by-laws were introduced in support of this claim. Roper later told Snodgrass that Elder was not dead. When Snodgrass told Skatzes what Roper had said, Skatzes told Snodgrass that he would "take care of it." Inmate Tim Williams corroborated most of Snodgrass's testimony.

{¶ 139} This evidence was sufficient to support Skatzes's convictions for the kidnapping and aggravated murder of Elder. We reject proposition of law XXXVIII.

*Skatzes*, 104 Ohio St. 3d at 222–23.

Skatzes argues that the Supreme Court of Ohio's denial of his claim was unreasonable because Snodgrass' attack on Elder was unconnected to Elder's death. (Traverse, ECF No. 42 at PageID 764). Particularly, Skatzes argues that Snodgrass used an icepick to attack Elder and the coroner testified that Elder's fatal wounds were elongated and not inflicted by an icepick. (*Id.* at PageID 767-68). Skatzes also argues that the Ohio Supreme Court got the facts wrong because it concluded that Skatzes told Snodgrass "I'll take care of it," when the transcript reflects that this statement was made by Lucky Roper. (*Id.* at PageID 769). Skatzes argues that he was prejudiced by the erroneous factual conclusion because it suggests the Ohio Supreme Court believed that he inflicted the final blows on Elder and not Roper. (*Id.*).

The record reflects that the state offered testimony from the following witnesses to prove the aggravated murder of Earl Elder: Jeffrey Ratcliff, Roger Snodgrass, Tim Williams, and Dr. Larry Tate. Corrections officer Jeffrey Ratcliff testified that shortly after the riot began, he retreated to the stairwell in the rear of the range where he was working. (ECF No. 74-9 at PageID 19149). Ratcliff testified that inmate Earl Elder followed him into the stairwell, ran up the stairs and refused to get out. (*Id.* at PageID 19151-52). Eventually, a group of inmates broke into the stairwell and grabbed Elder. (*Id.* at pid 19155-57). Ratcliff testified they, "started beating and killing [Elder] right there" with knives, ball bats, and weight bars. (*Id.* at PageID 19157). Ratcliff testified that when the inmates took him to the shower in L-6, Elder was still near the stairwell. (*Id.* at PageID 19157-58).

Roger Snodgrass testified that on the first night of the riot he was smoking marijuana in the gym when Skatzes came in and approached a man who he now knows to be Lucky Roper. (ECF No. 74-4 at PageID 18395-96). Snodgrass testified that after Skatzes spoke to Roper he and Snodgrass walked over to L-6 and Skatzes told Snodgrass that he wanted Snodgrass to "take this guy out." (*Id.* at PageID 18397). Snodgrass testified that they met Roper in the middle of L-6, Roper used a key to open cell L-6-60, and Skatzes and Roper told him to "take care of business." (*Id.* at PageID 18397-98). According to Snodgrass, he went into the cell, asked the occupant who he now knows to be Earl Elder if he believed in God and told him to say his peace with God, and then stabbed him several times. (*Id.* at PageID 18398-400). Snodgrass testified that Elder was moaning and still alive when Roper went in the cell and he and Skatzes left. (*Id.* at PageID 18400). Snodgrass testified that when he and Skatzes left, Skatzes put his arm around him. (*Id.* at PageID 18401). Snodgrass testified that later, Roper returned to the gym and said that Elder was not yet dead and then Roper said, "it's cool, I will take care of it." (*Id.* at PageID 18403).

Tim Williams testified that on the first night of the riot he was staying in the back of L-6 when he saw Snodgrass, Lucky Roper, and Skatzes walk down the range and open cell L-6-60. (ECF No. 73-22 at PageID 17035-36). Williams testified that he saw Snodgrass go into the cell, heard him tell the occupant words to the effect of "make your peace with God," and saw Snodgrass stab the occupant repeatedly with an icepick. (*Id.* at PageID 17036-37). Williams testified that Roper and Skatzes were present during the stabbing (*id.* at PageID 17037-38) and after Snodgrass and Skatzes left, Roper went back into the cell and stabbed the occupant four more times. (*Id.* at PageID 17041-17042). Williams testified that he knew Earl Elder but did not recognize him during the attack because he had been injured before it started. (*Id.* at PageID 17039-40).

Dr. Larry Tate performed the autopsy on Earl Elder. (ECF No. 74-7 at PageID 18849). Dr. Tate testified that Elder suffered from one hundred sixty-three stab injuries, most of which were superficial (*Id.* at PageID 18851-52). Dr. Tate testified that five of the stab wounds were potentially lethal stab wounds to Elder's chest. (*Id.* at PageID 18852). Dr. Tate also testified that Elder suffered a number of blows to the head which could have been fatal over time. (*Id.* at PageID 18856). Dr. Tate testified that the large chest wounds were caused by an elongated instrument and were less likely to have resulted from an icepick. (*Id.* at PageID 18862). Dr. Tate testified that Elder's cause of death was multiple stab wounds into the vena cava and heart. (*Id.* at PageID 18859).

Skatzes makes the same argument in Ground Nine that he made to the Ohio Supreme Court in Proposition of Law No. 38:

> [E]ven if Skatzes intended that Snodgrass kill Elder, Snodgrass was unsuccessful. The State's two witnesses, Snodgrass and Williams heard Elder alive after George Skatzes left the area. Both attribute the killing to Mr. Roper. The coroner's testimony supports this. Snodgrass used an icepick like weapon. Snodgrass was killed by wounds from a knife with a wide blade.

(Appellant Brief, ECF No. 67-7 at PageID 511). The Ohio Supreme Court implicitly rejected this argument when it found that the evidence was sufficient to support a conviction for aggravated murder. This Court is bound to defer to the Supreme Court of Ohio's conclusions on matters of state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) ("…a state court's interpretation of state law...binds a federal court sitting in habeas corpus.")

Next, Skatzes argues that the Supreme Court of Ohio made an unreasonable determination of the facts when it concluded:

> {¶ 138} Snodgrass explained that he acted on Skatzes's orders because he believed that he would have been killed if he disobeyed an order from the Aryan Brotherhood. Aryan by-laws were introduced in support of this claim. Roper later told Snodgrass that Elder was not dead. **When Snodgrass told Skatzes what Roper had said, Skatzes told Snodgrass that he would "take care of it**." Inmate Tim Williams corroborated most of Snodgrass's testimony.

*Skatzes*, 104 Ohio St. 3d 195, ¶¶ 138. To be sure, the trial transcript confirms that Lucky Roper indeed made this statement to Snodgrass, not Skatzes. (ECF No. 74-4 at PageID 18403). That said, this error of fact is inconsequential to the sufficiency of evidence analysis.

The state's theory was never that Skatzes personally killed Elder, but that he was complicit in the murder. (ECF No. 74-12 at PageID 19707). Skatzes' jury was instructed on the essential elements to convict him of the aggravated murder of Earl Elder, including complicity and conspiracy:

> It is the prosecution's theory of this case that this defendant purposefully committed these offenses in conjunction with others. This is referred to as complicity.
>
> ***
>
> Before you can find the defendant guilty, you must find beyond a reasonable doubt…the defendant acting with the required culpable mental state for the particular offense, number one solicited or procured another to commit the offenses; number two, aided or abetted another in the committing of the offenses; and/or three conspired with another to commit the offense.
>
> ***

86

> In order to find that the defendant conspired, you must find beyond a reasonable doubt that on or about the dates charged, the defendant with purpose to commit aggravated murder or kidnapping, either, one, planned with another person or persons that one or more of them would engage in conduct which facilitated the commission of the offense, or two agreed with another person or persons that one or more of them would engage in conduct which facilitated the commission of such an offense.

(ECF No. 74-13 at PageID 19868-71). The evidence presented at trial established that Skatzes, Roper, and Snodgrass participated in a common plan to kill Earl Elder. Whether Snodgrass or Roper inflicted the death blows with an icepick or some other weapon, the evidence is sufficient to sustain Skatzes' conviction for aggravated murder.

For these reasons, and considering the double deference owed to the jury and the Supreme Court of Ohio, the Court finds that Ground Nine is without merit.

### *Grounds Six & Ten*

In Ground Six, Skatzes asserts a freestanding claim for actual innocence of the murder of David Sommers (Petition, ECF No. 25 at PageID 277-80), and in Ground Ten, Skatzes asserts a freestanding claim for actual innocence of the murder of Earl Elder. (Petition, ECF No. 25 at PageID 291-95). Skatzes raised Grounds Six and Ten through a motion for a new trial based on new evidence filed with the Court of Common Pleas around the same time as his postconviction petition. (Memorandum in Support of Motion for a New Trial, ECF No. 70-8 at PageID 11042-11058). The last state court to address Ground Six and Ten,[15] was the Second District Court of Appeals' opinion consolidating postconviction and motion for a new trial issues:

> {¶ 105} Under his first and second assignments of error, Skatzes claims that Roger Snodgrass's alleged recantation of his trial testimony to Buddy Newell constituted

---

[15] The standard for a new trial under Ohio's Crim R. 33(A)(6) is substantially more lenient than the federal standard for actual innocence. "Before a new trial can be granted upon the basis of newly discovered evidence, the defendant must show that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *State v. Vinzant*, 2008-Ohio-4399, ¶ 7.

new evidence that could have changed the outcome of his trial. As we discussed under Skatzes' fourth assignment of error regarding postconviction relief, Newell claimed that Snodgrass had recanted his trial testimony about Skatzes' involvement in Earl Elder's and David Sommers' murders. Newell's claims were based on statements that were allegedly made to him by Snodgrass while they were in prison together. The statements directly contradict Snodgrass's trial testimony, and an affidavit submitted by Snodgrass. Skatzes asserts, however, that Snodgrass had an incentive to lie in his affidavit in order to avoid perjury charges. Skatzes contends that the trial judge "ordinarily should hold an evidentiary hearing" under these circumstances to assess the credibility of the affidavits.

{¶ 106} As the state points out, Newell did not have firsthand knowledge of some of the central allegations in his affidavits, such as the nature of the conversations between Snodgrass and the prosecutors. There are other reasons to doubt the credibility of the Newell affidavit as well, such as inconsistencies between the timeline that Newell recounts and the timing of Snodgrass's plea. More importantly, even if the trial court credited the statements in Newell's affidavit, the evidence only serves to impeach or contradict the evidence offered at trial. Such evidence does not justify a new trial. *Vinzant*, 2008–Ohio–4399, at ¶ 6 and 7. As such, the trial court did not err in denying the motion for new trial based on Newell's affidavit.

*State v. Skatzes*, 2008-Ohio-5387, ¶¶ 105-107.

To begin with, the Court will address Respondent's argument that freestanding claims of actual innocence are not cognizable in federal habeas corpus review. (Return of Writ, ECF No. 31 at PageID 494-499, 501). To be sure, "federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). In *House v. Bell*, 547 U.S. 518 (2006), the Supreme Court declined to answer the question left open in *Herrera*—whether a habeas petitioner may bring a freestanding claim of actual innocence. *See id.* at 554. Yet the Supreme Court also noted, "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* (quoting *Herrera*, 506 U.S. at 417); *Wright v. Stegall*, 247 F. App'x 709,

711–12 (6th Cir. 2007) ("Except in death penalty cases, freestanding actual innocence claims are not cognizable in federal habeas proceedings.").

Ohio's Criminal Rule 33 ostensibly provided Skatzes an avenue to litigate his innocence through the procedure to seek a new trial. Nevertheless, because the viability of a freestanding actual innocence claim remains an open question, and because the Supreme Court and the Sixth Circuit have acknowledged such a claim's possibility in a capital case, the Court will not summarily dismiss Grounds Six and Ten. The question becomes, then, which standard the Court should use to analyze Skatzes' freestanding actual innocence claims.

Perhaps the best example of the implementation of freestanding actual innocence is found in *In re Davis*, 557 U.S. 952 (2009), where the Supreme Court transferred a habeas petition filed under its original jurisdiction to the Southern District of Georgia to "receive testimony and make findings of fact as to whether evidence that could not have been obtained at the time of trial clearly establishes petitioner's innocence" under *Herrera*. *Id.* In determining the appropriate standard to apply, the Southern District of Georgia, began with *Herrera*:

> [B]ecause of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be *extraordinarily high.*

*In re Davis*, No. CV409-130, 2010 WL 3385081, at *43 (S.D. Ga. Aug. 24, 2010) (quoting *Herrera*, 506 U.S. at 417 (emphasis added)). The court found, "the standard must be (1) extraordinarily high, (2) more demanding than *Schlup,* and (3) crafted from the perspective of a reasonable juror." And the court concluded that, "[the petitioner] must show by clear and convincing evidence that no reasonable juror would have convicted him in the light of the new

evidence." *Id.* at 44. Applying this standard to Grounds Six and Ten, the Court concludes that Skatzes is not entitled to habeas relief based on a freestanding actual innocence claim.

To demonstrate his innocence in Ground Six, Skatzes offers the affidavits of Emanuel "Buddy" Newell (ECF No. 70-8 at PageID 11111-19, ECF 70-9 at PageID 11259-62), Aaron Jefferson (ECF No. 69 at PageID 8747-49), Dewey Bocook (*id.* at PageID 8765-68), Wayne Flannigan (*id.* at PageID 8769-71), and James Hunt (*id.* at PageID 8788-90).[16] Respondent counters with competing affidavits from Mark Piepmeier (ECF No. 70-9 at PageID 11215-16) and Roger Snodgrass[17] (*id.* at PageID 11213-14).

Newell's affidavit (11/8/2006) attests that while he was incarcerated with Roger Snodgrass at Toledo Correctional Institution in 2006, Snodgrass recanted his trial testimony implicating Skatzes in Sommers' murder. (ECF No. 69 at PageID 11111). According to Newell, he and Snodgrass reconciled, and Snodgrass confided in him that he lied during his testimony at Skatzes' trial to save himself from the death penalty. (*Id.* at PageID 11113-14). Newell attests that

---

[16] The only affidavit attached to Skatzes' motion for a new trial based on the murder of David Sommers was Buddy Newell's. (ECF No. 70-8 at PageID 1111-16; 70-9 at PageID 11259-62). Skatzes referenced the Johnson, Bocook, Flannigan, and Hunt affidavits that were attached to his postconviction pleadings in his motion for a new trial (ECF No. 70-8 at PageID 11049) and his brief to the Second District Court of Appeals. (Appellant Brief, ECF No. 70-10 at PageID 1384). These affidavits were not considered by the Second District in its opinion. Out of an abundance of caution, the Court has considered the affidavits in the manner they were referenced by Skatzes in his state court pleadings. The Court has not considered the affidavits by Albert Klontz or David Marsh because they were not attached to the motion for new trial or referenced therein, and thus not before the Second District Court of Appeals.

[17] On November 10, 2010, Respondent filed a Motion to Expand the Record (ECF No. 36) with an affidavit from Newell that recants the affidavit he provided to Skatzes. (ECF Nos. 36-1, 36-2). The Court granted Respondent's motion. (ECF No. 40). But this decision was rendered on November 17, 2010, which was before the United States Supreme Court opinion in *Pinholster*, 563 U.S. 160, was issued in 2011. The Sixth Circuit has held that the limitations on a habeas court's ability to consider documents outside the state court record cannot be waived, even by the state, *see Moore*, 708 F.3d at 784, indicating that the restrictions announced in *Pinholster* equally extend when the Respondent wishes to supplement the record with a document that was omitted from the state court proceedings. Accordingly, despite the Court's Order at ECF No. 40, Newell's recantation affidavit (ECF Nos. 36-1, 36-2) has not been considered in assessing the merits of Grounds Six and Ten.

Snodgrass admitted that he, Bocook, and Brookover alone killed Sommers.[18] (*Id.* at PageID 11114).

The Johnson, Bocook, Flannigan, and Hunt affidavits are offered by Skatzes to bolster the credibility of Newell's affidavit. (ECF No. 70-10 at PageID 1384-86). Particularly, Skatzes claims that these affidavits show that Snodgrass was lying because he was not present during Sommers' murder. The specific content of the Johnson, Bocook, and Flannigan affidavits are discussed in connection with Ground Three, *supra*.

James Hunt asserts in his affidavit that he was incarcerated with Roger Snodgrass at Warren Correctional Institution "after the Lucasville riot." (ECF No. 69 at PageID 8788-90). Hunt's affidavit states that Snodgrass bragged about killing Sommers with Brookover and that Skatzes was not involved. (*Id.*) The affidavit further asserts that Snodgrass said he made a deal with prosecutors and planned to say whatever they wanted. (*Id.*)

Respondent's affidavits from Roger Snodgrass and prosecutor, Mark Piepmeier contradict Skatzes' contention that Snodgrass lied during his trial testimony. Snodgrass asserts that he was not promised anything or threatened in exchange for his testimony, his testimony was truthful, he never spoke to Newell about his testimony, and he was within 47 days of release on parole when he was housed at Toledo Correctional Institution. (ECF No. 70-9 at PageID 11213-14). Piepmeier

---

[18]    Skatzes attached a second Newell affidavit to his motion for a new trial (12/30/1998). (ECF No. 70-9 at PageID 11259-62). This affidavit does not specifically mention details of the Sommers' murder but alleges that the Ohio State Highway Patrol urged him to implicate Skatzes, and even though he testified on behalf of the state in the Aaron Jefferson trial, and the parole board denied him parole because he had also testified on behalf of Lucasville defendants.

Mark Piepmeier's affidavit appears to contradict Newell's statement that he testified for the state in the Aaron Jefferson trial, stating, "As a result of his unstable mental state [Newell] was never called as a witness for the state at any riot trial." (ECF No. 70-9 at PageID 11216). The Court notes that this is not accurate. The state called Newell as a rebuttal witness in Aaron Jefferson's trial. *See State v. Jefferson*, No. 15828, 1997 WL 111757, at *2 (Ohio Ct. App. Mar. 14, 1997) ("On rebuttal, the state presented the testimony of Buddy Newell, who stated that Jefferson, Snodgrass and another man had beaten him with an aluminum baseball bat on the last day of the riot, but that he had escaped because he wrestled the bat away from Jefferson.").

asserts that Snodgrass never changed his story and was never promised anything or threatened for his testimony. (*Id.* at PageID 11215-16).

The Second District determined that Newell's affidavit lacked credibility. This conclusion is not unreasonable. Delayed affidavits which seek to exonerate a habeas petitioner are "treated with a fair degree of skepticism." *Herrera*, 506 U.S. at 423. Indeed, claims "based solely upon affidavits are disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations." *Id.* at 390. As noted by the Second District, Skatzes' claim of perjury is based on hearsay and "[h]earsay is presumptively unreliable and insufficient to establish actual innocence." *See Bell v. Howes*, 701 F. App'x 408, 412 (6th Cir. 2017) (citing *Herrera*, 506 U.S. at 417); *Knickerbocker v. Wolfenbarger*, 212 F. App'x 426, 433 (6th Cir. 2007).

In addition to the credibility issues identified by the Second District, Newell's affidavit should be viewed in context. Snodgrass testified that he tried to kill Newell during the riot, Newell begged Snodgrass not to murder him, and Newell only narrowly escaped death because he managed to get "the upper hand" by obtaining a shank. (ECF No. 74-5 at PageID 8495-97). The history between Newell and Snodgrass casts a healthy amount of doubt on the veracity of Newell's claims of reconciliation with Snodgrass and his accusations of perjury.

The remaining affidavits fare no better. The specific credibility and content problems of the Jefferson, Bocook, and Flannigan affidavits are discussed in Ground Three, *supra*. Hunt's affidavit suffers from the same problem as Newell's affidavit in that it discredits sworn trial testimony solely on hearsay.

The fair degree of skepticism with which the Court views the affidavits coupled with the extraordinarily high standard for actual innocence, presuming the Supreme Court would ever

actually entertain a freestanding actual innocence claim, prevents relief on Ground Six. Skatzes argues that evidence at his trial proves that he was not present during the Sommers' murder. (Traverse, ECF No. 42 at pid 720-735). He argues that there was no physical evidence connecting him to the murder, the state's case hinged on the testimony of Snodgrass and Brookover, Snodgrass admitted to multiple murders, Skatzes was not involved in the plot to kill Sommers, and Snodgrass' testimony contradicted the coroner's testimony about the nature and location of Sommers' injuries.[19] (*Id.* at PageID 728-33). The jury heard all this evidence at trial and still convicted. Skatzes' new affidavits, which suffer from general and specific credibility problems, considered along with the trial evidence,are simply insufficient to prove by clear and convincing evidence that no reasonable juror would have rendered a guilty verdict.

In Ground Ten, Skatzes argues that he is actually innocent of the aggravated murder of Earl Elder, relying on the affidavits of Eric Girdy, Anthony Taylor, Michael Trocadoro, Kenneth Law, James Hunt, and Buddy Newell. (ECF No. 69-1 at PageID 8907-10; 8851-52; ECF 69 at PageID 8848-52; ECF No. 69-1 at PageID 8967-70; ECF No. 69 at PageID 8788-90; ECF No. 70-8 at PageID 11111-16). He also relies on the interview summary of Jack Spurlock. (ECF No. 69 at PageID 8915).

Skatzes argues that these affidavits exonerate him of the Elder murder. But as pointed out in Ground Seven, the affidavits of Girdy, Taylor, Trocadoro, and Law lack credibility because they tell four different stories about how Elder was killed and each name a different group of perpetrators. (ECF No. 69-1 at PageID 8907-10; ECF No 69 at PageID 8851-52; ECF No. 69-1 at PageID 8911-13; ECF No. 69 at PageID 8848-50; ECF No. 69-1 at PageID 8967-70). Also pointed out in Ground Seven, Eric Girdy's affidavit is unreliable because he fails to mention his own

---

[19] Following *Pinholser*, *supra,*(2011), the Court has not considered evidence cited by Skatzes in his Traverse (ECF No. 42 at PageID 28-33) that was not included in the state court record.

culpability, to which he later admitted in 2006 when he plead guilty to Elder's murder. (ECF No. 68-10 at PageID 8586-89).

Newell's affidavit asserts that Skatzes was not involved in Elder's murder, but the credibility problems with Newell's affidavit discussed in Ground Six apply equally to Ground Ten. James Hunt's affidavit only offers hearsay testimony and does not specifically mention the murder of Earl Elder. (ECF No. 69 at PageID 8788-90). The Spurlock interview summary accuses Timothy Williams of the Elder murder, but without an affidavit Skatzes cannot show that Williams was willing to repeat this accusation under oath to a court of law. *See Freeman v. Trombley*, 483 F. App'x 51, 63 (6th Cir. 2012) (finding unsworn statement in support of actual innocence to be "inherently unreliable."); *Bell*, 701 F. App'x at 412 (same).

The jury heard largely consistent testimony from Snodgrass and Williams about the murder of Earl Elder. Skatzes' actual innocence witnesses offer inconsistent statements over time and compared to each other. Skatzes has failed to demonstrate by clear and convincing evidence that no reasonable juror would have convicted him of the aggravated murder of Earl Elder with these witnesses' testimony.

Skatzes has failed to prove, by clear and convincing evidence, that no reasonable juror considering the new evidence would have found him guilty of the murders of Sommers and Elder. Skatzes freestanding actual innocence claims in Grounds Six and Ten are dismissed for lack of merit.

### Ground Eleven

In Ground Eleven, Skatzes contends that his trial counsel were ineffective in the penalty phase of his trial. (Petition, ECF No. 25 at PageID 295-314). Skatzes raised what he now identifies in his federal habeas petition as Ground Eleven across ten separate claims in his postconviction

petition (ECF No. 68-7 at PageID 8074-75, 8082-8098—ECF No. 68-8 at PageID 8108). The

postconviction court denied the claims that form Ground Eleven and Skatzes appealed. (ECF No.

68-10 at PageID 8656-63; Appellant Brief, ECF No. 70-1 at PageID 9982-89). The Second District

affirmed:

> {¶ 90} Skatzes contends that trial counsel failed to utilize a "wealth of information" that could have helped to mitigate his sentence, and that counsel was thus ineffective in representing him. Specifically, Skatzes contends that his attorneys did not hire a competent mitigation expert to investigate the evidence that might have been offered in his case. As a result, he claims that he was deprived of the possibility that a lesser sentence might have been imposed if counsel had more thoroughly explored and presented evidence about his childhood, a prior head injury, and his mental health.

> {¶ 91} Skatzes relies on *Wiggins v. Smith* (2003), 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471, which held that trial counsel cannot make a reasonable strategic decision not to present extensive evidence about a defendant's background in mitigation without having first investigated the defendant's background. The Court held that, without an investigation, counsel cannot be presumed to have made a reasonable and informed strategic decision. The Court defined the deference owed an attorney's strategic judgments in terms of the adequacy of the investigations supporting those judgments, stating:

> {¶ 92} "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521–522, citing *Strickland*, 466 U.S. at 690–691. See, also, *Williams*, 529 U.S. 362.

> {¶ 93} In *Wiggins*, the Court concluded that the trial attorneys had acted unreasonably and ineffectively in failing to investigate Wiggins' background before deciding not to present mitigating evidence based on his background during the sentencing proceedings. In a report prepared for the postconviction proceedings, a forensic social worker reported that Wiggins, who was 27 years old and had no history of violent behavior, had suffered severe physical and sexual abuse in his childhood. His alcoholic mother had left Wiggins and his siblings home alone for days, forcing them to beg for food and eat paint chips and garbage. She locked the kitchen to keep the children from getting food, and she beat them if they broke in.

She had sex with men while her children were in the same bed and, on one occasion, intentionally burned Wiggins on a hot stove burner. When he had been removed to foster care, Wiggins continued to suffer abuse. He was physically abused by two foster mothers and was molested and raped by a foster father. In another foster home, he was repeatedly gang-raped by other children in the home. *Wiggins*, 539 U.S. at 513–517. Moreover, Wiggins' trial counsel did not hire a forensic social worker to prepare a social history of Wiggins, even though the state made funds available for that purpose. Some of counsel's statements at trial indicated that counsel had no knowledge of the abuse. These factors led the Court to conclude that counsel's investigation of mitigation evidence did not reflect reasonable professional judgment, and thus did not meet *Strickland's* performance standards. Id. at 533.

{¶ 94} Skatzes contends that, as in Wiggins, his counsel failed to thoroughly and effectively investigate his background for mitigation evidence and to present that evidence at trial. In affidavits from his attorneys and the mitigation investigator, Skatzes presented evidence that the mitigation investigator hired by his attorneys was inexperienced and that the attorneys did not closely oversee her work. Skatzes' attorneys also claim in their affidavits that they were unaware of any abuse or neglect. The mitigation investigator stated that she spoke with Skatzes' sister numerous times during her investigation, but that other family members did not return her calls and that Skatzes attempted to "dictate" the questions she would ask.

{¶ 95} Although Skatzes' attorneys appear to have been unaware of the alleged abuse in his childhood, there is no suggestion in the petition for postconviction relief that Skatzes' abuse was analogous to the abuse in *Wiggins*. When he sought postconviction relief, Skatzes' former wife, who did not have first-hand knowledge of many of the incidents recounted in her affidavit, offered the following evidence: Skatzes' mother raised him, his sister, and two older half-brothers alone; he was close to his sister but his relationships with the older half-siblings were strained; Skatzes' mother brought many men to the house and engaged in sexual activity with them; Skatzes' mother verbally abused the children; Skatzes' father's death when he was 14 hit him very hard; Skatzes' mother was "cold" and "bitter" and did not show any warmth toward the children; and the children's clothes were often dirty, second-hand, and a source of embarrassment. A childhood friend also stated by affidavit that Skatzes' half-brothers frequently "beat on him." Although these factors paint a picture of Skatzes' childhood that is far from idyllic, they are much less egregious than the incidents endured by Wiggins.

{¶ 96} There are also several references in the record to the fact that Skatzes did not cooperate with the involvement of his family in his defense. Skatzes apparently thought that the corrections officer who testified on his behalf was treated harshly by the prosecutors, and he therefore did not want family members called to testify. According to the mitigation investigator, this lack of cooperation extended to her efforts to speak with Skatzes' family. He placed limits on what he wanted the investigator to do, and family members did not cooperate with her efforts to contact

them. Thus, trial counsel's ignorance of the abuse now alleged does not appear to have been attributable to a lack of effort, but to a lack of cooperation. As such, it does not constitute ineffective assistance of counsel.

{¶ 97} Skatzes also contends that trial counsel should have gathered and presented evidence about his "possible traumatic head injury" and depression. On direct appeal, however, Skatzes challenged counsel's effectiveness for failing to present evidence of mental illness. These arguments are substantially similar. Moreover, Skatzes' evidence in support of a head injury and consequent behavioral issues was very thin. He presented an affidavit and report from Douglas W. Scharre, M.D., a professor of neurology and psychiatry, who noted "mild" and "slight" impairments and "hints" of dysfunction. We think it very unlikely that this evidence would have had a significant impact on the jury's determination.

{¶ 98} In sum, we conclude that the trial court did not abuse its discretion when it concluded that the proffered mitigation evidence would not have changed that outcome of the trial and that counsel were not ineffective in failing to discover or present it.

{¶ 99} The eleventh assignment of error is overruled.

*State v. Skatzes*, 2008-Ohio-5387, ¶¶ 89-99.

Skatzes argues that his counsels' investigation and presentation of mitigation evidence during the penalty phase of his trial was inadequate. Particularly, Skatzes contends his counsel retained and failed to properly supervise an unqualified mitigation investigator (Petition, ECF No. 25 at PageID 297-99), failed to identify family members who could have offered relevant information about his background (*id.* at PageID 299-302), failed to properly respond to Skatzes' reluctance for his family members to testify (*id.* at 299, 302-03, 306-10), failed to obtain prison and educational records (*id.* at PageID 302-04), overlooked evidence of brain injury and possible brain trauma (*id.* at PageID 304-06), failed to present evidence from the retained psychologist because he arrived at a diagnosis of antisocial personality disorder (*id.* at PageID 304-07), and failed to present evidence from a prison culture expert who would demonstrate duress. (*id.* at PageID 312-14). Skatzes explains he was prejudiced "because testimony from an expert would have provided the jury with the complex picture of a man 'badly damaged [and] almost certainly

brain-impaired [who is the] product of a highly dysfunctional family crucible, a person whose behavior and decisions throughout the Lucasville riot are only comprehensible against the backdrop of his life experiences....'" (*Id.* at PageID 311).

Respondent argues that part of Ground Eleven is procedurally defaulted. (Return of Writ, ECF No. 31 at PageID 453-54). Respondent points out that Skatzes failed to appeal postconviction claim twenty-eight, which alleged his trial counsel were ineffective for failing to engage a prison culture expert. The record reflects that Skatzes did not include this part of Ground Eleven in his appeal to the Second District (ECF No. 70-1 at PageID 9982-89), and it is therefore procedurally defaulted.[20] *See Buell*, 274 F.3d at 349. In any case, discussed below, the entirety of Ground Eleven is without merit.

The penalty phase of Skatzes' trial began on January 10, 1996, twenty-five days after the guilty verdicts were entered. (ECF No. 74-15).[21] Skatzes called five witnesses to testify: John Powers (*id.* at PageID 19944-73), Dwayne Johnson (*id.* at PageID 19975-20003), Wendell Drake (*id.* at PageID 20003-33), Charles Schweingrouber (*id.* at PageID 20033-60), and Jeffrey Ratcliff (ECF No. 74-16 at PageID 20067-85). Skatzes also made an unsworn statement to the jury. (*Id.* at PageID 20087-131).

Powers, Johnson, and Drake, who are African American, testified that Skatzes never exhibited any racist behavior toward them. (ECF No. 74-15 at PageID 19948-49, 19977, 20006-07). All five witnesses testified that they believed that Skatzes would be a positive influence in

---

[20]    Skatzes also asserts his actual innocence as an excuse (Traverse, ECF No. 42 at PageID 783), the merits of which are addressed and denied in connection with his procedural and substantive claims.

[21]    At the outset of the proceedings, Skatzes confirmed to the trial judge that he voluntarily chose to wear his prison uniform instead of street clothes for the penalty phase. (ECF No. 74-15 at PageID 19920).

prison for younger inmates. (*Id.* at PageID 19958-61, 19994, 20014-15, 20040; ECF No. 74-16 at PageID 20068).

Skatzes' unsworn statement to the jury sheds a good deal of light on the reasons for the nature and scope of the mitigation evidence. Skatzes gave a lengthy statement, a significant portion of which he dedicated to emphatically professing his innocence and challenging the evidence from the guilt phase of his trial. (*Id.* at PageID 20103-20129). Skatzes specifically told the jury that he did not want his family to testify:

> …I discovered that I was a very fortunate person, and I had a lot of people out there that really care for me and stuff like that, and I could have them coming in here for God knows how long.
>
> But I refused to do that because I'm very protective for my loved ones. And no disrespect intended to the prosecutor, but I seen what they did to Jeff Ratcliff first time around and I didn't much appreciate that, and I would not tolerate them disrespecting my loved ones in that way of talking to them.

(*Id.* at PageID 20101). Skatzes also told the jury about how the mitigation evidence they heard took shape:

> Well, so my bottom line is I'm not going to come up in here and do anything to counteract what Mr. Kelleher and Mr. Dixon have done. Like I told you before, the first time, at first I was ready to tell you to plug it in.
>
> I'm tired I'm real tired, and if it wasn't for my people, I would still have that attitude I suppose and Mr. Kelleher, as odd as it seems, he came across with the idea or reality that I could be of some help in the prison setting.

(*Id.* at PageID 20128).

Skatzes now argues that his counsel were ineffective because the mitigation evidence should have been much more expansive. First, Skatzes faults the work performed by his mitigation investigator, Susan Evanson, as inadequate. Evanson's invoice largely belies Skatzes' allegations. (ECF No. 66-2 at PageID 2842-44). It reflects that Evanson was in regular contact with Skatzes' sister, beginning in December 1994. (*Id.*). Evanson interviewed his sister and brother in person in

December 1994, interviewed Skates and other inmates at Chillicothe Correctional Institute multiple times, interviewed family members in both Marion and Dayton, made telephone calls to Skatzes' friends and relatives asking for testimonials, and prepared a social history for use during the penalty phase. (*Id.*). Evanson's invoice shows over two hundred hours of work. (*Id.*). Susan Evanson's affidavit is consistent with her invoice. It asserts that she recalls speaking to Skatzes' sister "numerous" times, reaching out to other family members, and gathering background records. (ECF No. 69-2 at PageID 9088-89).

The state court record also belies Skatzes' allegation and his trial counsels' affidavits swearing that they did not collect prison, child protection, or any other public records. (ECF No. 69 at PageID 8754-55, 8762-63). Jeffrey Kelleher signed and filed a Motion to Release State Held Records on December 8, 1994, seeking records from: Ohio Department of Youth Services, Adult Parole Authority, County Probation Department, and Ohio Department of Rehabilitation and Correction. (ECF No. 66 at PageID 2303-09). Skatzes' counsel specifically requested these records for use in the penalty phase of the trial. (*Id.* at PageID 2034). The record reflects that both Kelleher and Dixon appeared on behalf of Skatzes at the December 8, 1994, hearing where the Motion to Release State Held Records was addressed (ECF No. 73-2 at PageID 13819, 13871) and granted (ECF No. 66 at PageID 2338-40). In connection with counsels' request for discovery, the Court ordered the Ohio Department of Rehabilitation and Correction to turn over Skatzes' institutional records. (*Id.* at PageID 2347). On top of that, Skatzes' counsel issued a subpoena for Skatzes' "complete DRC file, including medical records." (*Id.* at PageID 2497-98). Which documents Skatzes' counsel received is unclear, but the record refutes any accusation that no independent effort was made.

Skatzes further supports Ground Eleven with an affidavit from his sister, Jackie Bowers (ECF No. 69-1 at PageID 9012-17) and his former wife, Cindy Skatzes (ECF No. 69-2 at PageID 9085-87). Bowers claimed that she and Skatzes grew up in a house with a mother who was promiscuous and often had strange men in the house for sex. (ECF No. 69-1 at PageID 9012, 9014). Bowers stated that Skatzes idolized their father and was devastated when he died. (*Id.* at PageID 9013). Bowers recounted that they were poor, had inadequate food, and wore dirty clothing. (*Id.* at PageID 9015). Bowers attested that both their mother and half-brothers were physically abusive to Skatzes and recalled that her half-brothers hit George with a "big black belt." (*Id.* at PageID 9013-9014). Bowers stated that Skatzes' mother would call the Child Welfare Office to pick him up and the state took custody of George and her on account of truancy. (*Id.* at PageID 9014, 9015). Bowers recalled a family history of depression and believed Skatzes suffers from depression as well. (*Id.* at PageID 9016). Bowers described Skatzes as a good father, husband, and provider. (*Id.* at PageID 9016). Bowers asserted that Skatzes did not want her to testify. (*Id.* at PageID 9017).

Cindy Skatzes asserted that she was married to Skatzes from 1978 to 1987. (ECF No. 69-2 at PageID 9085, 9087). The marriage produced one male child named "Shane." (*Id.* at PageID 9085). Cindy Skatzes described her former husband as a good father who is loyal to a fault. (*Id.* at PageID 9085, 9086). Cindy Skatzes also described Skatzes' mother as a cold and bitter woman. (*Id.* at PageID 9085). Cindy Skatzes asserted that Skatzes' mother entertained "numerous men" in the house, and Skatzes once walked in on his mother performing a sexual act on an unknown man.

*Id.* at PageID 9086). Cindy Skatzes claimed that her marriage involved "physical altercations" with Skatzes. (*Id.*).[22]

Skatzes relies heavily on an affidavit and sixty-two page report from Jeffrey Smalldon, Ph.D., in support of his argument that his trial attorneys were ineffective during the penalty phase. (ECF No. 69-1 at PageID 9018—ECF No. 69-2 at PageID 9081). Smalldon opines that Skatzes' counsels' mitigation efforts were deficient based on interviews with lay and expert witnesses and a records review. (ECF No. 69-1 at PageID 9022).

Dr. Smalldon interviewed Skatzes' sister, Jackie Bowers. (*Id.* at PageID 9022-25). Bowers reported details similar to her affidavit, including that their mother was hypercritical, neglectful, promiscuous, and emotionally abusive, and their father was absent. (*Id.* at PageID 9023). Bowers also reported to Dr. Smalldon that Skatzes was heavily impacted at age 14 by the death of his father and he was physically abused by his brother, Jim Loop. (*Id.* at PageID 9023). Bowers also recalled that they were embarrassed by their living conditions and their mother's reputation. (*Id.* at PageID 9023). Bowers recalled that Skatzes told her that he did not want her to testify because he did not want the prosecutors to "grill her" on the stand. (*Id.* at PageID 9025).

Dr. Smalldon interviewed Skatzes' ex-wife, Cindy Skatzes, who also provided information similar to her affidavit. According to Cindy Skatzes, Skatzes described his mother as cold, self-centered, and physically abusive. (*Id.* at PageID 9025-9026). Dr. Smalldon reported that Cindy Skatzes spoke about her former husband with affection, but also reported that Skatzes was difficult to be married to and was controlling, possessive, and physically aggressive towards her. (*Id.* at

---

[22]     Skatzes also provided an affidavit from his childhood friend, Arthur Davis, who confirmed that Skatzes' mother was mean and had a reputation for having many men around the house, and his half-brothers were physically abusive. (ECF No. 69-2 at PageID 9090-9091).

PageID 9025-26). Cindy Skatzes reported that her former husband had a history of wanting to prove that he was a "bad ass," and placed a high value on loyalty and respect. (*Id.* at PageID 9026).

Dr. Smalldon interviewed Skatzes' older brother, Jim Loop. (*Id.* at PageID 9031-9033). Loop described Skatzes' father as a mean drunk. (*Id.* at PageID 9031). He also described Skatzes as someone who always wanted to help people. (*Id.* at PageID 9032). Loop reported that Skatzes was fearful that someone would harm his family if they testified on his behalf. (*Id.* at PageID 9032-9033).

Dr. Smalldon summarized his review of Skatzes' education, child protection, and corrections records. (ECF No. 69-2 at PageID 9033-36). His records review revealed that Skatzes had trouble with attendance at school, which was attributed to the circumstances of his home life (*id.* at PageID 9033, 9036), his family had "limited funds" (*id.* at PageID 9033), and he was removed from the home at age 14 and placed at Marion County Children's Home (*id.* at PageID 9036). Skatzes' corrections records showed two letters of commendation for voluntary participation in a "Christmas Box Detail" and a construction project. (*Id.*).[23]

Dr. Smalldon also interviewed Skatzes. (*Id.* at PageID 9049-70). Skatzes confirmed reports from other family members that his mother was emotionally neglectful and physically abusive. (*Id.* at PageID 9058). Skatzes conveyed that he grew up very poor and without access to adequate bathing facilities and clothes. (*Id.*). Skatzes described his home life as "miserable" and linked his truancy and the beginning of his criminal activity. (*Id.* at PageID 9059).

---

[23] Included here is information that was not presented to the jury during the penalty phase. The Court does not include Dr. Smalldon's summary and opinions related to the negotiation tapes and radio broadcast, as that evidence was presented to the jury during the guilt phase of the trial. It is unclear whether the trial court would have permitted Dr. Smalldon to reframe the meaning and intent of Skatzes' words during the mitigation phase of the trial.

Dr. Smalldon also uncovered unfavorable information about Skatzes' history and background during his interview. For example, Skatzes reported that he fathered nine children by eight women and never met two of the children. (*Id.* at PageID 9059, 9061, 9063). Skatzes admitted that he was physically abusive toward most of the women with whom he had been involved. (*Id.* at PageID 9059). Skatzes also reported information that would have contradicted a case that he would have been a model inmate if sentenced to life imprisonment, including his belief system that his survival depended on an appearance of strength, and he "had" to respond to instances of disrespect with a show of physical strength. (*Id.* at PageID 9065). Skatzes served time for assisting a friend escape from jail, and he described himself as once "being on the run" from authorities (*Id.* at PageID 9063).

Dr. Smalldon administered a battery of tests and concluded that Skatzes has average intelligence. (*Id.* at PageID 9053). Dr. Smalldon arrived at a diagnosis of depressive disorder, dementia due to head trauma, antisocial personality disorder, and paranoid and aggressive traits. (*Id.* at PageID 9078). Dr. Smalldon concluded that Skatzes' performance on some of the tests suggested a "mild degree of functional brain impairment." (*Id.* at PageID 9076).

Dr. Smalldon criticized James Eisenberg, Ph.D., the psychologist hired by Skatzes' trial counsel, (*Id.* at PageID 9044-9045). Dr. Smalldon interviewed Dr. Eisenberg who reported that he diagnosed Skatzes with antisocial personality disorder and "there was little if anything he could present as a mitigation witness that would assist the defense." (*Id*. at PageID 9044). Dr. Smalldon referred to Dr. Eisenberg's conclusion as the "wrong approach." (*Id.* at PageID 9044). Dr. Smalldon believed that Skatzes' diagnosis could have been explained to the jury as a product of his experiences as a child and adolescent. (*Id.* at PageID 9044-9045).

Lastly, Dr. Smalldon criticized Skatzes' trial counsel for improperly managing Skatzes' directives that his family members were not to testify during the penalty phase. (*Id.* at PageID 9046-9047). Dr. Smalldon opined that this type of reluctance is common among capital defendants, and it was defense counsel's responsibility to manage Skatzes' "emotional ups and downs," and educate him about the "mitigation enterprise" and how critical it is for his long-range prospects. (*Id.* at PageID 9047). Dr. Smalldon acknowledged,

> Mr. Skatzes has always insisted that he was not guilty of the most serious crimes with which he'd been charged by the state. Part of the challenge for the defense was to overcome his resistance to planning the presentation of mitigation for crimes he denied having committed in the first place. That was, of course, a steep hill to climb, but it was one that absolutely had to be scaled if the trial jury was to be afforded access to information about him and his personal history that could very well prompt a sentencing decision in favor of life over death.

(*Id.*).

In support of Ground Eleven, Skatzes also relies on an affidavit and report from Douglas Scharre, M.D. (ECF No. 69-2 at PageID 9092-95). Dr. Scharre, a neurologist and psychiatrist, performed a physical exam of Skatzes and ordered a positron emission tomography ("PET") scan. (*Id.* at PageID 9094-9095). Dr. Scharre concluded that the PET scan showed evidence of "mild right fronto-parietal hypometabolism and mild left parietal hypometabolism" of unknown etiology, with traumatic brain injury as a possibility.[24] (*Id.* at PageID 9095).

To establish the part of Ground Eleven arguing his counsel was ineffective for failing to engage a prison culture expert, Skatzes offers the affidavit of Clemens Bartollas, Ph.D. (ECF No. 69-1 at PageID 8920-8928). Skatzes argues that Bartollas' testimony would have provided evidence of his duress, which is a statutory mitigating factor under Ohio Rev. Code Ann. §

---

[24] Skatzes reported "blows to the head," including a car accident and a couple of work-related accidents. (*Id.* at PageID 9053-9054).

2929.04. (Petition, ECF No. 25 at PageID 312). Dr. Bartollas identified himself as a sociologist with expertise in correctional institutions and prison culture. (ECF No. 69-1 at PageID 8920). In discussing the murder of Robert Vallandingham, Dr. Bartollas' opined that Skatzes was in a "vulnerable position" during the "silent vote" and any more aggressive dissent from Skatzes would have resulted in his death. (*Id.* at PageID 8926-8927).

The Sixth Circuit recently described the process a federal habeas court should employ when evaluating a penalty phase ineffective assistance of counsel claim:

> Counsel might be deficient beyond fair-minded dispute if he fails to perform any investigations whatsoever. Likewise, counsel acts unreasonably when he fails to investigate potentially powerful mitigating evidence that stared him in the face. So too if counsel never attempts to obtain material that he knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial. If counsel's conduct fails to abide by these specific guideposts laid down by the Supreme Court, then no fair-minded judge could disagree that counsel has failed to clear *Strickland's* low bar, and habeas relief will be appropriate. But if counsel's conduct doesn't breach any of these specific constraints, we next assess whether the state court unreasonably applied *Strickland's* general mandate that counsel's behavior must fall within "the wide range of reasonable professional assistance." 466 U.S. at 689.
>
> The more general the rule, the more leeway the state court enjoys— because the more standard-like the rule is, the more room there is for distinct yet "reasonable" applications of it. The *Strickland* standard is a general standard. We will upend its rejection of a petitioner's ineffective assistance claim only if there is *zero* "reasonable argument" available that counsel in fact satisfied *Strickland*'s vague standard.

*White v. Plappert*, 131 F.4th 465, 485-86 (6th Cir. 2025) (citation modified). Here, the record reflects that Skatzes' claim for relief falls under *Strickland's* general standard.

Skatzes argues that his counsels' performance was deficient because they failed to investigate and present a more aggressive mitigation case. But Skatzes made clear to his attorneys, to the potential witnesses, to the expert psychologist, and to the jury that he did not want his family

to testify. He was also very clear that he disagreed with the verdict and adamantly maintained his innocence.

Pertinent to Skatzes' case, counsel does not render ineffective assistance when complying with his client's express wishes not to present mitigation evidence. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Coleman v. Mitchell*, 244 F.3d 533, 545 (6th Cir. 2001), *superseded by statute on other grounds* (citing *Strickland*, 466 U.S. at 691). The Sixth Circuit has held that trial counsel is not ineffective for following his client's instructions on the scope of mitigation evidence. *Coleman*, 244 F.3d at 545–46. *See also Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005) ("the Constitution does not prohibit a competent capital defendant from waiving the presentation of mitigation evidence"); *Schriro v. Landrigan*, 550 U.S. 465 (2007) (holding that a death-eligible defendant who instructed his attorney not to present mitigating evidence could not establish that he was prejudiced by counsel's resulting failure to present mitigating evidence); *Wickline v. Mitchell*, 319 F.3d 813, 821 (6th Cir. 2003) (counsel not ineffective when petitioner refused to speak with a psychiatrist or a probation officer or involve his family); *Cowans v. Bagley*, 624 F. Supp. 2d 709, 770 (S.D. Ohio 2008), *aff'd*, 639 F.3d 241 (6th Cir. 2011) (finding that counsel was not ineffective when petitioner maintained his innocence and refused the presentation of mitigation evidence).

It is worth pointing out that Skatzes emphatically maintained his innocence throughout trial, during his testimony, during his mitigation phase statement, and during appeal and postconviction proceedings. Skatzes has asserted in these federal habeas proceedings both "gateway" and substantive actual innocence claims. Skatzes faults his counsel in Ground Eleven

107

for not presenting evidence to the jury designed to mitigate his moral culpability. How does this square with Skatzes' unwavering position that he has no culpability?

Dr. Smalldon noted the practical problems this posture created for trial counsel when preparing a mitigation case, describing it as a "steep hill to climb." The Sixth Circuit has recognized the potential constitutional problems:

> As an initial matter, Fields identifies no Supreme Court precedent holding that counsel performs deficiently by considering a client's informed wishes not to present a case in mitigation. If his counsel had put on a robust mitigation case conceding that Fields murdered Horton, Fields may well have argued that this lawyer violated his right to make this major decision. *See McCoy v. Louisiana*, —— U.S. ——, 138 S. Ct. 1500, 1507–09, 200 L.Ed.2d 821 (2018). But as far as we can tell, the Supreme Court has yet to decide whether an attorney or a client decides whether to present a case in mitigation. *Cf. Schriro v. Landrigan*, 550 U.S. 465, 469–70, 476–77, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). But many lower courts have held that a defendant can voluntarily waive the presentation of mitigating evidence.

*Fields v. Jordan*, 86 F.4th 218, 246 (6th Cir. 2023), *cert. denied sub nom. Fields v. Plappert*, 144 S. Ct. 2635 (2024). Skatzes' plea of innocence and limitations on the mitigation case created a no-win situation for his counsel during the penalty phase. Under the circumstances, counsels' strategy to present some mitigation evidence that neither compromised his innocence nor involved his family cannot be considered deficient performance.[25] The Second District Court of Appeals' similar conclusion is not unreasonable.

Skatzes argues that his counsel was ineffective nonetheless because his decision to forgo a more robust mitigation case was not knowing and intelligent.[26] The Supreme Court has "never

---

[25]    The Court acknowledges that *McCoy* was decided well after the penalty phase of Skatzes' trial. The right it recognized, however, was borne by the Constitution and is one that trial counsel may have been mindful of or concerned about during his trial.

[26]    George Skatzes' affidavit states that if he would have understood the importance of the mitigation phase, he would have permitted his family members to testify. (ECF No. 69-2 at PageID 9083).

imposed an informed and knowing requirement upon a defendant's decision not to introduce [mitigating] evidence." *Fry v. Shoop*, 124 F.4th 1019, 1029 (6th Cir. 2025) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 479 (2007)). *See also Cowans*, 624 F. Supp. 2d at 769, *aff'd*, *Cowans*, 639 F.3d 241 (rejecting argument that decision to not to present mitigation evidence was not knowing or voluntary). The record establishes that Skatzes was aware of the gravity of the proceedings. Noted above, Skatzes explained to the jury during his unsworn statement that the scope of the mitigation case was at his direction and based on his desire to protect his family members. (ECF No. 74-16 at PageID 20100-102, 20128).

Discussed above, Skatzes' allegations that his counsel made little or no efforts to obtain his background records is belied by the record and without merit. Dr. Smalldon criticized the efforts made by Skatzes' counsel to gather and obtain records. (*Id.* at PageID 9044). But Skatzes has not produced the records for the Court's independent review, and Dr. Smalldon's opinion is not informed with the knowledge of which records trial counsel had in their possession or whether a strategic reason was made not to use those records at the penalty phase.[27] Nothing about the information that Dr. Smalldon describes in the reviewed records suggests the jury would have entered life sentences had those records been used by counsel.

Skatzes also argues that his counsels' performance was deficient because they failed to adequately use an expert psychologist to explain his antisocial personality disorder. But Skatzes' trial counsel retained expert psychologist Dr. Eisenberg, who believed his evaluation would be unhelpful. "It is not unreasonable for counsel, untrained in the field of mental health, to rely on the professional opinions of experts." *White v. Plappert*, 131 F.4th 465, 488 (6th Cir. 2025) (citation modified). The same conclusion applies to Skatzes' suggestion that his counsel should have known

---

[27] The Court acknowledges and has considered the affidavit from Martha Phillips, which generally describes the standards of practice for a mitigation specialist. (ECF No. 69-1 at PageID 9004-07).

about the functional brain impairment diagnosed by Dr. Smalldon. "[I]f a 'trained psychologist' did not detect any evidence of a particular mental defect, counsel's not detecting the same is not 'an objectively unreasonable mistake.'" *Id.* (quoting *Campbell v. Coyle*, 260 F.3d 531, 555 (6th Cir. 2001)). "It was not unreasonable for defense counsel to rely on an expert's lack of suggestions that defendant had 'organic brain damage' or 'required any additional mental health testing.'" *Id.* (quoting *Clark v. Mitchell*, 425 F.3d 270, 285 (6th Cir. 2005)).

Skatzes also fails to show that his counsel was deficient for failing to retain a prison culture expert, the defaulted part of Ground Eleven. Dr. Bartollas' affidavit only discusses duress in connection with the Vallandingham murder (ECF No. 69-1 at PageID 8926-8927), for which Skatzes received a life sentence, and does not specifically mention how duress played a role in Skatzes' participation in the murders of Elders and Sommers.

For these reasons, the Second District Court of Appeals' conclusion that counsels' performance was not deficient was neither contrary to nor an unreasonable application of *Strickland*.

The Court likewise rejects Skatzes' argument that the Second District was unreasonable when it concluded that he was not prejudiced. To prevail on the prejudice prong, Skatzes must show that "all reasonable judges would find that (a) this evidence was different in kind and degree from the evidence presented at trial, (b) the jury would have found that the evidence diminished [Skatzes'] moral culpability, and (c) there's a 'substantial likelihood' a juror would have concluded that the mitigating evidence outweighed the aggravating evidence." *White*, 131 F.4th at 492 (quoting *Shinn v. Kayer*, 592 U.S. 111, 121 (2020); *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005); *Williams*, 529 U.S. at 398; *Bobby v. Van Hook*, 558 U.S. 4, 20 (2009)) (citation modified). Skatzes has not made this showing.

110

Skatzes fails to show how the evidence he offers in support of Ground Eleven would have diminished his moral culpability in the eyes of the jury for the aggravated murders of Elder and Sommers.[28] He has not shown how the mitigators "impaired his ability to appreciate the wrongfulness of his conduct or to conform his conduct to the law at the time of the murder." *Shinn*, 592 U.S. at 122 (holding no prejudice when petitioner failed to make such showing). Skatzes' lay witnesses offered evidence about his childhood that the Second District described as "far from idyllic," but insufficient to establish prejudice. *State v. Skatzes*, 2008-Ohio-5387, ¶ 95 (copy at state court record, ECF No. 70-7 at PageID 10932). The details of Skatzes' background are indeed less than ideal, but a fair-minded jurist could conclude there's no reasonable probability the jury would find them mitigating.[29]

Also, absent is any expert testimony about how the diagnosis of "mild right fronto-parietal hypometabolism and mild left parietal hypometabolism" diminishes Skatzes' moral culpability for the Elder or Sommers murders. (ECF No. 69-2 at PageID 9095). In the notable Supreme Court opinions on penalty phase ineffective assistance of counsel claims, the evidence of organic brain

---

[28]     As for the defaulted part of Ground Eleven, even if Dr. Bartollas would have extended his general opinions about prison culture to the murders of Elder and Sommers, his testimony about the duress Skatzes experienced during the riot would have been cumulative of other trial testimony and the Court finds it hard to believe that his opinion on the matter would have had any impact on the jury's verdict.

[29]     The Second District concluded that the evidence offered by Skatzes about his history and background was "much less egregious than the incidents endured by Wiggins." (ECF No. 70-7 at PageID 10932). The magnitude of the evidence Skatzes offers is in fact not comparable to *Wiggins v. Smith*, 519 U.S. 510 (2003). In *Wiggins*, the Supreme Court described the mitigation evidence that Wiggins' counsel failed to investigate and present as: "petitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage. Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked. She had sex with men while her children slept in the same bed and, on one occasion, forced petitioner's hand against a hot stove burner -- an incident that led to petitioner's hospitalization. At the age of six, the State placed Wiggins in foster care. Petitioner's first and second foster mothers abused him physically, and the father in his second foster home repeatedly molested and raped him. At age 16, petitioner ran away from his foster home and began living on the streets. He returned intermittently to additional foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one occasion. After leaving the foster care system, Wiggins entered a Job Corps program and was allegedly sexually abused by his supervisor." *Wiggins*, 539 U.S. at 516–517 (citation modified).

damage was accompanied by expert testimony tying the damage to the petitioner's crime. *See Rompilla v. Beard*, 545 U.S. 374 (2005) ("Rompilla's problems relate back to his childhood, and were likely caused by fetal alcohol syndrome [and that] Rompilla's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired at the time of the offense."); *Porter v. McCollum*, 558 U.S. 30, 36 (2009) ("Dr. Dee concluded that Porter suffered from brain damage that could manifest in impulsive, violent behavior. At the time of the crime, Dr. Dee testified, Porter was substantially impaired in his ability to conform his conduct to the law and suffered from an extreme mental or emotional disturbance…."); *Sears v. Upton*, 561 U.S. 945, 949 (2010) ("Evidence produced during the state postconviction relief process also revealed that Sears suffered significant frontal lobe abnormalities. Two different psychological experts testified that Sears had substantial deficits in mental cognition and reasoning—*i.e.*, problems with planning, sequencing and impulse control, —as a result of several serious head injuries he suffered as a child."). Skatzes fails to "provide any real link" between any of his offered mitigating factors and his crimes. *White v. Plappert*, 131 F.4th 465, 495 (6th Cir. 2025) (quoting *Thornell v. Jones*, 602 U.S. 154, 165–168 (2024)).

Even if all the mitigating evidence was presented to the jury, there is no substantial likelihood that the jury would have changed its mind. "When assessing the prejudicial impact of counsel's failure to introduce mitigating evidence, we must "keep in mind the State's evidence on the other side of the scale." *White*, 131 F.4th at 495 (quoting *Caudill v. Conover*, 881 F.3d 454, 464 (6th Cir. 2018)). During the penalty phase closing argument, the state argued four aggravating circumstances: (1) Skatzes' status as a prisoner in an Ohio detention center, (2) Skatzes' previous conviction of aggravated murder, (3) Skatzes killed two people as part of a course of conduct, and (4) Skatzes committed the murders while "committing or attempting to commit, or fleeing

immediately after committing, or attempting to commit a kidnapping." (ECF No. 74-16 at PageID 20136-20139). The state challenged Skatzes' contention that he would not be a violent man in prison, pointing to an incident where he stabbed another inmate for taking his property and his membership in the Aryan Brotherhood. (*Id.* at PageID 20143). The state also challenged Skatzes' contention that he would be a positive influence in prison, arguing he had solicited Snodgrass to kill Elder. (*Id.* at PageID 20144). The state also disagreed with Skatzes' position that his efforts to assist the guards during the riot should be considered mitigating, arguing that it was done out of self-interest. (*Id.*).

A more robust mitigation case would have, no doubt, resulted in a more robust response from the state. Additional defense witnesses touting Skatzes' virtues or disadvantages would have provided the state with ample opportunity to remind the jury of the gruesome details of the Elder and Sommers murders. The jury would have been reminded that Skatzes recruited a younger member of the Aryan Brotherhood to stab Elder to death and praised him afterward. (ECF No. 74-4 at PageID 18395-18403). The jury would have also been reminded that Sommers met his end after he was lured to L-7 where Skatzes beat him to death with a baseball bat. (ECF No. 74-5 at PageID 18492-18493). A more robust mitigation case may have also provided the state with an opportunity to explore the unfavorable information about Skatzes' history and character uncovered by Dr. Smalldon.

Skatzes has offered extra evidence about the disadvantaged circumstances of his upbringing and his diagnosis of mild functional brain impairment. But he has failed to demonstrate that this evidence would have diminished his moral culpability so much so that it would have overcome the aggravating circumstances on the other side of the scale. A reasonable judge could

find that the extra evidence did not have a substantial likelihood of changing the jury's death penalty verdicts.

The Second District's decision dismissing Ground Eleven was neither contrary to nor an unreasonable application of federal law. Ground Eleven is dismissed for lack of merit.

### Ground Twelve

In Ground Twelve, Skatzes contends that the trial court erred when instructing the jury on "conspiracy," and "principal offender." (Petition, ECF No. 25 at PageID 314-18). Skatzes raised Ground Twelve on direct appeal (Appellant's Brief, ECF 67-3 at PageID 4014-17, 4102) and then to the Supreme Court Ohio (Appellant's Brief, ECF No. 67-7 at PageID 5313-14, 5390-95, 5412-13), which entered the last reasoned opinion:

> {¶ 57} In propositions of law VIII and IX, Skatzes contends that the trial court's instructions on [] conspiracy were inadequate. Again, Skatzes's failure to object to [the] instruction waived all but plain error. *Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.
>
> ***
>
> {¶ 59} Here, and in proposition of law IX, Skatzes asserts that the court's instruction on conspiracy was error. The trial transcript indicates that the court stated, "You may not find * * * that the defendant conspired with others to commit an offense unless you find beyond a reasonable doubt that a substantial overt act in furtherance of such conspiracy is proved to have been done by him or by a person with whom he conspires, and that such an act *wasn't* performed subsequent to the defendant's entrance into the conspiracy." (Emphasis added.) This instruction is plainly illogical. On its face, it required the jury to find Skatzes culpable only if his overt actions in furtherance of the conspiracy actually occurred before his involvement in the conspiracy.
>
> {¶ 60} The record, however, contains copies of the written instructions provided to the jury during deliberations, and these written instructions correctly stated the law, using "was" instead of "wasn't." In addition, the trial court directed the jurors not to take notes during its charge because they would have a copy of the instructions in the jury room during deliberations.

{¶ 61} Even assuming that the court misstated the instruction, we find that any such error did not affect the outcome of Skatzes's trial. Not only did the written instructions correctly state the law on conspiracy, the trial court encouraged the jury to rely upon the written instructions during deliberations. Moreover, given the jury's detection of a conflict between "a" and "the" in the jury instruction and verdict form discussed in proposition of law XIII, *infra*, the jury likely would have noticed a conflict in logic between the oral and written instructions and would have requested a clarification had they been confused. No outcome-determinative error occurred. We reject propositions of law VIII and IX.

\*\*\*

{¶ 66} In proposition of law XII, Skatzes raises a number of other alleged errors in the trial-phase jury instructions and asserts that these errors, both individually and cumulatively, warrant a reversal. Skatzes's failure to object to any of the claimed instructional errors waived all but plain error. *State v. Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. We find no plain error in any of the 12 instructional errors raised by Skatzes.

\*\*\*

{¶ 78} Skatzes asserts that the trial court erred in defining "principal offender" as "one who has hands-on involvement in a homicide." This court has held that "principal offender" means "actual killer," *State v. Penix* (1987), 32 Ohio St.3d 369, 371, 513 N.E.2d 744, or "one who personally performs every act constituting the offense" of aggravated murder, *State v. Getsy* (1998), 84 Ohio St.3d 180, 197, 702 N.E.2d 866, or "one who directly caused the death." *State v. Stallings* (2000), 89 Ohio St.3d 280, 292, 731 N.E.2d 159. The court of appeals agreed with Skatzes that "hands-on involvement" was not specific enough but held that it did not constitute plain error. We agree. The instruction pertained only to the Sommers murder. Skatzes claimed that he was not present for Sommers's murder and first learned of it after the riot when he was in Mansfield. The state's evidence, however, established that Skatzes was an active participant in the Sommers murder. The error in the instruction was harmless because the evidence at trial showed that Skatzes was an actual killer of Sommers. See *State v. Chinn* (1999), 85 Ohio St.3d 548, 559–560, 709 N.E.2d 1166.

*Skatzes*, 104 Ohio St. 3d at 206–07–39.

Respondent argues that Ground Twelve is procedurally defaulted because Skatzes' trial counsel failed to contemporaneously object to the jury instructions at trial. (Return of Writ, ECF No. 31 at PageID 505-506). The record reflects that the Supreme Court of Ohio enforced Ohio's contemporaneous objection rule and reviewed Ground Twelve for plain error only. (ECF No. 67-

10 at PageID 6787). Ohio's contemporaneous objection rule is an adequate independent state procedural rule entitled to be honored in habeas. *Wogenstahl v. Mitchell*, 668 F.3d 307, 334 (6th Cir. 2012) (citing *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006)); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011); *Smith v. Bradshaw*, 591 F.3d 517, 522 (6th Cir. 2010); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011). Accordingly, Ground Twelve is procedurally defaulted.

Skatzes argues that the procedural default is excused due to his trial counsels' ineffectiveness for failing to object.[30] (Traverse, ECF No. 42 at PageID 834). Attorney neglect, ignorance, or inadvertence does not constitute cause to excuse a procedural default unless counsel's performance was constitutionally deficient under *Strickland*, 466 U.S. 668. *Coleman*, 501 U.S. at 752–755; *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994). Besides cause, a petitioner must also show actual prejudice as a result of the claimed constitutional error, *i.e.*, that the constitutional errors worked to his "actual and substantial disadvantage, infecting the entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). If there is strong evidence of the petitioner's guilt and a lack of evidence for his claim, the actual prejudice requirement is not satisfied. *Id.* at 172; *Rust*, 17 F.3d at 161–62. For the reasons discussed below, the Court finds that Skatzes' claim of ineffective assistance of counsel fails on *Strickland's* prejudice prong and thus does not excuse his procedural default.[31] At any rate, also discussed below, even if not procedurally defaulted, Ground Twelve would fail on the merits.

---

[30]     Skatzes also asserts his actual innocence as an excuse (Traverse, ECF No. 42 at PageID 834), the merits of which are addressed and denied in connection with his procedural and substantive claims.

[31]     *See Ege v. Yukins*, 485 F.3d 364, 379 n.7 (6th Cir. 2007) (reviewing an ineffective assistance claim *de novo* as cause to overcome procedural default but applying AEDPA deference when reviewing it as an independent claim). Skatzes was not prejudiced by his counsels' failure to object to the "conspiracy" instruction because the jury could not have been misled about the correct interpretation of the law under the circumstances. He was not prejudiced by counsels' failure to object to the "principal offender" instruction because under Ohio law, the evidence offered about Skatzes' participation in Sommers' homicide fits the correct definition of "actual killer."

With specific regard to a habeas challenge to jury instructions, a petitioner has a particularly heavy burden: "In a habeas proceeding, allegedly improper jury instructions must be shown to have infected the accused's trial to such a degree as to constitute a clear violation of due process. The petitioner must show more than that the instructions are undesirable, erroneous, or universally condemned." *Wood v. Marshall*, 790 F.2d 548, 551 (6th Cir. 1986); *Coe v. Bell*, 161 F.3d 320, 329 (6th Cir. 1998). The Supreme Court has made clear that "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004). "'[A] single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge.'" *Boyde v. California*, 494 U.S. 370, 378 (1990) (quoting *Cupp, Id.* at 146–147). "To warrant habeas relief, 'jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair. The burden is even greater than that required to demonstrate plain error on appeal.'" *Buell v. Mitchell*, 274 F.3d 337, 355 (6th Cir. 2001) (quoting *Scott v. Mitchell*, 209 F.3d 854, 882 (6th Cir. 2000)).

Skatzes has not met this standard.

(a) *Conspiracy*

Skatzes argues that the oral instructions misread Ohio law on "conspiracy." The transcript recorded that the trial judge said the following:

> You may not find the defendant, that the defendant conspired with others to commit an offense unless you find beyond a reasonable doubt that a substantial overt act in furtherance of such a conspiracy is proved to be done by him or by a person with whom he conspires, and that such an act *wasn't* performed subsequent to the defendant's entrance into the conspiracy.

(ECF No. 74-13 at PageID 19853-19854) (emphasis added). Skatzes argues that the instruction should have read "*was* performed subsequent to…" and the erroneous oral instruction violated his

117

due process rights because it reduced the state's burden of proof. (Traverse, ECF No. 42 at PageID 835-839).

To begin, the Court rejects Skatzes' argument that his claim is subject to automatic reversal under *Stromberg v. People of State of Cal.*, 283 U.S. 359 (1931). The Supreme Court has described the scenario in *Stromberg*:

> There, the jury returned a general verdict of guilty against an appellant charged under a California statute making it an offense publicly to display a red flag (a) as a sign, symbol or emblem of opposition to organized government, (b) as an invitation or stimulus to anarchistic action, or (c) as an aid to propaganda that is and was of a seditious character. This Court held that clause (a) was unconstitutional as possibly punishing peaceful and orderly opposition to government by legal means and within constitutional limitations. The Court held that, even though the other two statutory grounds were severable and constitutional, the conviction had to be reversed, because the verdict did not specify the ground upon which it rested. As there were three purposes set forth in the statute, and the jury was instructed that their verdict might be given with respect to any one of them, independently considered, it is impossible to say under which clause of the statute the conviction was obtained. If any one of these clauses, which the state court has held to be separable, was invalid, it cannot be determined upon this record that the appellant was not convicted under that clause. The necessary conclusion from the manner in which the case was sent to the jury is that, if any of the clauses in question is invalid under the Federal Constitution, the conviction cannot be upheld.

*Bachellar v. Maryland*, 397 U.S. 564, 570–71 (1970). Skatzes' case is distinguishable and not controlled by *Stromberg*. Reversal was required in *Stromberg* because there was no way to know whether the defendant was convicted under a constitutional or unconstitutional section of the statute. The alleged error in Skatzes' case involves a single instruction on a single legal theory— conspiracy, and the trial court's substitution of an incorrect word during the oral reading of the instruction. Skatzes fails to point to Supreme Court authority that calls for automatic reversal under these circumstances.

Considering the jury instructions as a whole, there is no reasonable likelihood that the jury was misled by the putative misreading of the conspiracy instruction. The jury was first instructed:

> In order to find the defendant conspired, you must find beyond a reasonable doubt that on or about the dates charged, the defendant with purpose to commit aggravated murder or kidnapping, either, one, planned with another person or persons the commission of such an offense or, two, agreed with another person or persons that that one or more of them would engage in conduct which facilitated commission of such an offense.

(ECF No. 74-13 at PageID 19853). Then, the jury was instructed that they must find beyond a reasonable doubt that overt act in furtherance of the conspiracy "*wasn't* performed subsequent to the defendant's entrance into the conspiracy." (ECF No. 74-13 at PageID 19854) (emphasis added).

The Ohio Supreme Court found that there was no outcome determinative error because the misread instruction was "plainly illogical," and the jury received a correct instruction in the written copy. *Skatzes*, 104 Ohio St. 3d at 207. As noted by the Ohio Supreme Court, the oral instruction would require the jury to find an overt act in furtherance of a conspiracy that had not happened yet. This is a result that "makes no conceivable sense." *Middleton v. McNeil*, 541 U.S. 433, 438 (2004).

The Court finds it hard to believe that the jury recalled and applied a single misstated word in an oral instruction that spanned forty-three transcript pages. Nor does it follow that the jury would have applied that word in a way that simply made no sense. The Ohio Supreme Court's dismissal of Ground Twelve was not unreasonable. This is especially true when the evidence at trial established that Skatzes himself engaged in an overt act in furtherance of the Vallandingham conspiracy when he delivered the co-conspirators ultimatum to the state, and in furtherance of the Elder conspiracy when he recruited Snodgrass and accompanied him to the scene. Both acts occurred after the conspiracy was formed and these points were argued by the prosecutor during

closing argument. (ECF No. 74-12 at PageID 19718, 19707). *See Middleton v. McNeil*, 541 U.S. 433, 438 (2004) (holding that it is not improper to consider prosecutor's argument when considering whether jury instruction violated due process).

(b) *Principal Offender*

Skatzes next argues that he is entitled to habeas relief because the jury was improperly instructed on "principal offender." As explained in Ground Four, the state advanced a theory that Skatzes was the "principal offender" in David Sommers' murder. (Petition, ECF No. 25 at PageID 273-274). The jury was instructed on the specifications attendant to the David Sommers' aggravated murder charge, including Specification Number 3:

> Before you can find the defendant guilty of Specification Number 3, you must find that the State has proved beyond a reasonable doubt that the defendant purposely caused the death of David Sommers while committing, or attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, and either the offense or the offender was a principal offender in the commission of the aggravated murder or, if not a principal offender, committed the aggravated murder with prior calculation and design.
>
> Principal offender is one who has hands-on involvement in the homicide.

(ECF No. 74-13 at PageID 19875). The Ohio Supreme Court found that the instruction was "not specific enough" under Ohio law, which defines principal offender as an "actual killer," but the instruction did not constitute plain error because the evidence showed that Skatzes was an "actual killer of Sommers." *Skatzes*, 104 Ohio St. 3d at 210.

Skatzes argues that the instruction violated his due process rights. Specifically, he argues that the coroner's testimony showed that he did not administer the final death blow to David Sommers, and he was therefore not the "principal offender." (Traverse, ECF No. 42 at PageID 841-42). Skatzes made this same argument in his direct appeal to the Supreme Court of Ohio: that there could only be one "principal offender" under the circumstances. (Appellant Brief, ECF No.

67-7 at PageID 5515). The court rejected this interpretation of Ohio law when it concluded that

the evidence at trial showed he was "*an* actual killer of Sommers." *Skatzes*, 104 Ohio St. 3d at 210.

(emphasis added). This court is bound to defer to the Ohio Supreme Court's interpretation of state

law. "A state court's interpretation of state law, including one announced on direct appeal of the

challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546

U.S. 74, 76 (2005); *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007) (citing *Walker v. Engle*, 703

F.2d 959, 962 (6th Cir. 1983)); *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the

province of a federal habeas court to reexamine state court determinations on state law

questions.").

Skatzes has failed to show that the jury instructions were so infirm that they rendered his

entire trial fundamentally unfair. Nor has he shown that the Supreme Court of Ohio's dismissal of

his claim was contrary to or an unreasonable application of federal law. Even if Ground Twelve

were not procedurally defaulted, it would be dismissed for lack of merit.

### *Ground Thirteen*

In Ground Thirteen, Skatzes contends that the trial court violated his due process rights by

admitting prejudicial testimony from Roger Snodgrass. (Petition, ECF No. 25 at PageID 318-328).

Skatzes asserted Ground Thirteen in state court on direct appeal. (Appellant's Brief, ECF No. 67-

7 at PageID 5315, 5419-21; 5321, 5494-98). The Ohio Supreme Court issued the last reasoned

decision:

> {¶ 82} In proposition of law XIV, Skatzes argues that the trial court erred in
> allowing inmate Snodgrass to testify that the Aryan Brotherhood had agreed with
> the Muslims regarding the treatment of white inmates during the riot. Snodgrass
> was not certain that it was Skatzes from whom he had heard about the alleged
> agreement.
>
> {¶ 83} Snodgrass testified that he had killed inmate Elder under orders from
> Skatzes and that Muslim inmate Lucky Roper had talked with Skatzes in the gym

prior to the Elder murder and had watched the Elder killing along with Skatzes. When the prosecutor asked Snodgrass why he and Skatzes had been involved in this murder with a Muslim, Snodgrass replied that, according to Jason Robb, the Aryan Brotherhood had made a pact with the Muslims. Snodgrass stated that Skatzes had explained the pact to him: "[N]o more white guys were going to be killed in that riot, without sanctions from the AB, * * * that if the [white guys] were to be killed, they were goin' to be killed by their own kind or at least given that opportunity." Snodgrass then equivocated and said he might have heard this from Robb or another Aryan leader.

{¶ 84} Skatzes claims that this testimony about the pact was inadmissible. The testimony was not inadmissible under Evid.R. 404(B), because the testimony did not refer to any prior crime, wrong, or act. If the statement was made by Skatzes, the testimony was admissible under Evid.R. 801(D)(2)(a) as an admission or statement. If the statement was not made by Skatzes, but instead by Robb or another Aryan leader, as Snodgrass conceded was possible, then the statement was admissible under Evid.R. 801(D)(2)(e), as a statement made by a co-conspirator of a party during the course and in furtherance of the conspiracy. We reject proposition of law XIV.

<div align="center">***</div>

{¶ 129} In proposition of law XXXV, Skatzes alleges error in the trial court's admission of State Exhibit 334, a document purporting to be the by-laws of the Aryan Brotherhood. He contends that the state did not lay a proper foundation for the document and, therefore, that the document was hearsay. Skatzes also alleges that the government shifted the burden of proof to him to show that he had no knowledge of the by-laws.

{¶ 130} Inmate Snodgrass testified that the by-laws were written by inmate Tramp Johnson and given to inmate Bocook, who then gave them to Snodgrass after the takeover. Among other things, the by-laws defined a "traitor" as one who abandoned a "Brother in the middle of a conflict or potentially violent conflict" and that failure of a member to promptly heed a "Call to Arms" would be considered a "traitorous act." Snodgrass stated that being "deemed a traitor" meant you would be killed. Snodgrass also stated that the by-laws were in effect during the takeover.

{¶ 131} Snodgrass properly identified the by-laws pursuant to Evid.R. 901(B)(1), and his testimony was sufficient to support a finding that the document was what he claimed it to be. Snodgrass also testified that all Aryan Brotherhood members had to learn about and accept the by-laws as part of becoming a member. This testimony supported the inference that Skatzes knew about the by-laws at the time of the riot, and it did not unfairly shift the burden of proof to him to disprove his knowledge of them.

{¶ 132} Moreover, the by-laws were not hearsay under Evid.R. 801(B) because the document containing the by-laws was not offered for the truth of the matter

asserted. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at
¶ 58–60. "Statements offered as evidence of commands or threats or rules directed
to the witness, rather than for the truth of the matter asserted therein, are not
hearsay." *United States v. Bellomo* (C.A.2, 1999), 176 F.3d 580, 586, citing *United
States v. Stratton* (C.A.2, 1985), 779 F.2d 820, 830. We reject proposition[] of
law…XXXV.

*Skatzes*, 104 Ohio St. 3d at 210–12–43.

Respondent argues that Ground Thirteen should be dismissed as procedurally defaulted
because Skatzes failed to fairly present it to the Ohio state courts. (Return of Writ, ECF No. 31 at
PageID 514-518). Specifically, Respondent argues that Skatzes presented Ground Thirteen to the
state courts as a violation of Ohio evidentiary rules and not as a federal due process claim. (*Id.*).
In response, Skatzes points to his appellate brief and argues that his claim was fairly presented.[32]
(Traverse, ECF No. 42 at PageID 847-850).

The first part of Ground Thirteen concerning Snodgrass' testimony about the pact between
the Aryan Brotherhood and the Muslims appears in Skatzes' brief to the Supreme Court of Ohio
as Proposition of Law No. 14. (Appellant's Brief, ECF No. 67-7 at PageID 5315, 5419-5421).
Federal law is merely referenced in the heading describing the proposition of law:

Proposition of Law No. 14: A witness may testify to what the witness has seen and
heard but not about what another person said. A witness testified about what
another person had said. The defendant's rights under the Rules of Evidence or
Compulsory Process, the Due Process Clause, or the Confrontation Clause of the
Ohio Constitution, art 1§ 16, and the United States Constitution, amend V, VI, VIII,
& XIV were violated.

(*Id*. at 5419). Skatzes' brief on Proposition of Law No. 14 solely discusses Ohio law and does not
argue how his due process rights were violated or cite any federal cases. (*Id.* at PageID 5419-
5421). This is not enough to preserve the claim for federal habeas review.

---

[32]      Skatzes also asserts his actual innocence as an excuse (Traverse, ECF No. 42 at PageID 854-855), the merits
of which are addressed and denied in connection with his procedural and substantive claims.

"To escape procedural default, claims that the rights to due process and to a fair trial have been violated must of themselves be fairly presented, rather than functioning as catchall language appearing within the presentation of other non-constitutional arguments." *Blackmon v. Booker*, 394 F.3d 399, 400–401 (6th Cir. 2004). A petitioner's "naked assertion" in his brief headings and conclusions that his rights to a fair trial and due process were violated was insufficient to constitute fair presentment where the petitioner "failed to develop any cogent arguments regarding those rights beyond the naked assertion that they were violated." *Id*; *Olson v. Little*, 604 F. App'x 387, 401–02 (6th Cir. 2015) (reference to fair trial in state court brief insufficient to avoid procedural default); *Onon v. Woods*, 2014 WL 12971929, at *2 (6th Cir. Nov. 14, 2014) (reference to United States Constitutional Amendments without analysis insufficient to avoid procedural default).

The Court reaches the opposite conclusion for the second part of Ground Thirteen concerning the Aryan Brotherhood by-laws. Skatzes presented this part of Ground Thirteen to the Supreme Court of Ohio as Proposition of Law No. 35. (Appellant's Brief, ECF No. 67-7 at PageID 5321, 5494-98). Skatzes argued that the introduction of the by-laws shifted the burden of proof to him and he cited two United States Supreme Court cases for the proposition that the state bore the burden of proof. (*Id.* at PageID 5497-5498). This was enough to put the Supreme Court of Ohio on notice that Skatzes was asserting a federal claim. *See Whiting v. Burt*, 395 F.3d 602, 613 (6th Cir. 2005) (fair presentment includes "reliance upon federal cases employing constitutional analysis").

Notwithstanding Skatzes' partial default of Ground Thirteen, the Court finds that it lacks merit in its entirety. The Sixth Circuit has described the rigorous standard for habeas review of state court evidentiary decisions:

> [F]ederal habeas courts review state court evidentiary decisions only for consistency with due process. A state court evidentiary ruling

> will be reviewed by a federal habeas court only if it were so fundamentally unfair as to violate the petitioner's due process rights. Moreover, such rulings are usually not to be questioned in a federal habeas corpus proceeding. Even if errors are made in the application of state law, such errors ... especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus. If a ruling is especially egregious and results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief. Importantly, however, as a general matter, state-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. Ultimately, states have wide latitude with regard to evidentiary matters under the Due Process Clause.

*Wilson v. Sheldon*, 874 F.3d 470, 475–76 (6th Cir. 2017) (citation modified).

At trial, the prosecutor asked Snodgrass if Skatzes ever explained to him why Lucky Roper was part of the murder of Earl Elder. (ECF No. 74-4 at PageID 18404). Snodgrass responded, "well from my understanding, a pact was made with the Muslims." (*Id*.). The defense objected. (*Id.*). Snodgrass continued,

> Jason Robb told me a pact was made with the Muslims…when George told me no more white guys were going to be killed in that riot, without sanctions from the AB, that if they were going to be killed, they were goin' to be killed by their own kind or at least be given that opportunity…

(*Id.*). Snodgrass then said that he could not be sure that Skatzes made the comment, and it could have been Jason Robb. (*Id.* at PageID 18404-18405).

The Ohio Supreme Court found that Snodgrass' testimony was admissible under Ohio's evidence rules. To the extent Skatzes argues that this ruling is an incorrect interpretation of Ohio law, the claim is non-cognizable in federal habeas review. The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court

determinations on state-law questions." *Id.* at 67–68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State courts are the final arbiters of state law, and the federal courts will not intervene in such matters. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).

Skatzes' argument that Snodgrass' testimony violated due process also fails. To obtain habeas relief based on an allegedly improper evidentiary ruling, a petitioner must identify a Supreme Court case establishing a due process right with regard to the specific kind of evidence at issue. *Stewart v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020). Skatzes fails to identify any clearly established Supreme Court precedent that would preclude admission of Snodgrass' testimony about the pact. Moreover, considering that the Supreme Court of Ohio concluded that the evidence was properly admitted and the fact that Snodgrass conceded that he was unsure if Skatzes made the remarks, Skatzes fails to demonstrate that his due process rights were denied.

The second part of Ground Thirteen concerning Snodgrass' testimony regarding the admission of the Aryan Brotherhood by-laws also fails. Snodgrass identified the bylaws of the Aryan Brotherhood and testified that they were written by Tramp Johnson. (ECF No. 74-5 at PageID 18512-18513). Snodgrass testified that Skatzes was a captain in the Aryan Brotherhood and the by-laws were in effect at the time of the riot. (*Id.*). He pointed out that according to the by-laws it was the duty of a member of the Aryan Brotherhood to follow orders during wartime. (*Id.* at PageID 18514).

The Ohio Supreme Court found that Snodgrass' testimony "supported the inference that Skatzes knew about the by-laws at the time of the riot, and it did not unfairly shift the burden of proof to him to disprove his knowledge of them." *Skatzes*, 104 Ohio St. 3d 195, ¶ 131 (copy at state court record, ECF No. 67-10 at PageID 6296). Skatzes now argues that the admission of the

126

by-laws violated his due process rights because it allowed the jury to infer that, as a member of the Aryan Brotherhood, his interaction with Muslims during the riot was evidence of a conspiracy. (Traverse, ECF No. 42 at PageID 862-863).

Like the first part of Ground Thirteen, Skatzes cannot point to a United States Supreme Court case holding that the admission of the by-laws under the circumstances rendered his trial fundamentally unfair. More to the point, other evidence introduced at trial established that the Aryan Brotherhood's interaction with the Muslims during the riot was unusual and contrary to the organization's philosophy. Roger Snodgrass testified that it was strange to see leaders from the Muslims and Aryan Brotherhood meeting three weeks before the riot and twice on the day of the riot because "they did not mix well." (ECF No. 74-4 at PageID 18364, 18368, 18369). When David Lomache saw the Aryan Brotherhood and the Muslims conferring in the L-3 dayroom after the start of the riot, he described the situation as "unusual" and "not normal" because they stayed apart. (ECF No. 73-18 at PageID 16417-16418).

Skatzes testified that he joined the Aryan Brotherhood to oppose cell integration and because the large number of new black inmates was threatening to the white inmates. (ECF No. 74-9 at PageID 19324-19329). According to Skatzes, some members of the Aryan Brotherhood were white supremacists, there were different levels of extremism, but he believed that the white man should "band together and stand up because it is his ass out there." (ECF No. 74-10 at PageID 19449-19450). From this evidence the jury could have reasonably inferred that Skatzes' collaboration with the Muslims was a deviation from the norm and confirmed a conspiracy.

Even so, a conviction under a theory of conspiracy required the prosecution to prove:

> …beyond a reasonable doubt that on or about the dates charged, the defendant with purpose to commit aggravated murder or kidnapping, either, one, planned with another person or persons that one or more of them would engage in conduct which facilitated the commission of the offense, or two agreed with another person or

127

persons that one or more of them would engage in conduct which facilitated the commission of such an offense.

(ECF No. 74-13 at PageID 19868-71). The jury did not need to believe that Skatzes knew about or subscribed to the by-laws to find him guilty because there was evidence that Skatzes acted in concert with others to facilitate the murders of Vallandingham and Elder.

Accordingly, even if the first part of Ground Thirteen were not procedurally defaulted, it would be dismissed for lack of merit. The second part of Ground Thirteen is likewise without merit and is dismissed.

### Ground Fourteen

In Ground Fourteen, Skatzes contends that his due process rights were violated because the trial court admitted evidence of two murders for which he was not charged, Pop Svette and Albert Steano. (Petition, ECF No. 25 at PageID 321-24). Ground Fourteen also alleges that Skatzes' due process rights were violated because Kenneth Jenkins testified that Skatzes threatened him during their incarceration together after the riot. (*Id.* at PageID 322). Skatzes raised Ground Fourteen on direct appeal, labeled as Propositions of Law No. 28 and 29, to the Ohio Supreme Court. (ECF No. 67-7 at PageID 5319, 5461-65; 5320, 5466-69). The Ohio Supreme Court denied Skatzes' appeal:

{¶ 108} In proposition of law XXVIII, Skatzes contends that the state's introduction of evidence of other acts he had committed violated Evid.R. 404(B) and R.C. 2945.59. Skatzes's failure to object to the other-acts testimony waives any error on appeal. *State v. Bays* (1999), 87 Ohio St.3d 15, 26–27, 716 N.E.2d 1126. Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶ 109} Most of the evidence Skatzes cites involved uncharged acts during the riot, such as destroying property, disciplining inmates by violence, and involvement in the Aryan Brotherhood. Evidence of Skatzes's involvement in the Aryan

Brotherhood was offered to show his leadership role during the takeover, which bore directly upon the crimes with which he was charged. Compare *State v. Sanders* (2001), 92 Ohio St.3d 245, 256–257, 750 N.E.2d 90 (evidence of bad acts by other inmates admissible to show defendant's leadership role).

{¶ 110} Evidence about Skatzes's involvement in a hunger strike and stopping up toilets at Mansfield Correctional Institution after the takeover had ended should have been excluded under Evid.R. 404(B). Nevertheless, evidence on these relatively minor incidents did not prejudice Skatzes and was harmless. See *Robb*, 88 Ohio St.3d at 69, 723 N.E.2d 1019; *State v. Gumm* (1995), 73 Ohio St.3d 413, 426, 653 N.E.2d 253. We reject proposition of law XXVIII.

{¶ 111} In proposition of law XXIX, Skatzes complains that the trial court admitted testimony of bad acts by other inmates in the riot. Skatzes asserts that such evidence should have been excluded under Evid.R. 403 and 404(B). Skatzes lists a number of acts committed by others that he claims should not have been admitted through a conspiracy theory.

{¶ 112} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. Arguments similar to those raised by Skatzes were raised and rejected in *Robb*, 88 Ohio St.3d at 68–69, 723 N.E.2d 1019, and in *Sanders*, 92 Ohio St.3d at 256–257, 750 N.E.2d 90. The evidence in this case helped prove that prison gang leaders, including Skatzes, conspired over 11 days to seize and control L-complex, settle old scores, engage in assaults, take hostages, and commit murders.

{¶ 113} The prosecutor was entitled to present evidence about the context of the alleged crimes to make the actions of the participants understandable to the jurors. Skatzes did not commit his crimes in a vacuum, and the prosecution was not required to proceed as if he had. The trial court, as in *Robb*, had wide latitude to permit evidence as to how the riot began and unfolded, the rules and procedures established by the gangs during the riot, how infractions were dealt with, and the ways in which the relationships between the gangs and their members affected the events that occurred.

{¶ 114} This information was relevant to the offenses that Skatzes committed, the biases of the various witnesses, and the reasons that they behaved the way they did. Given the prison-inmate culture and the gang loyalty demonstrated by gang members, much of this testimony would not be within the knowledge or experience of the average juror. The trial court could have reasonably concluded that the probative value of this evidence outweighed the danger of unfair prejudice or confusion of issues. The evidence was relevant and thus was admissible under Evid.R. 403. We reject proposition of law XXIX.

*Skatzes*, 104 Ohio St. 3d at 217–47.

Respondent contends that Ground Fourteen is procedurally defaulted because, while similar to Proposition of Law No. 29 on direct appeal, it contains a different factual basis. (Return of Writ, ECF No. 31 at PageID 519-520). Skatzes' brief to the Supreme Court of Ohio references the improper admission of evidence concerning the murder of Pop Svette. (Appellant's Brief, ECF No. 67-7 at PageID 5467). At the same time, his brief failed to include any allegation pertaining to the murder of Albert Steano or the alleged threat against Kenneth Jenkins (*id.* at PageID 5461-5469), rendering these parts of Ground Fourteen procedurally defaulted.[33] *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) ("A claim may only be considered 'fairly presented' if the petitioner asserted both the factual and legal basis for his claim to the state courts."); *Williams v. Bagley*, 380 F.3d 932, 967 (6th Cir. 2004) (when a petitioner fails to bring a claim on direct appeal, it would be barred by Ohio's doctrine of res judicata, and is procedurally defaulted for purposes of federal habeas review). In any event, as discussed below, even if Skatzes had not procedurally defaulted part of Ground Fourteen, it would be dismissed for lack of merit.

During Skatzes' trial, David Lomache testified that he witnessed Pop Svette's murder. (ECF No. 73-18 at PageID 16444-45). Lomache testified that he saw Freddie Frakes beat Svette to death with a baseball bat. (*Id.*). Lomache also tied Frakes to Aryan Brotherhood leadership when he testified that Frakes was present in the L-2 unit office when leadership from the Muslims, Black Gangster Disciples, and Aryan Brotherhood, including Skatzes, discussed killing a correctional officer. (*Id.* at PageID 16471-16472). Robert Brookover also testified about Svette's murder. (ECF No. 73-24 at PageID 17427-17429). Brookover recounted that he saw Freddie Frakes beat Svette to death with a baseball bat. (*Id.* at PageID 12429). Miles Hogan testified that a month before the

---

[33] Skatzes asserts his actual innocence as an excuse (Traverse, ECF No. 42 at PageID 854-55), the merits of which are addressed and denied in connection with his procedural and substantive claims.

riot he learned that the Aryan Brotherhood had "a contract out" on Albert Steano and the day the riot began Robb and Bocook were looking for Steano. (ECF No. 73-20 at PageID 16842-46).

In addition to the testimony about the two murders, Kenneth Hazlett testified that he witnessed Skatzes, Snodgrass, and Frakes escorting Robert Vallandingham around the cell blocks. (ECF No. 74-7 at PageID 18761). Kenneth Jenkins testified that while housed at Mansfield Correctional Institution, he refused to participate in a hunger strike spearheaded by the Aryan Brotherhood. Jenkins testified he was consequently threatened by Skatzes, who said, "I will deal with you when I get out, your days are numbered." (ECF No. 73-23 at PageID 17323-17324).

Skatzes argues that the admission of this testimony violated his due process rights because "[t]he jury would…consider Skatzes guilty of the uncharged murders of Steano and Svette through his guilt by association with his Aryan associates." (Traverse, ECF No. 42 at PageID 859). Respondent argues that the admission of this evidence was not improper and does not rise to the level of a constitutional violation because "[e]vidence about meetings, gang relationships, and crimes committed by others was necessary to put Skatzes' actions into context and make them understandable to jurors as to why and how the inmates behaved and made decisions." (Return of Writ, ECF No. 31 at PageID 523).

"There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence ...." *Bugh v. Mitchell*, 329 F.3d 496, 512–13 (6th Cir. 2003) (citation modified). "While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, it has not explicitly addressed the issue in constitutional terms." *Id.* Because there is no Supreme Court decision holding that the admission of "other acts" evidence violates the Constitution, the state

court's conclusion that the evidence was admissible cannot be deemed "contrary to" Supreme Court precedent under 28 U.S.C. § 2254(d). *Id.* at 513.

Moreover, the Court finds that the trial court's admission of the "other bad acts" evidence was not so fundamentally unfair as to deprive Skatzes of due process. As noted by the Ohio Supreme Court, the disputed evidence was admissible for the purposes enunciated in Ohio Evid. R. 404(b).[34] The trial court instructed the jury not to use the "other bad acts" evidence to decide whether Skatzes was a bad person or likely to commit crimes. The jury was also instructed:

> If you find that the evidence of other acts are true and that the defendant committed them or was in complicity with those who did, you may consider the evidence only for the purpose of deciding whether it proves, one, the defendant's motive, opportunity, purpose, preparation, or plan to commit the offenses charged in this trial; and two, the knowledge of circumstances surrounding the offenses charged in this trial; three, the identity of the person or persons who committed the offenses in this trial. That evidence cannot be considered for any other purpose.

(ECF No. 74-13 at PageID 19856-57). The jury is presumed to have followed those instructions. *Bey v. Bagley*, 500 F.3d 514, 522 (6th Cir. 2007) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

For the above reasons, the Court finds that the admission of the "other acts evidence" did not deprive Skatzes of due process of law. The Ohio Supreme Court's same conclusion is neither contrary to nor an unreasonable application of federal law. The parts of Ground Fourteen concerning the murder of Albert Steano and the alleged threat against Kenneth Jenkins are procedurally defaulted and all of Ground Fourteen lacks merit.

---

[34] Because it was not presented (and thus procedurally defaulted in this federal habeas petition), the Supreme Court of Ohio did not address whether the admission of Jenkins' testimony about the threat was admissible. It did find that the admission of testimony about "other acts" at Mansfield Correctional Institution was harmless error. *Skatzes*, 104 Ohio St. 3d at 217 (copy at state court record, ECF No. 67-10 at PageID 6294). It is unclear whether the Supreme Court of Ohio would have extended that ruling to the alleged threat by Skatzes against Jenkins. In any event, this testimony, if not procedurally defaulted, does not rise to the level of a constitutional violation for the same reasons discussed above.

### *Ground Fifteen*

In Ground Fifteen, Skatzes alleges that his trial counsel was ineffective in the guilt phase for failing to object to the jury instructions on "conspiracy" and "principal offender" (addressed in Ground Twelve, *supra*), and failing to object to "other bad acts" evidence (addressed in Ground Fifteen, *supra*). (Petition, ECF No. 25 at PageID 324-328). Skatzes presented numerous claims of ineffective assistance of trial counsel to the Supreme Court of Ohio as Proposition No. 50. (Appellant's Brief, ECF No. 67-7 at PageID 5545-5586). The Supreme Court of Ohio dismissed the entire claim, including the sections now labeled as Ground Fifteen:

> {¶ 198} In proposition of law L, Skatzes refers to numerous instances where defense counsel failed to object or act effectively throughout trial. We will discuss each in turn.
>
> <div align="center">***</div>
>
> {¶ 206} Skatzes argues that counsel failed to object to jury instructions and other processes at trial. Skatzes cites nothing specific, however, and he admits that counsel did object to some instructions. Skatzes's bare assertions establish neither deficient performance nor prejudice.
>
> <div align="center">***</div>
>
> {¶ 214} Skatzes argues that counsel were ineffective in failing to object to irrelevant evidence concerning the bad acts of others. Much of this evidence was properly admitted because it was relevant to the roles of the various gangs in the riot, to Skatzes's leadership role, and to the manner in which the gangs wielded their power. This evidence helped prove the conspiracy that occurred over the course of takeover. Moreover, because much of this evidence did not implicate Skatzes in these other crimes, he was not prejudiced by its admission, nor were counsel ineffective in failing to object to it.
>
> {¶ 215} Skatzes complains that counsel were ineffective for not objecting to numerous instances of hearsay testimony by Sgt. Hudson and the inmates testifying on behalf of the state. As stated earlier, counsel were not ineffective in allowing Hudson to testify as a summary witness. Skatzes claims that it was plain error for the court to admit testimony about the killing or confinement of inmates disfavored by gang leaders, the attack on inmate Fryman, and a poem about the Aryan Brotherhood found in the cell of Aryan leader Freddie Snyder. Skatzes also complains of inmate opinions that Brookover was a snitch and what should be done with him and testimony by inmates Snodgrass, Hazlett, and Lomache that was never tied to Skatzes.

<div align="center">133</div>

{¶ 216} Given the lack of evidence tying Skatzes to some of the incidents in question, defense counsel, in the exercise of their professional judgment, may have decided that the testimony was harmless or even helpful. A decision to object could have drawn undue attention to the testimony. Moreover, objections "tend to disrupt the flow of a trial" and "are considered technical and bothersome." *State v. Campbell* (1994), 69 Ohio St.3d 38, 53, 630 N.E.2d 339. The decisions by defense counsel not to interrupt appear to reflect "an objective standard of reasonable representation." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. In any event, the outcome of Skatzes's trial would not have been different even if counsel had objected to the evidence cited by Skatzes. The jury could readily distinguish between evidence that put the takeover in context and evidence that related to the crimes charged against Skatzes.

\*\*\*

{¶ 224} We reject proposition of law L.

*Skatzes*, 104 Ohio St. 3d at 237–38.

Respondent contends that Ground Fifteen is procedurally defaulted. (Return of Writ, ECF No. 31 at PageID 468-469). Specifically, Respondent argues that Skatzes presented a different factual basis to the Supreme Court of Ohio. (*Id.*). Except for the two sub-parts that Skatzes concedes were not part of his appellate brief (Traverse, ECF No. 42 at PageID 870), the Court disagrees.

Skatzes contends in Ground Fifteen that his counsel failed to object to: (a) the "conspiracy" jury instruction, (b) the "principal offender" jury instruction, (c) testimony regarding the murder of Pop Svette, (d) testimony regarding the murder of Albert Steano, and (e) testimony regarding an alleged threat made by Skatzes against Kenneth Hazlett. (Petition, ECF No. 25 at PageID 324-28). Skatzes raised a non-specific claim in the section of his brief to the Ohio Supreme Court addressing Proposition of Law No. 50 that his counsel failed to object to jury instructions. (Appellant's Brief, ECF No. 67-7 at PageID 5555-56). The Ohio Supreme Court mentioned the vague nature of Skatzes' arguments, but did not decline to address the claim for lack of specificity, so the Court will consider (a) and (b) preserved for federal habeas review. Skatzes argued in his

134

brief in Proposition No. 50, Section "N," that his counsel failed to object to "testimony about the uncharged homicide of Pop Svette." (*Id.* at PageID 5566). Thus, (c) is exhausted.

Skatzes concedes that (d) and (e) were not included in his brief to the Ohio Supreme Court (ECF No. 42 at PageID 870), so those sub-parts of Ground Fifteen are procedurally defaulted. *Williams*, 380 F.3d at 967. Even if (d) and (e) were not procedurally defaulted, they would be dismissed for the same reasons as the rest of Ground Fifteen.

The underlying merits of sub-parts (a) and (b) were addressed in Ground Twelve. Recall, the Court found that Skatzes was not prejudiced by either jury instruction. The logical conclusion is that the jury followed the correct written instruction for "conspiracy" instead of the incorrect oral instruction because the oral instruction was senseless. The Court also found that Skatzes was not prejudiced by the "principal offender" jury instruction. While the Ohio Supreme Court found that the preferred instruction would have defined "principal offender" as "actual killer," Skatzes was not prejudiced because the evidence supported a conclusion that he was an actual killer of David Sommers. In Ground Fifteen, the Court addressed the underlying merits of sub-parts (c), (d) and (e) and concluded that Skatzes was not prejudiced by the admission of the testimony about the Svette and Steano murders, as well as the threat against Jenkins, because the testimony was relevant, and the jury was properly instructed on how to consider the evidence for a limited purpose.

To establish ineffective assistance of counsel, a habeas petitioner must show "that counsel's performance was deficient ... [and] that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. Skatzes cannot meet this standard. The Supreme Court reasonably determined that any error from the jury instructions was harmless. *Skatzes*, 104 Ohio St. 3d at 207.

Moreover, the Ohio Supreme Court determined that the "other acts" evidence was properly admitted into evidence under Ohio law. Counsel cannot be deemed deficient for failing to make a meritless argument or a futile objection. *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013); *United States v. Steverson*, 230 F.3d 221, 225 (6th Cir. 2000). The failure to raise a meritless claim does not constitute ineffective assistance of counsel. *Tackett v. Trierweiler*, 956 F.3d 358, 375 (6th Cir. 2020) (citing *Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008), *as amended* (July 7, 2008)).

For these reasons, Ground Fifteen, sub-parts (a), (b), and (c) are dismissed for lack of merit. Sub-parts (d) and (e) are procedurally defaulted and also lack merit.

### Ground Sixteen

In Ground Sixteen, Skatzes contends that his appellate counsel were ineffective. (Petition, ECF No. 25 at PageID 328-336). In Ohio, claims of ineffective assistance of appellate counsel are not cognizable in a post-conviction petition under Ohio Revised Code § 2953.21 and must be raised through an application to reopen the direct appeal under Ohio App. R. 26(B). *State v. Murnahan*, 63 Ohio St. 3d 60 (1992); *Hoffner*, 622 F.3d at 504 (6th Cir. 2010). Skatzes filed a Rule 26(B) application to reopen his appeal with the Second District Court of Appeals arguing that his direct appeal counsel were ineffective for failing to raise various assignments of error in his direct appeal. (ECF No. 67-11 at PageID 6399—ECF No. 68-3 at PageID 7391). The Second District denied the application. (ECF No. 68-3 at PageID 7399-407), holding in pertinent part:

> APPELLANT'S CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL WERE VIOLATED BY APPELLATE COUNSEL'S FAILURE TO RAISE PROSECUTOR MISCONDUCT IN IMPROPERLY ARGUING TO THE JURY THAT IT CONSIDER THE NON-STATUTORY AGGRAVATING FACTOR THAT WERE APPELLANT NOT SENTENCED TO DEATH HE WOULD RECEIVE NO PUNISHMENT AND GET A HUGE "FREEBEE" AND BY APPELLATE COUNSEL'S FAILURE TO RAISE TRIAL COUNSEL'S INEFFECTIVENESS IN FAILING TO OBJECT TO THIS MISCONDUCT

Skatzes claims that the prosecutor "goad[ed] jurors to impose a death sentence" by arguing that imposing a life sentence rather than death would give him a "freebee" in light of the life sentence he had already been serving at the time of the offense. In our view, the prosecutor's comment cannot be accurately described as "goading" and did not duly inflame the passions of the jury the comment was within the wide latitude afforded to a prosecutor in closing arguments. Moreover, even if we were to assume, arguendo, that this comment was improper, we would be wholly unpersuaded that it affected the outcome of the trial.

The first assignment of error does not warrant reopening.

APPELLANT'S CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED BY APPELLATE COUNSEL'S FAILURE TO RAISE TRIAL COUNSEL'S INEFFECTIVENESS ON A NUMBER OF OCCASIONS

Skatzes points to several instances of alleged ineffectiveness under this assignment of error, all of which relate to conduct of trial counsel that was not raised on appeal…Skatzes argues that counsel should have objected to errors in the jury instructions and to the admission of inmate testimony and evidence of other bad acts.

…We also fully examined the jury instructions, inmate testimony, and evidence of other bad acts on direct appeal. We addressed these issues on the merits, and Skatzes has provided us with no reason for considering them further on reopening.

***

Finally, Skatzes contends that trial counsel did not adequately address the views expressed by juror Carol Waaland during voir dire with respect to the Aryan Brotherhood. He claims that appellate counsel was ineffective in failing to pursue this issue.

Overall, the questioning of Waaland on voir dire showed her to be very open-minded. When questioned on her feelings about the Aryan Brotherhood, she did state that she could be fair if Skatzes' involvement in the Aryan Brotherhood "didn't have any direct bearing on what happened." However, viewed as a whole, Juror Waaland clearly indicated a willingness to withhold judgment and to be objective. We also note that, while Skatzes' involvement in the Aryan Brotherhood influenced his involvement with the riot, the views of the Aryan Brotherhood did not play a direct role in the crimes of which he was convicted.

All but one of Skatzes' victims were white. The one black victim was a corrections officer, and it was undisputed that Skatzes treated him well during the riot aside from the fact he was held against his will. For these reasons, appellate counsel was not ineffective in failing to assign as error trial counsel's failure to further explore Waaland's views on the Aryan Brotherhood.

(*Id.* at PageID 7400-04).

Skatzes filed a timely Notice of Appeal to the Ohio Supreme Court. (ECF No. 68-4 at PageID 7480-7491). Pursuant to a stipulated extension of time, Skatzes' merit brief was due on March 30, 2004 (ECF No. 68-4 at PageID 7502-7504), but was filed one day late, on March 31, 2004. (*Id.* at PageID 7505-7533). On April 6, 2004, the Ohio Supreme Court entered a *sua sponte* order striking Skatzes' brief as untimely in violation of S. Ct. Prac. R. XIV, Section 1(c) and dismissed the case. (ECF No. 68-5 at PageID 7645).

Skatzes moved for reconsideration (*Id.* at PageID 7685-93). He explained that his counsel hired a commercial copy company to prepare his brief and a commercial courier to deliver it to the Ohio Supreme Court. (*Id.* at PageID 7688-89). The copy company gave the brief to the courier too late for it to be timely delivered to the court on March 30, 2004. (*Id.).* The Ohio Supreme Court denied Skatzes' motion for reconsideration. (*Id.* at PageID 7684).

Skatzes alleges in Ground Sixteen that his appellate counsel was ineffective for failing to raise on direct appeal: prosecutorial misconduct for arguing during the penalty phase that imposing a life sentence rather than death would give him a "freebee," and subsequent ineffective assistance of trial counsel for failing to object, ineffective assistance of trial counsel for failing to challenge Juror Carol Waaland over her views on the Aryan Brotherhood, prosecutorial misconduct for prejudicial use of "other bad acts" evidence, ineffective assistance of trial counsel for failing to object to "other bad acts" evidence, and ineffective assistance of trial counsel for failing to object to jury instructions on "conspiracy." (Petition, ECF No. 25 at PageID 328-36). That said, Ground Sixteen is procedurally defaulted.[35]

---

[35]     It is not inappropriate for the Court to raise a procedural default defense *sua sponte. Smith v. State of Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 431–32 (6th Cir. 2006). Respondent raised procedural default as a defense,

Ohio S. Ct. Prac. R. XIV, Section 1(c) is an independent and adequate state ground, sufficient to bar federal habeas review. *Shorter v. Ohio Dep't of Rehab. & Corr.*, 180 F.3d 723 (6th Cir. 1999). The Ohio Supreme Court enforced this rule when it dismissed Skatzes' Rule 26(B) application for an untimely brief and later denied reconsideration. Ineffective assistance of counsel is unavailable for "cause and prejudice" because "a petitioner cannot claim constitutionally ineffective assistance of counsel" in proceedings in which "[t]here is no constitutional right to an attorney." *McClain v. Kelly*, 631 F. App'x 422, 429 (6th Cir. 2015) (citing *Coleman*, 501 U.S. at 752). "A Rule 26(B) application is a collateral challenge to which petitioners do not have the right to assistance of counsel." *Maples v. Stegall*, 340 F.3d 433, 438 (6th Cir. 2003)*; McClain*, 631 F. App'x at 429–30.

Nor can Skatzes successfully argue that the error of the commercial copy company constituted "'an objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule.'" *Coleman*, 501 U.S. at 753. In *Shorter*, the Sixth Circuit concluded that cause had not been demonstrated for failure to comply with Ohio S. Ct. Prac. R. XIV, Section 1(c) based on the tardiness of the Postal Service, since counsel could have hand-delivered the brief to the clerk of the Ohio Supreme Court himself. *Shorter*, 180 F.3d at 726.

In addition to the procedural default, the Court finds that Ground Sixteen lacks merit. The *Strickland* test applies to appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Burger v. Kemp*, 483 U.S. 776 (1987). To evaluate a claim of ineffective assistance of appellate counsel, the court must assess the strength of the claim that counsel failed to raise. *Henness v. Bagley*, 644 F.3d 308 (6th Cir. 2011) (citing *Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008), *as amended on*

---

but on different grounds (Return of Writ, ECF No. 31 at PageID 472-473) and Skatzes asserts his actual innocence as an excuse (Traverse, ECF No. 42 at PageID 880-881), the merits of which are addressed and denied in connection with his procedural and substantive claims.

*denial of reh'g and reh'g en banc* (Feb. 25, 2009)). Counsel's failure to raise an issue on appeal amounts to ineffective assistance only if a reasonable probability exists that inclusion of the issue would have changed the result of the appeal. *Id.* (citing *Wilson*)*.* The attorney need not advance every argument, regardless of merit. *Jones v. Barnes*, 463 U.S. 745, 751–752 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."). Effective appellate advocacy is rarely characterized by presenting every non-frivolous argument which can be made. *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003); *Williams v. Bagley*, 380 F.3d 932, 971 (6th Cir. 2004). *See Smith v. Murray*, 477 U.S. 527 (1986). "Only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of [appellate] counsel be overcome." *Dufresne v. Palmer*, 876 F.3d 248 (6th Cir. 2017) (quoting *Fautenberry v. Mitchell*, 515 F.3d 614, 642 (6th Cir. 2008)).

Skatzes' appellate counsel raised sixty-two assignments of error in a two-hundred eighteen-page brief on direct appeal. (Appellant's Brief, ECF No. 67-2 at PageID 3970-3988). The assignments of error encompassed a wide range of issues throughout both stages of the trial. The assignments of error challenged the sufficiency of the evidence and issues pertaining to co-conspirator testimony, which the state almost exclusively relied on to establish the elements of the three aggravated murders. These assignments of error, unquestionably, had a stronger chance of overcoming harmless error review than the omitted ones Skatzes mentions in Ground Sixteen.

Skatzes also fails to demonstrate that the omitted errors would have been successful on appeal. Indeed, on direct appeal the Ohio Supreme Court rejected Skatzes' argument that testimony about the uncharged murders was inadmissible and the jury instructions on conspiracy were prejudicial. (*See* Ground Twelve, Ground Fifteen, *supra*). When addressing his Rule 26(B)

application, the Second District Court of Appeals determined that the rest of the omitted errors were without merit. As the last reasoned decision, this Court is bound to defer to that conclusion.

Skatzes procedurally defaulted Ground Sixteen by failing to timely file his brief with the Ohio Supreme Court. Even if Ground Sixteen were properly before the Court it would be dismissed for lack of merit because the Second District Court of Appeal's application of *Strickland* was not unreasonable.

### Ground Seventeen

In Ground Seventeen, Skatzes contends his death sentence violates the 8th Amendment and the Due Process Clause because he suffers from "serious mental illness." (Petition, ECF No. 25 at PageID 336-338). Skatzes raised Ground Seventeen on direct appeal to the Ohio Supreme Court as Proposition of Law No. 40 (Appellant's Brief, ECF No. 67-10 at PageID 5644-53), which was dismissed:

> {¶ 180} In proposition of law LX, Skatzes contends that the record establishes that he may suffer from a serious mental illness. Skatzes asserts that we should extend the decision in *Atkins v. Virginia* (2002), 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335, prohibiting execution of mentally retarded persons, to those who suffer from serious mental illness. Nothing in the 6,000–plus pages of transcript and record establishes that Skatzes suffers from a serious mental illness. Skatzes has not presented any evidence bearing on his mental health. None of the assertions that Skatzes was "paranoid" or referred to as "Crazy George" create a genuine issue as to whether Skatzes has a mental illness that warrants consideration as part of his sentencing. We reject proposition of law LX.

*Skatzes*, 104 Ohio St. 3d at 229.

In support of Ground Seventeen, Skatzes relies on lay witness opinion about his mental state, Dr. Smalldon's diagnosis of depressive disorder and dementia, and Dr. Scharre's diagnosis of functional brain impairment. (Petition, ECF No. 25 at PageID 337-338). He also cites the United States Supreme Court opinions, *Atkins*, 536 U.S. at 335 and *Roper v. Simmons*, 543 U.S. 551

(2005), as authority for the proposition that his mental illness renders his death sentence a violation of the Constitution.

*Atkins* prohibits the execution of the intellectually disabled and *Simmons* prohibits the execution of juveniles. In *Franklin v. Bradshaw*, the Sixth Circuit noted, "no authorities have extended…*Atkins*, and *Simmons* to prohibit the execution of those with mental illnesses," *Franklin v. Bradshaw*, 695 F.3d 439, 455 (6th Cir. 2012). *See also Mundt v. Jenkins*, No. 2:17-CV-773, 2024 WL 1859867, at *39 (S.D. Ohio Apr. 29, 2024) ("the Supreme Court has not ruled on the proposition that execution of the severely mentally ill violates the Eighth Amendment."). Skatzes acknowledges, "no case law currently stands for the proposition that the execution of a mentally ill individual violates the Eighth Amendment," but argues that the existing authority should be extended to him because "the trajectory of Eighth Amendment jurisprudence and societal developments support such a finding." (Traverse, ECF No. 42 at PageID 895).

"It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by the Supreme Court." *Harrington*, 562 U.S. at 101. Perhaps, in the appropriate posture, arguments against executing the seriously mentally ill will someday prevail. But this Court sitting in federal habeas review is bound by the limitations of AEDPA, which requires deference to the Ohio Supreme Court's reasonable decision, which declined to extend *Atkins* to Skatzes and concluded that the record fails to substantiate Skatzes' claim of mental illness.

For these reasons, Ground Seventeen is dismissed for lack of merit.

## CONCLUSION

Having found no error entitling Skatzes to habeas corpus relief, his Petition for a writ of habeas corpus must be dismissed with prejudice.   The Clerk will enter judgment accordingly.

## CERTIFICATE OF APPEALABILITY

A certificate of appealability may issue only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). When a habeas corpus petition is denied on procedural grounds, the petitioner must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Skatzes has failed to meet this standard and the Court will not enter a certificate of appealability.

December 10, 2025.

s/ *Michael R. Merz*
United States Magistrate Judge